Page 1

[1]        IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
[2]                    DALLAS DIVISION
[3]
  CLINTON CALHOUN III,                    )
[4]
      Plaintiff,                          )
[5]                                       )  CIVIL ACTION
  VS.                                     )  NO. 3:07-CV-0031-R
[6]
  AMERIQUEST MORTGAGE COMPANY,   )
[7]
      Defendant.                          )
[8]
[9]
[10]
[11]        ORAL DEPOSITION OF
[12]        CLINTON CALHOUN III
[13]          November 7, 2007
[14]
[15]
[16]  ORAL DEPOSITION of CLINTON CALHOUN III, taken at
[17]  the instance of the Defendant on the 7th day of
[18]  November, A.D., 2007, in the above styled and numbered
[19]  cause at the offices of Jeanette Johnson & Associates,
[20]  2601 Welborn Street, in the City of Dallas, County of
[21]  Dallas and State of Texas before Vicki L. Peterson,
[22]  RPR, a Certified Shorthand Reporter in and for the
[23]  State of Texas, pursuant to the Federal Rules of Civil
[24]  Procedure and the provisions stated on the record.
[25]    Pursuant to information made a part of the

Page 2

[1]  record at the time said testimony was taken, the
[2]  following includes all parties present.
[3]
[4]
[5]              APPEARANCES
[6]
[7]
    APPEARING FOR PLAINTIFF:
[8]
      Ms. Jeanette Johnson
[9]   JEANETTE JOHNSON & ASSOCIATES
      2601 Welborn Street
[10]  Dallas, Texas  75219
[11]
[12]  APPEARING FOR DEFENDANT:
[13]   Ms. Karen E. Sprole
      DIAMOND, McCARTHY, TAYLOR, FINLEY & LEE, L.L.P.
[14]   3400 Renaissance Tower
      1201 Elm Street
[15]  Dallas, Texas  75270
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]  CLINTON CALHOUN III,
[2]  having been first duly sworn, testified as follows:
[3]                  EXAMINATION
[4]                BY MS. SPROLE:
[5]      Q: Would you please state your name for the
[6]  record?
[7]      A: Clinton Calhoun III.
[8]      Q: Is that your full name?
[9]      A: Correct.
[10]      Q: Do you have a middle name?
[11]      A: No, ma'am.
[12]      Q: No middle initial, no —
[13]      A: No.
[14]      Q: Okay. What's your date of birth, Mr. Calhoun?
[15]      A: 5-17-62.
[16]      Q: How old are you now?
[17]      A: 45.
[18]      Q: Have you given a deposition before?
[19]      A: No.
[20]      Q: This is your first one?
[21]      A: Correct.
[22]      Q: Okay. Well, as your attorney probably
[23]  explained to you, we have a court reporter here who is
[24]  taking down every word that you say, and so it will
[25]  help her if we don't talk over each other. So let me

Page 4

[1]  finish my question before you start giving your answer.
[2]      If you don't understand my question, let
[3]  me know. If you don't — if you don't ask for a
[4]  clarification to my question, I'll assume that you
[5]  understood my question. And you need to answer out
[6]  loud, so don't shake your head yes or no because the
[7]  court reporter can't get that down.
[8]      You have now been sworn, so everything
[9]  that you say at this deposition today is under oath and
[10]  it has the same — the same veracity as you would if
[11]  you were in a court of law testifying before a judge
[12]  and jury. Do you understand that?
[13]      A: Yes, ma'am.
[14]      Q: Okay. And if you need to take a break or
[15]  anything, you let me know and we can take a break at an
[16]  appropriate point, okay?
[17]      A: Yes.
[18]      Q: Where are you working now?
[19]      A: I am not working at the time.
[20]      Q: Where — you were working at Countrywide; is
[21]  that right?
[22]      A: Yes.
[23]      Q: And you left there and then you went someplace
[24]  else?
[25]      A: That's correct.

Page 17

[1] actually started with Ameriquest.

[2] **Q:** Okay.

[3] **A:** So I wasn't working simultaneously.

[4] **Q:** At any point in time, were you working at both
[5] Nissan and at Ameriquest?

[6] **A:** Yeah. As I recalled prior —

[7] **Q:** On the weekends.

[8] **A:** I was working on the weekends.

[9] **Q:** So did you disclose that to Ameriquest?

[10] **A:** To the best of my knowledge, no.

[11] **Q:** And how long did you continue working on the
[12] weekends at Nissan after you were employed by
[13] Ameriquest?

[14] **A:** It may have been four to six weeks,
[15] approximately. I'm not sure of the time.

[16] **Q:** And did you — why did you stop working at
[17] Nissan eventually?

[18] **A:** To dedicate myself full time to Ameriquest.

[19] **Q:** Okay. On your employment application to
[20] Ameriquest, you say that your reason for leaving Nissan
[21] is an "increase in salary"?

[22] **A:** Uh-huh.

[23] **Q:** Do you see where it says that?

[24] **A:** Uh-huh.

[25] **Q:** What did you mean by that?

Page 18

[1] **A:** I was advised by the individual who gave me
[2] information about the position — at the time I was
[3] making six figures at Nissan, and he indicated I could
[4] make even more there. He showed me proof, so that was
[5] part of the reason why I left as well.

[6] **Q:** Now, on your application you say your ending
[7] salary at Nissan was 97,000. Were you — were you
[8] actually making more than that?

[9] **A:** That's approximately the amount in terms of —
[10] I worked there three and a half years. If you
[11] calculate my average pay, it's probably over six
[12] figures.

[13] **Q:** Do you remember what your starting salary was
[14] at Ameriquest?

[15] **A:** Base pay was 24,000 plus commission.

[16] **Q:** Okay. And do you remember approximately how
[17] much you made in 2004 at Ameriquest?

[18] **A:** From the time that I started, approximately
[19] April to December, I would probably say it may have
[20] been an average of over 10 to 12 thousand in terms of
[21] average.

[22] **Q:** A month, you mean?

[23] **A:** Correct.

[24] **Q:** So that would be about — well, let me just
[25] show you what's been marked as — this is actually

Page 19

[1] Exhibit No. 3, which is a letter that you received from
[2] Ameriquest confirming your employment. And I'm really
[3] just showing this to you so that you can have a
[4] recollection as to what — when you started at
[5] Ameriquest. It says your start date will be on or
[6] about June 6th of 2004. Does that sound about right to
[7] you?

[8] **A:** No, I don't think so. I believe I've got
[9] hired at the end of April, started the beginning of May
[10] of — no, this is '04 instead of '06.

[11] **Q:** '04. Right.

[12] **A:** Oh, okay.

[13] **Q:** June 6 of '04.

[14] **A:** Yeah, I'm thinking —

[15] **Q:** If I misspoke, I apologize.

[16] **A:** — it might have been early May.

[17] **Q:** Okay. Well, take a look back at your
[18] employment application, and if you look at the top
[19] right, it's dated May 17th of '04.

[20] **A:** I see a date of April 28th of '06.

[21] **Q:** No. Look at the — look at the part that you
[22] filled out. There's your name. It's like right around
[23] there. Let me see.

[24] **A:** I don't have anything there.

[25] **Q:** Do you see the line that has your name on it

Page 20

[1] and then it has the date?

[2] **A:** Yes. May 17th of '06.

[3] **Q:** Right. And then if you look at the very
[4] last — let me see — the second to the last page, you
[5] signed it on May 17th — oh, that's —

[6] **A:** That's my birth date.

[7] **Q:** That's your birth date. But that is actually
[8] supposed to be the day that you were signing it, which
[9] they're both — you know, that happens on birthdays.
[10] You know what I mean? You start writing the date and
[11] then you put in your birthday year instead of the
[12] actual year that it is, because you're supposed to be
[13] putting the date that you are signing it, and so you
[14] wrote "May 17th, 1962," —

[15] **A:** Yes, ma'am.

[16] **Q:** — which obviously is not the date you signed
[17] it. But does this help refresh your recollection as to
[18] when it was that you applied to work at Ameriquest and
[19] when you started?

[20] **A:** Yes, ma'am, based on this top date of 5-17-04,
[21] but there were a couple of dates at the top as well. I
[22] don't know.

[23] **Q:** Okay. And it's not really a big deal. I was
[24] just trying to get a general sense for when you started
[25] at Ameriquest and then what your earnings were that

Page 21

[1] first year.

[2]    Is your e-mail address still

[3] slickclintcool3@hotmail.com?

[4]    A: That's one of my e-mails.

[5]    Q: Let me show you what's been marked as Exhibit

[6] No. 2.

[7]    MS. JOHNSON: Exhibit No. 2?

[8]    Q: (BY MS. SPROLE) Have you seen this e-mail

[9] before, Mr. Calhoun?

[10]    MS. JOHNSON: Excuse me. Have we marked

[11] these other exhibits? Because this is Exhibit No. 3, I

[12] think.

[13]    MS. SPROLE: No, it's No. 2 because I had

[14] previously marked them. When I gave — if you look at

[15] his, when I gave it to him, I had shown him what had

[16] been marked as Exhibit No. 3 was his application — I

[17] mean, was his letter from Ameriquest.

[18]    Q: (BY MS. SPROLE) Have you seen this e-mail

[19] before, Mr. Calhoun?

[20]    A: Yes, I believe it's in the information. It

[21] looks familiar.

[22]    Q: Did you see it during the time that you were

[23] working at Ameriquest?

[24]    A: I don't recall seeing it at that time.

[25]    Q: Okay. Did you see it in preparation for your

Page 22

[1] deposition today or in connection with this lawsuit?

[2] Because we produced this document.

[3]    A: Okay. Yes.

[4]    Q: Okay. What did you do to prepare for your

[5] deposition today?

[6]    A: Basically talked with my attorney.

[7]    Q: Sure.

[8]    A: And basically watched a maybe 15 minute CD.

[9]    Q: Is it on like how to give a deposition or what

[10] to expect sort of thing?

[11]    A: Yes, ma'am.

[12]    Q: Did it have some really bad acting in it?

[13]    A: I didn't —

[14]    Q: That's what I usually show my witnesses. It's

[15] like from the early '80s and it's pretty bad, but it

[16] gets the point across.

[17]    A: Yes, ma'am.

[18]    Q: Okay. Did you review any documents?

[19]    A: Yes, ma'am.

[20]    Q: Did you review the documents that you produced

[21] to Ameriquest in this case?

[22]    A: Yes.

[23]    Q: Did you review the documents that Ameriquest

[24] produced to you in this case? Do you know?

[25]    A: Well, I reviewed some documents. I didn't —

Page 23

[1] I don't know if it was — which documents, but it was

[2] several documents.

[3]    Q: Okay. Have you given to your attorney all of

[4] the documents that you have that you believe are

[5] relevant to your claims in this case?

[6]    A: To the best of my knowledge.

[7]    Q: Now, is it true that you had credit issues in

[8] the past?

[9]    A: Everybody has credit issues.

[10]    Q: Well, is it true that you had credit issues?

[11]    A: Yes, ma'am.

[12]    Q: Did you file for bankruptcy previously?

[13]    A: Yes, ma'am.

[14]    Q: Was it in connection with a divorce or

[15] something?

[16]    A: That's correct.

[17]    Q: How many times have you been divorced?

[18]    A: Twice.

[19]    Q: Am I correct you have eight children?

[20]    A: Nine.

[21]    Q: You have nine. Well, at the time you signed

[22] your affidavit I guess you had eight.

[23]    A: Correct.

[24]    Q: So you had another one in the last couple of

[25] years, huh?

Page 24

[1]    A: That's correct.

[2]    Q: Wow. I have one and he keeps me busy, so I

[3] don't know how you do it.

[4]    How old is your oldest child?

[5]    A: She is 27.

[6]    Q: And just run through the ages of your children

[7] for me, if you wouldn't mind.

[8]    A: Sure. 27, —

[9]    Q: It's a test.

[10]    A: — 26.

[11]    Q: Sorry. 27 is one and 26 is the other, or do

[12] you have two who are 27?

[13]    A: No, the oldest is 26. The next oldest — I

[14] mean, the oldest is 27. The next oldest is 26. The

[15] next oldest is 24. The next oldest 23. The next

[16] oldest is 19, 18, six — no, I missed one. 13, —

[17]    Q: Okay.

[18]    A: — six, and then one year. Is that eight?

[19]    Q: That's nine. But you told me you had nine, so

[20] that's right.

[21]    A: And that's what I was going to say. I've got

[22] them all.

[23]    Q: I don't really want to get into this, but are

[24] you currently married?

[25]    A: No, ma'am.

Page 25

[1]   Q: Okay. And what is — I don't think I asked
[2] you what your address is.
[3]   A: Currently, 5159 Finnhorse Drive, Grand
[4] Prairie, Texas of course, 75052.
[5]   Q: Okay. And just running through your
[6] employment history, after you left Ameriquest, you then
[7] went to Countrywide; is that right?
[8]   A: That's —
[9]   Q: Was that your next place of employment?
[10]   A: Yes, ma'am.
[11]   Q: And when did you start at Countrywide?
[12]   A: Around June of '06.
[13]   Q: About two months after you were fired from
[14] Ameriquest?
[15]   A: That's correct.
[16]   Q: And so then you were at Countrywide for how
[17] long?
[18]   A: Approximately until October.
[19]   Q: When you went to First NLC Mortgage?
[20]   A: Yes, ma'am.
[21]   Q: What were you doing at Countrywide?
[22]   A: Loan officer.
[23]   Q: Is that something similar to mortgage
[24] specialist?
[25]   A: Correct. Really they're the same.

Page 26

[1]   Q: Okay. And were you in the subprime mortgages
[2] or prime mortgages or —
[3]   A: Did it all.
[4]   Q: Both?
[5]   A: Prime and subprime.
[6]   Q: So it took you about two months to get a job
[7] after Ameriquest?
[8]   A: Not really. That was just my start date.
[9]   Q: Okay. When did you receive your offer to
[10] start?
[11]   A: It was probably the prior month.
[12]   Q: May, approximately, of '06?
[13]   A: Yes.
[14]   Q: Do you know how much money you made in those
[15] three or four months that you were at Countrywide?
[16]   A: Not exactly, but if I was to put an average
[17] number to compensation for those several months, it
[18] would probably calculate around six, seven thousand a
[19] month. And I'm not sure on that.
[20]   Q: Okay. Why did you leave Countrywide?
[21]   A: I took a position as branch manager at First
[22] NLC Mortgage.
[23]   Q: Did you consider that to be a promotion?
[24]   A: From the job I had?
[25]   Q: Right. From — sorry, go ahead.

Page 27

[1]   A: Most definitely.
[2]   Q: And did you start immediately at NLC?
[3]   A: Yes. Once I left Countrywide, I started
[4] immediately with First NLC.
[5]   Q: You're aware, aren't you, Mr. Calhoun, that in
[6] the beginning of May of 2006 that Ameriquest closed all
[7] of its retail branches?
[8]   A: Yes, ma'am.
[9]   Q: And that it laid off almost 4,000 employees?
[10]   A: I don't know how many employees.
[11]   Q: Okay. Are you aware that a lot of employees
[12] got laid off when all of the retail branches were
[13] closed?
[14]   A: Yes, ma'am.
[15]   Q: And that was about three weeks after your
[16] termination from Ameriquest, right?
[17]   A: You mean of their layoff?
[18]   Q: Right.
[19]   A: I mean, I don't know exactly when it happened,
[20] so — but I'm sure it was right in that area or time
[21] frame.
[22]   Q: Do you stay in touch with any of your former
[23] colleagues from Ameriquest?
[24]   A: Not in terms of — the last time I spoke with
[25] anyone, it's been a while.

Page 28

[1]   Q: Okay. Who was the last person you spoke to
[2] from Ameriquest?
[3]   A: Probably a gentleman by the name of Corey.
[4]   Q: Do you remember his last name?
[5]   A: I believe it's Wortham, Corey Wortham. He
[6] used to be an employee there, and he's probably the
[7] last one I talked to.
[8]   Q: Okay. Was he still employed at the time you
[9] left Ameriquest?
[10]   A: No, ma'am.
[11]   Q: Did you talk to him about testifying for you
[12] in this case?
[13]   A: No, ma'am.
[14]   Q: Does he know anything about this lawsuit?
[15]   A: I think he may have heard that there was a
[16] pending lawsuit.
[17]   Q: Who else have you spoken to from Ameriquest
[18] since you stopped working there?
[19]   A: Oh, several individuals since the time I
[20] stopped working there in terms — you want me to try to
[21] name them?
[22]   Q: Sure.
[23]   A: Joe Garrett. He was the — he was my area
[24] manager at the time that I was — or during part of
[25] that point in time. Anthony Haap.

Page 29

[1]   Q: Anthony Haap used to be the branch manager in
[2] Plano, right?
[3]   A: Yes, at one time. Karl Kuhn, Mark Bednar.
[4]   Q: When was the last time you spoke with Karl
[5] Kuhn?
[6]   A: It was right — probably during the month or
[7] so after I left.
[8]   Q: Okay.
[9]   A: Back then. I take that back. In fact, it
[10] might have been before I left. I'm not sure, but in
[11] that time frame.
[12]   Q: Okay.
[13]   A: Lidell Stevenson. He was an employee there as
[14] well.
[15]   Q: Within the last six months, have you spoken to
[16] anybody who used to work at Ameriquest with you?
[17]   A: In the last six months, probably just Corey.
[18]   Q: Okay. And you're just friends with him?
[19]   A: Yeah, we're sort of friends.
[20]   Q: You're just like social —
[21]   A: We don't associate. When I say we don't
[22] associate, we don't go out or anything like that. Once
[23] in a while, he'll call me or I'll call him, "Hey, how
[24] you doing?" That's pretty much it.
[25]   Q: Okay. Let me show you what's been marked as

Page 30

[1] Exhibit No. 4. Is this a document you completed at
[2] Ameriquest?
[3]   A: Yes, ma'am.
[4]   Q: Where you are enrolling in benefits provided
[5] by Ameriquest; is that right?
[6]   A: Yes, ma'am.
[7]   Q: And I had really just copied this to go over
[8] the dates of your children's births. Are there any
[9] other children of yours who you enrolled in the
[10] Ameriquest benefits that are not listed on this form?
[11]   A: No, ma'am. Everyone else is over the age of
[12] 18.
[13]   Q: Okay.
[14]   A: Except Candice. She was in college. Candice
[15] and Abby Gail, so —
[16]   Q: And I saw some documents that you had provided
[17] to Ameriquest showing that she was enrolled in college.
[18] I assume they required you to prove that she was in
[19] college to be eligible for benefits.
[20]   A: That's correct.
[21]   Q: Now, when you started working at Ameriquest in
[22] June of 2004, you were a mortgage specialist, right?
[23]   A: Yes, ma'am.
[24]   Q: I think it had a couple of different titles.
[25] It was an account executive for a while, and then it

Page 31

[1] was a mortgage specialist.
[2]   Let me just show you what's been marked
[3] as Exhibit No. 5, which is a job description for
[4] mortgage specialist. Did you see this document while
[5] you were employed at Ameriquest, to the best of your
[6] recollection?
[7]   A: I believe so.
[8]   Q: Okay. Does it generally describe the job
[9] requirements of a mortgage specialist's job?
[10]   A: If this document does?
[11]   Q: Uh-huh. Go ahead and take a look at it.
[12]   A: Yes, I would say it does.
[13]   Q: Okay. And if you could turn to page 2 of the
[14] document, please. Do you see the section there at the
[15] bottom that says "Confidential Data"?
[16]   A: Yes, ma'am.
[17]   Q: And it talks about how it's important to keep
[18] customer information confidential. Do you see where it
[19] says that?
[20]   A: That's correct.
[21]   Q: And do you agree that that was part of the
[22] requirement of your job was to keep customer loan
[23] information confidential?
[24]   A: Yes, ma'am.
[25]   Q: So when a customer applies for a loan, they

Page 32

[1] give you probably their Social Security number; is that
[2] right?
[3]   A: Amongst other things.
[4]   Q: Right. And their — information related to
[5] their salary, their income, that sort of thing?
[6]   A: Yes, ma'am.
[7]   Q: Things that people consider to be
[8] confidential, right?
[9]   A: That's correct.
[10]   Q: Let me show you what's been marked as Exhibit
[11] No. 6, and this is just a personnel action notice that
[12] shows that as of June 6 of 2004, which is when you were
[13] hired, you were an account executive and then
[14] essentially the position title changed to mortgage
[15] specialist on February 1st of '05. Does that sound
[16] about right to you?
[17]   A: That's about right.
[18]   Q: Okay. And if you look in the "Remarks"
[19] section, it says, "Companywide title change of the" —
[20] excuse me, "of the account executive position to
[21] mortgage specialist."
[22]   A: Yes, ma'am.
[23]   Q: Okay. Did your job duties change when your
[24] title changed from account executive to mortgage
[25] specialist?

Page 33

[1] **A:** No, ma'am.

[2] **Q:** Now, you were over 40 when Ameriquest hired

[3] you, weren't you?

[4] **A:** That's correct.

[5] **Q:** And what was it, about a year after you

[6] started at Ameriquest you were promoted to branch

[7] manager, weren't you?

[8] **A:** That's correct.

[9] **Q:** And let me just make sure I have this right.

[10] When you started at Ameriquest, you were working in the

[11] Plano branch; is that right?

[12] **A:** That's correct.

[13] **Q:** Could you just explain briefly for the jury

[14] what a mortgage specialist does?

[15] **A:** Just in brief description, initiates loan

[16] applications, analyze products, refinance new and

[17] previous mortgages.

[18] **Q:** And at the time you were working there, were

[19] you cold calling customers or were customers coming

[20] into the branch to sign up for loans or how did you

[21] generate most of your customer base?

[22] **A:** Well, all of those three happened. The

[23] majority was in-and-out calls.

[24] **Q:** What does that mean?

[25] **A:** That you were actually calling leads that were

Page 34

[1] provided by the company.

[2] **Q:** Okay. So that the company identified your

[3] potential customer contacts for you, then?

[4] **A:** Some, yes.

[5] **Q:** And so your job was essentially as a salesman,

[6] right, so trying to get these customers to sign up for

[7] a mortgage with Ameriquest?

[8] **A:** I don't like to classify it as "salesman," but

[9] sort of an advisor is what I would call it.

[10] **Q:** Okay. And I thought that you had actually

[11] described yourself as having been in sales, so —

[12] **A:** The category is sales, —

[13] **Q:** Uh-huh.

[14] **A:** — but that position in terms of dealing with

[15] customers, I'm — to me is more of an advisor, but the

[16] category is sales, if that makes sense.

[17] **Q:** A little bit. And so did you earn a

[18] commission, then, on every mortgage that you signed

[19] essentially?

[20] **A:** Well, you're supposed to.

[21] **Q:** Okay.

[22] **A:** But it could be at a time where you can do a

[23] sale and not be paid any commission on it based on that

[24] sale.

[25] **Q:** How come?

Page 35

[1] **A:** The way you have actually sold the loan.

[2] **Q:** What does that mean?

[3] **A:** Meaning that normally your loan is sold at a

[4] certain rate, a certain payment based on that loan

[5] amount. And the way that's sold, usually it is a

[6] commission, but if it's sold at a lower rate or if it's

[7] some type of — what we call a deduction that has to be

[8] done to the loan, it could possibly generate you to

[9] have no commission.

[10] **Q:** I see. So it would kind of depend on the

[11] terms of the loan.

[12] **A:** Absolutely.

[13] **Q:** All right. But, nonetheless, in 2004 up to

[14] about the middle of 2005 or so things were pretty good

[15] at Ameriquest financially, weren't they? I mean,

[16] people were making a lot of money?

[17] **A:** I wouldn't say many. You did have several

[18] that were.

[19] **Q:** There were some branch managers that were

[20] making just what I would consider to be sort of

[21] astronomical sums. Weren't some branch managers making

[22] over $200,000 a year?

[23] **A:** Yes, some.

[24] **Q:** And were those branch managers compensated

[25] based on what the people in their branch were

Page 36

[1] generating?

[2] **A:** Well, from the time that I started, the pay

[3] did change quite often. At the time that I started, of

[4] course, I was a loan officer, mortgage specialist,

[5] account executive. So I don't have all the details of

[6] what the branch manager was getting paid at that time,

[7] but as I became a branch manager, it was changed

[8] significantly from the time that I started.

[9] **Q:** In terms of how the compensation was

[10] calculated?

[11] **A:** That is correct.

[12] **Q:** Well, then in approximately May of

[13] 2005 — that's what we were talking about a few minutes

[14] ago — you were then promoted to branch manager, right?

[15] I'm showing you what's been marked as Exhibit No. 7.

[16] **A:** Yes, ma'am.

[17] **Q:** Does that sound right to you?

[18] **A:** That's correct.

[19] **Q:** Who made the decision to promote you to branch

[20] manager?

[21] **A:** As far as I know, part of that came from my

[22] branch manager, who was actually gone when I've got

[23] promoted. His name was Harsha Galegwaea. Sorry on the

[24] pronunciation. But my area manager was the ultimate, I

[25] think, decision maker in that, who was Joe Garrett.

---

Page 41

[1]   A: Approximately seven. I can name them. You
[2] had Plano, Galleria, Dallas, South Dallas, Irving,
[3] Hurst, Arlington. I think that's it. I think it's
[4] approximately seven.
[5]   Q: What about East Dallas? Was that within this
[6] area?
[7]   A: I named them.
[8]   Q: You said Dallas and South Dallas.
[9]   A: Dallas is considered East Dallas. You got —
[10] I said Galleria, —
[11]   Q: Right.
[12]   A: — Dallas, which is East Dallas, —
[13]   Q: Is that East Dallas? Okay.
[14]   A: — and then South Dallas.
[15]   Q: Who was the branch manager in 2005 over the
[16] Dallas branch?
[17]   A: Or East Dallas?
[18]   Q: Right.
[19]   A: I believe it was Daniel Munoz.
[20]   Q: And maybe I'm not understanding. Dallas and
[21] East Dallas are the same, you're saying?
[22]   A: Yeah. I'm categorizing Dallas as "East
[23] Dallas," because you have got another Dallas branch,
[24] but they called that the Galleria.
[25]   Q: Okay. Who had been the branch manager in

Page 42

[1] South Dallas before you were promoted to that position?
[2]   A: If I can recall, it was a young lady that was
[3] not there anymore. When I took over the branch, there
[4] was no one there. I didn't know her, but I was told it
[5] was a young lady that had left the company.
[6]   Q: Approximately how many mortgage specialists
[7] worked for you, then, once you became the branch
[8] manager?
[9]   A: Initially, I believe it was approximately 18
[10] to 20.
[11]   Q: And this was in May — the end of May of 2005?
[12]   A: Yes, ma'am.
[13]   Q: And you got a pay raise when you became the
[14] branch manager, didn't you?
[15]   A: Not really. When I say "not really" — well,
[16] officially, yes, but prior to actually taking over that
[17] position, I was actually working in that position, if
[18] that makes sense.
[19]   Q: No. Could you explain, please?
[20]   A: I — let's say I was the acting branch manager
[21] prior to taking over the branch.
[22]   Q: Okay. You were the acting branch manager of
[23] what branch?
[24]   A: South Dallas.
[25]   Q: Before —

Page 43

[1]   A: Before I officially took over the branch, for
[2] approximately two and a half to three weeks. So I was
[3] acting as a branch manager. I wasn't getting paid. I
[4] was still getting paid as a loan officer. And then I
[5] took over as branch manager probably approximately
[6] three weeks after that.
[7]   Q: Okay.
[8]   A: Almost a month after that.
[9]   Q: Because if you look at what's been marked as
[10] Exhibit 7 it says that your new pay rate is $36,000
[11] effective May 27th of '05. And I know you had a
[12] commission too, but I'm just talking about your base
[13] salary for right now. So you had been making 24 or 26
[14] thousand?
[15]   A: Uh-huh.
[16]   Q: And then when you became the branch manager,
[17] you started making 36,000. Is that —
[18]   A: Base.
[19]   Q: Base. Is that approximately right?
[20]   A: Yes, ma'am.
[21]   Q: Plus commission, of course.
[22]   A: Correct.
[23]   Q: Let me show you what's been marked as Exhibit
[24] No. 8. This is just your personnel action notice that
[25] shows that you have been promoted from mortgage

Page 44

[1] specialist to branch manager with an annualized salary
[2] of $36,000. Do you see where it says that?
[3]   A: Yes, ma'am.
[4]   Q: And that sounds right to you as to what
[5] happened at this time?
[6]   A: Yes, ma'am.
[7]   Q: Do you see in the "Remarks" section it says,
[8] "Please pay 3 month guarantee," toward the bottom of
[9] the page?
[10]   A: Yes, ma'am.
[11]   Q: What does that mean?
[12]   A: Well, when you initially started as a branch
[13] manager at that time, they took your last three months'
[14] salary as a loan officer or mortgage specialist and
[15] made that your guarantee for the first three months.
[16]   Q: Why did they do that? Do you know?
[17]   A: That was policy.
[18]   Q: Was it to make sure you got fair pay for the
[19] first three months you were a branch manager, or what
[20] was the purpose of calculating it that way, if you
[21] know?
[22]   A: I don't exactly know.
[23]   Q: Okay. And then let me show you what's been
[24] marked as Exhibit No. 9, which is another personnel
[25] action notice which shows that in October of 2005 you

---

Page 53

[1] **Q:** And did he hand-deliver this letter to you,

[2] then, on November 17th —

[3] **A:** Yes, ma'am.

[4] **Q:** — or thereabouts?

[5] **A:** Thereabouts.

[6] **Q:** Had you — had you heard rumors that this was

[7] going to happen, or was this a surprise?

[8] **A:** It was a surprise.

[9] **Q:** Unpleasant surprise, I assume.

[10] **A:** Absolutely.

[11] **Q:** Now, of the 18 or so people in your branch,

[12] how many of them lost their jobs in connection with

[13] this reduction?

[14] **A:** Well, not knowing, I would estimate

[15] approximately half.

[16] **Q:** And what happened to the remaining mortgage

[17] specialists in your branch? Where did they go?

[18] **A:** To the other branches.

[19] **Q:** Okay. Did any of them stay in the South

[20] Dallas branch?

[21] **A:** No, ma'am.

[22] **Q:** And you're aware, aren't you, Mr. Calhoun,

[23] that a whole lot of branch managers lost their jobs in

[24] connection with this reorganization?

[25] **A:** No. I was thinking it was more the loan

Page 54

[1] officers.

[2] **Q:** Okay. Are you aware of any branch managers

[3] who lost their jobs in connection with this

[4] reorganization?

[5] **A:** As a branch manager?

[6] **Q:** Right.

[7] **A:** Yes.

[8] **Q:** Okay. So you —

[9] **A:** So they didn't lose their job with the

[10] company, but I know some branch managers that were in

[11] the same situation I am.

[12] **Q:** Essentially what happened is through no fault

[13] of your own you were demoted from a branch manager back

[14] to a mortgage specialist, right?

[15] **A:** That's correct.

[16] **Q:** And there were other Ameriquest branch

[17] managers who at the same time were also demoted down to

[18] mortgage specialists, right?

[19] **A:** That's correct.

[20] **Q:** Did you think that this demotion was tied in

[21] any way to your race?

[22] **A:** Let me think about that question. You're

[23] saying the reduction in force?

[24] **Q:** Right.

[25] **A:** At the time that it happened, I would say no.

Page 55

[1] **Q:** Did you think it was because of your age?

[2] **A:** Here again, at that time, I would say no.

[3] **Q:** And you're qualifying your answer, so as you

[4] sit here now do you think it was — the decision was

[5] made because of your race?

[6] **A:** The demotion?

[7] **Q:** Right.

[8] **A:** I don't know. I think that's a great

[9] question. I don't know.

[10] **Q:** As you sit here now, do you think it was

[11] because of your age?

[12] **MS. JOHNSON:** Object to these questions

[13] because we requested documents on this, and you have

[14] not provided them, for him to make an assessment of the

[15] others that have been impacted.

[16] **Q:** (BY MS. SPROLE) You can answer the question.

[17] **A:** Can you repeat the question?

[18] **Q:** Yes. Did you think that your demotion from

[19] branch manager to mortgage specialist at the time of

[20] the reduction in force was based on your age?

[21] **MS. JOHNSON:** Again, I renew my

[22] objection, calls for speculation without you providing

[23] us the documents.

[24] **Q:** (BY MS. SPROLE) I'm asking you what you

[25] think, Mr. Calhoun.

Page 56

[1] **A:** I'm not sure because the whole situation was

[2] just so ironic, so to answer the question, I'm not

[3] sure.

[4] **Q:** Okay. Were there other African-American

[5] mortgage specialists who worked in the South Dallas

[6] branch?

[7] **A:** As a branch — as a loan officer?

[8] **Q:** Right.

[9] **A:** Yes.

[10] **Q:** Did any of them lose their jobs entirely?

[11] **A:** Yes.

[12] **Q:** And were any of them allowed to keep their

[13] jobs at Ameriquest after this reduction?

[14] **A:** African-Americans that I know of, no. No.

[15] **Q:** From your branch.

[16] **A:** Correct.

[17] **Q:** From the South Dallas branch.

[18] **A:** I only know of one. I only recall one guy.

[19] **Q:** Okay. Do you remember what his name was?

[20] **A:** He was released. If I can refer to this

[21] document, I'll tell you exactly. Darrell Wrightsil.

[22] He was the only one.

[23] **Q:** Okay. What about Mark Bednar?

[24] **A:** He wasn't African-American.

[25] **Q:** And did he lose his job in connection with

Page 57

[1] this reduction?

[2]    A: No, ma'am.

[3]    Q: Okay. Did he keep working for Ameriquest

[4] after November of 2005?

[5]    A: Yes, ma'am.

[6]    Q: Where did he go?

[7]    A: To the Plano branch.

[8]    Q: With you?

[9]    A: Yes.

[10]    Q: So you had been his branch manager, but after

[11] this reduction in force you were then both mortgage

[12] specialists?

[13]    A: That's correct.

[14]    Q: Did this person whose name you can't remember

[15] who came to tell you that your branch was being closed,

[16] did — it was a man, right?

[17]    A: Yes, ma'am.

[18]    Q: Did he make any comments to you about your

[19] race?

[20]    A: No, ma'am.

[21]    Q: Did he make any comments to you about your

[22] age?

[23]    A: No, ma'am.

[24]    Q: So obviously, Mr. Calhoun, you chose —

[25] instead of taking this termination package, or whatever

Page 58

[1] you want to call it, little payout, you chose to

[2] continue working for Ameriquest, and so you accepted

[3] the demotion to mortgage specialist and went to go work

[4] in the Plano branch, right?

[5]    A: Yes, ma'am.

[6]    Q: And this is the same Plano branch that you had

[7] started your career at?

[8]    A: That's correct.

[9]    Q: How many of your South Dallas employees went

[10] to the Plano branch other than Mr. Bednar?

[11]    A: I believe there was three. It was Tonya

[12] Brown, Mark Bednar, and Michael Esmail. That's it.

[13]    Q: Did some of the other employees go to

[14] different branches, or did the rest of them lose their

[15] jobs?

[16]    A: Some of them went to other branches.

[17]    Q: Okay. Like the Dallas branch or something?

[18]    A: I'd say it was about — like I say, it was

[19] about half was kept and dispersed to the other

[20] branches.

[21]    Q: Were you involved in the decision as to which

[22] of your mortgage specialists would keep their jobs and

[23] which of them would be sent to other branches?

[24]    A: No, ma'am.

[25]    Q: As of November 17th of 2005, then, to your

Page 59

[1] knowledge, did the South Dallas branch stop producing

[2] in terms of the loans it was generating or originating?

[3]    A: No, ma'am.

[4]    Q: What happened?

[5]    A: Those loans continued to be produced.

[6]    Q: And who then got the credit for them?

[7]    A: Well, I was advised that the branch was

[8] closing and found out later it didn't close, and the

[9] Dallas branch, or East Dallas, transferred over —

[10] well, took over the branch.

[11]    Q: Okay. Where physically was the Dallas branch

[12] located?

[13]    A: Or East Dallas?

[14]    Q: Yeah. Which one are we going to call it?

[15]    A: I just want to make sure we're talking about

[16] the same branch, and we are. East Dallas was off of

[17] 635 and I believe it was Abrams.

[18]    Q: And there was not a separate Dallas branch

[19] that you know of?

[20]    A: The Galleria.

[21]    Q: Okay. I'm sorry, excluding the Galleria,

[22] there wasn't some other separate Dallas branch.

[23]    A: No.

[24]    Q: Okay. I just make sure that we're completely

[25] clear about what branch we're talking about, but — so

Page 60

[1] I'm jumping ahead of myself here, but later you applied

[2] to be the branch manager of the Dallas branch, right?

[3]    A: No, Plano.

[4]    Q: Didn't you also apply to be the branch

[5] manager —

[6]    A: Oh, initially?

[7]    Q: Right.

[8]    A: Yes.

[9]    Q: And where was that location?

[10]    A: That was the Galleria.

[11]    Q: That was the Galleria.

[12]    A: Yeah.

[13]    Q: Okay. That's why I was confused. I think,

[14] then, it might make sense for us to call this the East

[15] Dallas branch.

[16]    A: Okay.

[17]    Q: The branch at 635 and Abrams —

[18]    A: Is East Dallas.

[19]    Q: — is East Dallas, and that was — Munoz was

[20] the branch manager of it? Or who was the — who was

[21] the branch manager of it in November —

[22]    A: Daniel Munoz.

[23]    Q: Right. That's what I said. He was the branch

[24] manager as of November of 2005?

[25]    A: Yes, ma'am.

Page 65

[1] who had been reporting to him when he was in the East
[2] Dallas branch? Do you know?
[3]    A: Let me go back, because there was loan
[4] officers that were with me that stayed in that branch.
[5]    Q: Okay. How do you know that?
[6]    A: It's just my recollection. And I can give you
[7] specific names. Fior, working for me, stayed in the
[8] branch.
[9]    MS. JOHNSON: And just give their first
[10] and last names for the court reporter.
[11]    Q: (BY MS. SPROLE) Who is that first person?
[12] Oh, Fior Delao?
[13]    A: Fior Delao. Clint Carlisle, Tom — let's see,
[14] Tom Le, Jonathan Siersma. There may have been one
[15] more. It may have been Lloyd Nelson. But those
[16] individuals stayed in the branch.
[17]    Q: Where physically was the South Dallas branch?
[18]    A: The South Dallas branch was off of 75.
[19]    Q: And approximately what?
[20]    A: Pretty much right across the street from the
[21] mall, the — what is it?
[22]    Q: NorthPark?
[23]    A: NorthPark Mall.
[24]    Q: That's not very far south.
[25]    A: It was designated by territory, not location.

Page 66

[1]    Q: Okay. I had pictured it being in —
[2]    A: South Dallas.
[3]    Q: — South Dallas, south of downtown somewhere.
[4]    MS. JOHNSON: You're not the only one.
[5]    Q: (BY MS. SPROLE) Okay. And you know I had
[6] seen an address and it was North Central Expressway,
[7] and I thought that must be yet another branch. But it
[8] was on North Central Expressway.
[9]    A: That's correct.
[10]    Q: Okay. Are you aware, Mr. Calhoun, that each
[11] branch has a number assigned to it, like a branch
[12] identification number?
[13]    A: Yes, ma'am.
[14]    Q: What was the number identification for the
[15] South Dallas branch? Do you know?
[16]    A: I don't remember.
[17]    Q: Okay. That's fine. If you can look at
[18] Exhibit No. 10, it shows you it's number 5766. If you
[19] look under "Branch Name," it says "South Dallas, 5766."
[20]    A: Correct.
[21]    Q: Okay. And are you — I doubt you do, but do
[22] you know what the number was for the East Dallas
[23] branch?
[24]    A: No, ma'am.
[25]    Q: Do you know whether Fior Delao, for example,

Page 67

[1] went from being assigned to branch number 5766 to a
[2] different branch number after November 17th of 2005?
[3]    A: No, ma'am. I don't know how that was done. I
[4] don't know if they were still assigned to South Dallas
[5] or they were assigned to another number. I'm not — I
[6] have no idea.
[7]    Q: Okay. And I just want to make sure I'm clear.
[8] You don't know whether after November 17th of 2005
[9] anybody worked in the 635 and Abrams branch physically?
[10] Let me — let me rephrase that.
[11]    Do you know after November 17th of 2005
[12] whether any Ameriquest employees worked in the 635 and
[13] Abrams branch?
[14]    A: Well, from what I can recall, there was a
[15] short period of time, maybe a week, and then
[16] everybody — it was almost like when we got out, they
[17] came over.
[18]    Q: Okay.
[19]    MS. SPROLE: Objection, nonresponsive.
[20]    Q: (BY MS. SPROLE) We'll get to that. But do
[21] you know after November 17th of 2005 — or let's just
[22] make it easy and say December 1st of 2005, was anybody
[23] physically working in the branch at 635 and Abrams?
[24]    A: I'm not sure of the dates. And, here again,
[25] from the time I was demoted, there was a gap before

Page 68

[1] they came over, but I don't know the dates.
[2]    Q: Okay. And I'm not trying to trick you as to
[3] the particular dates. I'm just trying to get a general
[4] understanding as — basically, after you were demoted
[5] and you went to work in the Plano branch, was anybody
[6] working in the 635 and Abrams branch, let's just say
[7] beginning in 2006?
[8]    A: I don't think so. I think everybody was gone.
[9] I think people were in my branch.
[10]    Q: But basically the people from the branch that
[11] had been at 635 and Abrams moved into the branch on
[12] Central Expressway across from NorthPark Mall?
[13]    A: I believe so.
[14]    Q: And Mr. Munoz went from being the branch
[15] manager physically located at 635 and Abrams to being
[16] the branch manager of the branch on Central Expressway?
[17]    A: Yes. He took my place.
[18]    Q: He took your place in the physical location is
[19] what you're saying?
[20]    A: I think we're talking the same thing. He
[21] became the branch manager at South Dallas.
[22]    Q: Okay. But you aren't aware of anybody
[23] becoming a branch manager at the branch at 635 and
[24] Abrams, are you?
[25]    A: Not that I can recall.

Page 69

[1]  **Q:** Did you ever hear of that position becoming
[2] open and you applied for it or anything like that?

[3]  **A:** South — I mean, East Dallas?

[4]  **Q:** Correct.

[5]  **A:** No, ma'am.

[6]  **Q:** And I actually have a couple of other
[7] documents I just want to show you just so we have a
[8] clear record.

[9]  Let me show you what's been marked as
[10] Exhibit No. 12, which is a personnel action notice
[11] which shows that you went from being a branch manager
[12] to a mortgage specialist. Your pay change was
[13] effective the 21st of November of 2005. Do you see
[14] where it says all that?

[15]  **A:** Yes, ma'am.

[16]  **Q:** It says that you, "Accepted transfer to Plano
[17] as a mortgage specialist during realignment, branch
[18] closure of South Dallas." Do you see that in the
[19] "Additional Remarks" section?

[20]  **A:** Yes. This was done on the pretense that my
[21] branch was going to close.

[22]  **Q:** I understand.

[23]  **A:** So that response could have been different if
[24] I would have known the outcome of what was going to
[25] happen with my branch.

Page 70

[1]  **Q:** Oh, had you written the additional remarks?

[2]  **A:** Huh?

[3]  **Q:** Is that your handwriting in the "Additional
[4] Remarks" section?

[5]  **A:** Yeah, at the time —

[6]  **Q:** I see.

[7]  **MS. JOHNSON:** No, no. Listen to the
[8] question. Do you understand her question?

[9]  **A:** Can you repeat that, please?

[10]  **Q:** (BY MS. SPROLE) Sure. Do you see the section
[11] number seven that says "Additional Remarks"?

[12]  **A:** Yes.

[13]  **Q:** Is that your handwriting?

[14]  **A:** Yes.

[15]  **Q:** "Accepted to transfer"?

[16]  **A:** Yes.

[17]  **Q:** That's your handwriting?

[18]  **A:** Yes, I believe so.

[19]  **Q:** Okay. And then you signed off — that's your
[20] signature, isn't it, —

[21]  **A:** Yes, ma'am.

[22]  **Q:** — underneath there under "Approvals" where it
[23] says "Associate: Clinton Calhoun"? Is that your
[24] signature?

[25]  **A:** That's correct.

Page 71

[1]  **Q:** Okay. Is Mr. Munoz Hispanic?

[2]  **A:** You would think by his name. He was white to
[3] me.

[4]  **Q:** Okay.

[5]  **A:** I mean, he looks like a white guy, but Munoz
[6] is his last name. So if he walked in, you would think
[7] he was white. I don't know what he is.

[8]  **Q:** Okay. You don't know how he was categorized
[9] by the company, obviously.

[10]  **A:** No.

[11]  **Q:** Do you have any evidence, Mr. Calhoun, that
[12] the closure of the South Dallas branch was based on
[13] your race?

[14]  **A:** It was — other than the fact that — me being
[15] the sole black manager, and other — one other black
[16] loan officer was released, that gave me the thinking
[17] that it was — I felt that it was discrimination just
[18] for the fact that here you've got this black guy who
[19] has done an outstanding job, took that branch from
[20] second to first, being — or was advised that, "Okay.
[21] We're going to close your branch," and then find out
[22] later that the branch was never closed and that they
[23] brought Daniel Munoz over there. So in that sense,
[24] yes.

[25]  **Q:** So it's your belief that it was because of

Page 72

[1] your race; is that right?

[2]  **A:** Absolutely.

[3]  **Q:** And is it your belief that it was because of
[4] your age or not?

[5]  **A:** In addition, I feel that had something to do
[6] with it as well.

[7]  **Q:** And why do you feel that way?

[8]  **A:** At the time in my area, I was the only black
[9] manager that was over 40 that this happened to.

[10]  **Q:** How do you know that?

[11]  **A:** As a manager, I knew the managers in my area.
[12] I don't know about companywide. I'm talking in my
[13] area, but I was the only one.

[14]  **Q:** Of the seven or so branches that we talked
[15] about earlier? Is that what you're comparing to?

[16]  **A:** Correct.

[17]  **Q:** Were any of the other branches in your area
[18] closed?

[19]  **A:** I believe it was the Arlington — if I'm not
[20] mistaken, the Arlington branch closed.

[21]  **Q:** Do you know who the branch manager of
[22] Arlington was?

[23]  **A:** At the time it was a white guy. I don't
[24] remember who it was.

[25]  **Q:** Do you know whether he was in his 30s, 40s?

A011

Page 73

[1] Do you know how old he was?

[2] A: I didn't know this guy, but I think he was —

[3] may have been late 20s.

[4] Q: Do you know whether he was given the

[5] opportunity to stay on with the company as a mortgage

[6] specialist?

[7] A: I have no idea.

[8] Q: And you don't remember his name, do you?

[9] A: No.

[10] Q: Any other branches in your area closed?

[11] A: Not that I'm aware of.

[12] Q: And you're aware that this was a nationwide

[13] closure, right, that branches across the whole country

[14] were closed?

[15] A: Yes, ma'am.

[16] Q: Now, earlier I had asked you whether you

[17] thought that the closure of your branch was based in

[18] any way on your race, and you said you didn't know.

[19] Why is it now that you believe that it was based on

[20] your race? Why did you change your mind?

[21] A: Well, it was just basically — remember, I

[22] said initially when everything happened I wasn't

[23] thinking that, but as things happened, it led me to

[24] believe that it was due to race and age discrimination.

[25] Q: Actually, I asked you initially, and then I

Page 74

[1] asked you as you were sitting here today whether you

[2] thought it was because of your race, and you said you

[3] didn't know. And so I'm just trying to find out what

[4] happened — you know, you testified that you didn't

[5] know whether it was because of your race, we took a

[6] break, we came back, and now you're testifying that you

[7] think it was because of your race that your branch was

[8] closed. And I'm trying to find out why you changed

[9] your mind during that time period.

[10] A: Well, I didn't understand exactly what you

[11] were saying in terms of initially versus later, et

[12] cetera.

[13] Q: Did you meet with your lawyer while we were on

[14] our break?

[15] A: Yeah, I talked to her briefly.

[16] Q: Did you talk about your belief about race or

[17] age discrimination while we were on the break?

[18] MS. JOHNSON: Objection. You need not

[19] testify as to what you and your lawyer talked about.

[20] Attorney-client privilege and work product privilege.

[21] Q: (BY MS. SPROLE) Well, if your attorney was

[22] coaching you as to how to answer questions on breaks,

[23] that's improper.

[24] MS. JOHNSON: Do not answer the question.

[25] I'm asserting work product privilege and

Page 75

[1] attorney-client privilege.

[2] Q: (BY MS. SPROLE) But your testimony is that

[3] you did speak to your lawyer during the break, correct?

[4] A: Briefly.

[5] Q: So other than your belief that the closure of

[6] the South Dallas branch was — that your branch was

[7] targeted because of your race, do you have any other

[8] evidence for me to support a claim of race

[9] discrimination in connection with the closure of the

[10] South Dallas branch?

[11] A: Well, you're saying "closure." From me it was

[12] never closed.

[13] Q: I understand. Well, let's say the change from

[14] you being the branch manager to you not being the

[15] branch manager.

[16] A: Okay.

[17] Q: Other than your subjective belief, do you have

[18] any evidence that it was based — that the decision was

[19] based on your race?

[20] MS. JOHNSON: Objection to the

[21] characterization of his prior testimony as only a

[22] subjective belief.

[23] Q: (BY MS. SPROLE) You can go ahead and answer

[24] the question.

[25] A: Can you ask me one more time?

Page 76

[1] Q: Right. Other than what you told me was your

[2] belief that the South Dallas branch — that you were

[3] targeted to no longer be the branch manager of the

[4] South Dallas branch because of your race, do you have

[5] any other evidence for me to support your assertion?

[6] MS. JOHNSON: Object. Same objection.

[7] But go ahead and answer.

[8] A: Other than the evidence that was in the

[9] affidavit.

[10] Q: (BY MS. SPROLE) The affidavit that you

[11] submitted to the EEOC?

[12] A: Yes, ma'am.

[13] Q: Okay. And we can go over that affidavit

[14] later, but I just want to hear your testimony as to

[15] what other evidence you have that you were chosen to no

[16] longer be the branch manager of the South Dallas branch

[17] because of your race.

[18] A: I don't recall exactly. I would have to look

[19] at the affidavit to look at additional evidence.

[20] Q: That's — and we can do that later, but what I

[21] want to know is right now, without you looking at your

[22] affidavit, what other evidence you have for me of that.

[23] A: I don't recall exactly. I think there were

[24] some other circumstantial factors.

[25] Q: Well, and I'm entitled to find out what those

Page 77

[1] are, so I need you to tell me all of those right now.

[2] **A:** That's what I'm saying.

[3] **Q:** No, I want to know based on your recollection

[4] as you sit here right now what other evidence you have

[5] for me of that.

[6] **MS. JOHNSON:** Objection. When you're

[7] asking him what evidence, it's really calling for a

[8] legal conclusion. If you want to ask him factually

[9] based questions, it's one thing, but I object to you

[10] asking him his evidence.

[11] **MS. SPROLE:** And I object to your

[12] speaking objection. You can just make your objection

[13] and then let the witness answer the question.

[14] **MS. JOHNSON:** Go ahead and answer her

[15] question.

[16] **A:** Just little circumstantial factors.

[17] **Q:** (BY MS. SPROLE) And what are those factors?

[18] **A:** Just how everything took place.

[19] **Q:** Like what?

[20] **A:** Me being advised one thing — or led to

[21] believe one thing, found out that it wasn't true.

[22] **Q:** And let me just stop you right there. Are you

[23] referring to your contention that you were told the

[24] South Dallas branch was closing, but it did not close?

[25] Is that what you're referring to there?

Page 78

[1] **MS. JOHNSON:** Objection to you

[2] interrupting his testimony.

[3] **MS. SPROLE:** I don't think that's a valid

[4] objection.

[5] **A:** That, and in addition to things that I was

[6] advised.

[7] **Q:** (BY MS. SPROLE) Like what?

[8] **A:** Like, "You're top person. You'll get the next

[9] branch. It's yours." And come to find out, if my

[10] branch wasn't going to close, why was I moved anyway?

[11] **Q:** I'm sorry, could you repeat that? I just

[12] didn't understand what you said.

[13] **A:** Things that I was advised, "You're top guy.

[14] You're the number one manager. You will have dibs on

[15] the first branch." It was almost like, "Don't worry

[16] about this. We're going to get you a branch because

[17] you deserve it."

[18] **Q:** And so what about that makes you believe that

[19] the decision was made based on your race?

[20] **A:** I found out the whole thing was a lie.

[21] **Q:** That they didn't close the South Dallas

[22] branch? You just tell me what was a lie.

[23] **A:** They did not close the South Dallas branch.

[24] They lied and I didn't get the position that they

[25] promised. I wasn't selected. This was a whole — it

Page 79

[1] was almost like everything was fabricated.

[2] **Q:** Okay. Are there any other facts that support

[3] your claim that you believe that your selection to no

[4] longer be the branch manager in November of 2005 was

[5] based in any way on your race?

[6] **A:** Other than what I have in the affidavit.

[7] **Q:** Okay. Nothing else that you can tell me as

[8] you're sitting here right now?

[9] **A:** Not to my knowledge.

[10] **Q:** What other facts do you have that support your

[11] claim, if you're making such a claim, that your

[12] demotion was based on your age?

[13] **A:** Here again —

[14] **Q:** Other than what you told me already.

[15] **A:** Oh, I — you've got to understand, you know,

[16] I — a lot of — I was always referred to as, "Hey, old

[17] man," you know, just a lot of little things that was

[18] told to me — or said to me.

[19] **Q:** Okay. And let's talk about that. When —

[20] well, tell me who referred to you as an old man.

[21] **A:** Several of the employees.

[22] **Q:** I need their names, please.

[23] **A:** Can I refer to this here?

[24] **Q:** Sure. Are these employees in the South Dallas

[25] branch who referred to you as an old man?

Page 80

[1] **A:** Or was.

[2] **MS. JOHNSON:** Why don't you — I object

[3] to you asking a question. He's trying to answer your

[4] question, and you ask him another question. I object

[5] to that. Let him answer the first question first.

[6] **Q:** (BY MS. SPROLE) I'm asking you who —

[7] **A:** Would you like to hear the names?

[8] **Q:** I'm asking you for names of people who

[9] referred to you as an old man.

[10] **A:** Jonathan, Lyle Scott.

[11] **Q:** Can you give me first and last names, please?

[12] **A:** Jonathan Siersma, Lyle Scott, Randall Vitek,

[13] Darrell Wrightsil, Tom Le. I mean, just about

[14] everybody who —

[15] **Q:** Okay. And these were all people who reported

[16] to you in the branch?

[17] **A:** Oh, and in the other branches too, though.

[18] **Q:** What do you mean?

[19] **A:** I was just giving you the names of people on

[20] here, but you have people in other branches as well.

[21] **Q:** But of the names from the South Dallas branch,

[22] these were all people who reported to you, correct?

[23] **A:** Yes.

[24] **Q:** Were they involved in the decision, to your

[25] knowledge, to demote you from branch manager to

Page 81

[1] mortgage specialist?

[2]    **A:** I don't know.

[3]    **Q:** I just asked you what you know.

[4]    **A:** I don't know. You're saying, were they

[5] involved? I don't know if they was involved in the

[6] decision or not.

[7]    **Q:** Do you suspect that a mortgage specialist was

[8] involved in the decision to demote a branch manager?

[9]    **MS. JOHNSON:** Objection, calls for

[10] speculation.

[11]    **Q:** (BY MS. SPROLE) You can answer my question.

[12]    **A:** Could it be possible? Absolutely, yes.

[13]    **Q:** Do you have any knowledge that a —

[14]    **A:** Oh, no.

[15]    **Q:** — that a mortgage specialist was involved in

[16] the decision to demote a branch manager?

[17]    **A:** Yeah, I have seen it work both ways.

[18]    **Q:** Do you have any knowledge that any of these

[19] mortgage specialists were involved in the decision to

[20] demote you to mortgage specialist?

[21]    **A:** I don't know. Not to my knowledge.

[22]    **Q:** And that's all I'm asking you, Mr. Calhoun, is

[23] what you know. When did the — did Mr. Siersma refer

[24] to you as an old man?

[25]    **A:** Exact time and date, I can't tell you. I'm

Page 82

[1] saying throughout the time a lot of people did. And

[2] when I say "a lot of people did," try to understand if

[3] you're tops in the mortgage business, everybody know

[4] you, even if you don't know them, if that makes any

[5] sense. You're known. They know how much money you

[6] make. It comes out every week, every month.

[7]    So you're known throughout the mortgage

[8] industry, and people knew of me as a single parent,

[9] eight children at the time. So people knew me. I used

[10] to get a pat on the back, "Hey, old man, you're old

[11] enough that I could date your daughter." A lot of

[12] little things from numerous people.

[13]    **Q:** And did you take offense at it?

[14]    **A:** Sometimes, sometimes not.

[15]    **Q:** Did you ever say that — I'm sorry. Did I

[16] interrupt you?

[17]    **A:** Yeah. Go ahead.

[18]    **Q:** Did you ever say to any of these people who

[19] called you an old man, "Don't call me that. That hurts

[20] my feelings," or something along those lines?

[21]    **A:** Yeah. "No, I'm not an old man. I look

[22] younger than you." You know, I always say things back.

[23]    **Q:** Have people told you in the past that you

[24] don't look your age, that you look younger than you

[25] are?

Page 83

[1]    **A:** Some people have told me that.

[2]    **Q:** Now, you have a — your oldest daughter — is

[3] your oldest a girl, 27? Is your oldest a woman?

[4]    **A:** Yes, ma'am.

[5]    **Q:** And so two years ago she was 25?

[6]    **A:** Yes, ma'am.

[7]    **Q:** So was it true that there were people in the

[8] branch who were old enough to date your daughter?

[9]    **A:** Yeah. I mean, yeah, in that sense. They're

[10] in their 20s, she's in her 20s, so I would say yes.

[11]    **Q:** That's what I mean. I don't mean that you

[12] would want them to date your daughter necessarily, but

[13] they were approximately the same age as your daughter,

[14] right?

[15]    **A:** It varied.

[16]    **Q:** Did you ever report to Mr. Garrett that people

[17] had referred to you as an old man?

[18]    **A:** He said it too.

[19]    **Q:** Mr. Garrett called you an old man?

[20]    **A:** Yeah.

[21]    **Q:** Were you older than he was?

[22]    **A:** I don't know his age.

[23]    **Q:** Okay. Did you take offense when he called you

[24] an old man?

[25]    **A:** Personally, yes.

Page 84

[1]    **Q:** How come?

[2]    **A:** For the fact that he's made that statement.

[3]    **Q:** What — what about it offended you?

[4]    **A:** Just the fact that he was calling me an old

[5] man.

[6]    **Q:** Was he being serious or was he joking when he

[7] said it? How did you take it?

[8]    **A:** I took it offensive. I don't know if he was

[9] serious or what. I mean, because I — him, I don't

[10] think I never said anything back, so —

[11]    **Q:** How come?

[12]    **A:** First of all, he was my boss, and I just tried

[13] to — I try to be professional.

[14]    **Q:** Did you ever complain to human resources about

[15] people calling you an old man?

[16]    **A:** Yes, ma'am.

[17]    **Q:** Okay. Who did you complain to?

[18]    **A:** Tanya Tottress.

[19]    **Q:** When did you first make a complaint to Tanya

[20] Tottress about that?

[21]    **A:** It didn't happen until after I was in the

[22] Plano branch.

[23]    **Q:** So before your demotion, had you complained to

[24] anybody in human resources about being called an old

[25] man?

Page 85

[1] A: Before the demotion, other — not in human
[2] resources, no.
[3] Q: Did you complain to anybody?
[4] A: Yeah. To people, yeah.
[5] Q: To whom?
[6] A: Employees.
[7] Q: I'm sorry?
[8] A: Do you want specific names?
[9] Q: Yes.
[10] A: Jason Cooper. He was the previous branch
[11] manager.
[12] Q: When did you complain to Jason Cooper?
[13] A: Throughout the time that I was advised that —
[14] or people have told me that. Joe said it. So I told
[15] him I didn't like it. It wasn't professional.
[16] Q: What branch was Jason Cooper the branch
[17] manager of?
[18] A: The Hurst branch.
[19] Q: Did Jason Cooper tell you —
[20] A: It was Hurst and Bedford. I believe it was
[21] called Bedford.
[22] Q: Okay. Did Jason Cooper tell you that you
[23] should complain to human resources?
[24] A: He just said it was wrong, it was
[25] discriminatory. But to answer your question, I don't

Page 86

[1] think he never said to complain.
[2] Q: How was it that it was discriminatory, to use
[3] your word?
[4] A: I mean, he just — I'm just telling you what
[5] he said.
[6] Q: Okay. What did you take that to mean?
[7] A: That it could be a form of discrimination.
[8] Q: Meaning what?
[9] A: That it could be a form of discrimination.
[10] Q: But how was it — how was it discriminatory in
[11] your view, if that's what you thought it was?
[12] A: Because you — certain things, promotions for
[13] other positions, they could utilize that, you know.
[14] They could look at that and say, "I'm not going to hire
[15] this guy" or "I'm not going to promote this guy because
[16] of his age. I'm going to bring in a younger guy."
[17] Q: Right. So had you complained to anybody about
[18] race — let me strike that.
[19] Had you complained to anybody in human
[20] resources about race discrimination as of the time you
[21] were demoted?
[22] A: Prior to that?
[23] Q: Prior to November 17th of 2005.
[24] A: Not that I'm aware of.
[25] Q: Had you been referred to as an old man before

Page 87

[1] you became a branch manager by anybody at Ameriquest?
[2] A: Basically referring to the Plano branch, I may
[3] have had a few people say that.
[4] Q: Had Joe Garrett referred to you as an old man
[5] when you were in the Plano branch the first time?
[6] A: Not until I became a branch manager. I didn't
[7] have any contact with him prior to that. It's not
[8] really — the loan officers really didn't have contact
[9] with your area managers.
[10] Q: You had more contact with your branch manager?
[11] A: Yes. And he said it too.
[12] Q: Harsha Galegwaea?
[13] A: All the time.
[14] Q: But you never complained to Joe Garrett, say,
[15] about Harsha Galegwaea calling you an old man?
[16] A: No, see, that's what I'm saying. Your loan
[17] officers didn't really have contact with your area
[18] managers. They dealt with the branch managers. The
[19] branch managers dealt with the area managers.
[20] Q: Well, what I'm trying to find out is if you
[21] made any sort of formal complaint against Harsha
[22] Galegwaea for referring to you as an old man?
[23] A: No, ma'am. Not that I can recall, no. Not to
[24] HR.
[25] Q: Okay. Or to your supervisor or your

Page 88

[1] supervisor's supervisor?
[2] A: Which is Joe Garrett.
[3] Q: Right.
[4] A: No, ma'am.
[5] Q: Okay. Do you know — I may have asked you
[6] this, so if I did, I apologize. Do you know who made
[7] the decision to demote you from branch manager to
[8] mortgage specialist?
[9] A: I have no idea.
[10] Q: As of — well, while you were the branch
[11] manager, was Ron Comer a branch manager?
[12] A: Yes, I think he was a branch manager for a
[13] while. Yeah.
[14] Q: Do you know what branch he was branch manager
[15] of?
[16] A: I'm not for sure what branch he was at.
[17] Q: Was he in your area?
[18] A: I think he — he was the one, I believe, that
[19] was at the Arlington branch. Remember, I said I didn't
[20] know, but I think it was Ron Comer at the time.
[21] Q: So to the best of your knowledge, Ron Comer
[22] was the branch manager of the Arlington branch, and he
[23] was demoted to mortgage specialist, then, around the
[24] same time you were?
[25] A: I believe so.

Page 89

[1] **Q:** And he's white?

[2] **A:** Yes, ma'am.

[3] **Q:** Do you know if he's over or under 40?

[4] **A:** I don't know his age.

[5] **Q:** You have no reason to know —

[6] **A:** I think he's 30 something.

[7] **Q:** Okay. What about Karl Kuhn. Do you know him?

[8] Do you know who he was?

[9] **A:** Uh-huh.

[10] **Q:** Who was he?

[11] **A:** He was a white guy. He became, if I'm not

[12] mistaken, a branch manager as well. And I'm not for

[13] sure where these guys were at, what branches. He may

[14] have been in the Hurst branch. I'm not for sure.

[15] **Q:** Okay. Was he a branch manager during the time

[16] that you were a branch manager, —

[17] **A:** Yes.

[18] **Q:** — Karl Kuhn?

[19] **A:** Karl Kuhn and Ron Comer and myself all went to

[20] Plano and we were branch managers. We were the only

[21] branch managers that — that was demoted. Both of them

[22] were white, I was black, and then we all went to Plano.

[23] **Q:** Okay. I think originally you testified that

[24] the South Dallas branch was the only one that was

[25] supposedly closed. And I'm just saying "supposedly"

Page 90

[1] because your contention is that it wasn't really

[2] closed.

[3] **A:** Okay.

[4] **Q:** And then you said that the Arlington branch in

[5] that area was also closed in November of 2005, right?

[6] **A:** Right.

[7] **Q:** Okay. Is it your testimony now that you're

[8] adding the Bedford or Hurst branch to that list of

[9] branches in your area that were closed in November of

[10] 2005?

[11] **A:** See, all — I'm not for sure because all of

[12] them wasn't closed. Arlington, I think, was closed,

[13] and the other one I think somebody else took over.

[14] **Q:** Did Bedford/Hurst stay open?

[15] **A:** I'm not for sure.

[16] **Q:** Okay. Let me get at it a different way, then.

[17] Of the seven to eight branches in your

[18] area as of November of 2005, how many of the branch

[19] managers were demoted from branch manager to mortgage

[20] specialist?

[21] **A:** That I'm aware of, three, which is the three

[22] that went to Plano, including myself.

[23] **Q:** And that is you, obviously, Mr. Comer and

[24] Mr. Kuhn.

[25] **A:** Right.

Page 91

[1] **Q:** And is Mr. — I'm sorry.

[2] **A:** Go ahead.

[3] **Q:** Is Mr. Kuhn white?

[4] **A:** Yes.

[5] **Q:** Do you know his age?

[6] **A:** Twenty something. I think late 20s.

[7] **Q:** So of seven branch managers in November of

[8] 2005, three of them were demoted — the seven branch

[9] managers in your area, three of them were demoted to

[10] mortgage specialist, to your knowledge.

[11] **A:** As far as I know.

[12] **Q:** Were there any others?

[13] **A:** As far as I know, no. I'm trying to figure

[14] the ones that was open. You had Amanda, Daniel. I'm

[15] going to tell you I don't know exactly.

[16] **Q:** I know it was all a while ago.

[17] **A:** I was trying to think backwards of the ones

[18] that was open. I know us three went to Plano, and I

[19] don't know any other branch managers going to any other

[20] branch.

[21] **Q:** Is that something you think you would have

[22] known?

[23] **A:** What are you referring to?

[24] **Q:** If there were other branch managers who were

[25] also demoted to mortgage specialist, do you think you

Page 92

[1] would have heard about it within your area?

[2] **A:** I may have.

[3] **Q:** Were you given your choice of what branch to

[4] go to?

[5] **A:** No.

[6] **Q:** Were you told you had to go to the Plano

[7] branch?

[8] **A:** Yes. I think it's on that document as well.

[9] **Q:** Are you referring to what's been marked as

[10] Exhibit No. 11?

[11] **A:** Yes, ma'am. But I was not given a choice. I

[12] was advised I was going to Plano.

[13] **Q:** Okay. Is there a different branch that you

[14] would have preferred to have gone to?

[15] **A:** Perhaps.

[16] **Q:** Which one?

[17] **A:** I mean, you ask me now. At the time I didn't

[18] think about it because I was told to go to Plano, so

[19] that's where I had to go.

[20] **Q:** What company documents have you reviewed,

[21] Mr. Calhoun, to support your claim that the loans that

[22] had been originated in the South Dallas branch were

[23] transferred to Mr. Munoz?

[24] **A:** Review when? Back then or now?

[25] **Q:** Whenever.

Page 97

[1] 17th, 2005 that were still pending in the South Dallas
[2] branch that got transferred to Mr. Munoz.
[3]   A: If I had to put a number on there, it was
[4] quite a bit. Maybe 50. 40 something, 50.
[5]   Q: Fifty separate loans?
[6]   A: Additional loans. 40 or 50 loans. It was a
[7] lot. That's considered a lot.
[8]   Q: So you were working as a mortgage specialist
[9] in the Plano branch, and then at some point did you
[10] apply to become a branch manager again?
[11]   A: Uh-huh. Yes.
[12]   Q: Tell me about that.
[13]   A: Well, this is where Mr. Paul Razi comes in.
[14]   Q: Okay. Who is he?
[15]   A: I guess he was the new area manager.
[16]   Q: What happened to Joe Garrett?
[17]   A: He was let go during the downsize, reduction.
[18]   Q: And so Mr. Razi replaced him?
[19]   A: As far as I know.
[20]   Q: So he was now the area manager over your Plano
[21] branch — or the Plano branch that you were working in?
[22]   A: Yes, ma'am.
[23]   Q: So how did it come to pass that you applied
[24] for a branch manager position?
[25]   A: Basically Mr. Razi came in, introduced

Page 98

[1] himself, pulled — you know, does an introductory
[2] speech, pulled us three —
[3]   Q: Who is "us three"?
[4]   A: The three branch managers that were — or the
[5] three previous branch managers.
[6]   Q: Comer, Kuhn, and you?
[7]   A: Said he would have a sit-down talk with each
[8] of us individually, but made a statement that, "This is
[9] how it's going to go down. You three are my branch
[10] managers. Any branches come open, y'all will have
[11] first dibs at the position. These positions will go to
[12] y'all for the simple fact y'all were already branch
[13] managers."
[14]   Q: Now, had you worked with Mr. Razi previously?
[15]   A: Never heard of him.
[16]   Q: Do you know where he had — what his job was
[17] before he became the area manager?
[18]   A: I think he was the area manager in the Houston
[19] area, I think.
[20]   Q: When was it, approximately, that Mr. Razi told
[21] you that you had — you and Comer and Kuhn had dibs on
[22] the next branch manager jobs?
[23]   A: It was that first week that we went there.
[24]   Q: Was that November of 2005?
[25]   A: Yes, ma'am.

Page 99

[1]   Q: What did you say after he told you that you
[2] would have dibs on the next branch manager job?
[3]   A: Nothing.
[4]   Q: So when did a branch manager job become
[5] available?
[6]   A: Within several weeks of when he told us. I
[7] believe the following month, if I'm not mistaken.
[8]   Q: So approximately December of 2005?
[9]   A: Around about that time.
[10]   Q: December, January time period?
[11]   A: Exactly.
[12]   Q: And what branch was that?
[13]   A: The Galleria branch.
[14]   Q: Who had been the branch manager there?
[15]   A: Amanda Watson.
[16]   Q: What's her race?
[17]   A: White female.
[18]   Q: Approximately how old was she?
[19]   A: You know I won't know that. I don't know. If
[20] I had to guess, I would say late 20s.
[21]   Q: Younger than you, you think?
[22]   A: Yes, ma'am.
[23]   Q: And what happened to her? Did she quit? Is
[24] that what you said earlier?
[25]   A: She quit.

Page 100

[1]   Q: She wasn't fired?
[2]   A: No.
[3]   Q: Why did she quit? Do you know?
[4]   A: I didn't talk to her specifically. I was told
[5] she went to work for Joe.
[6]   Q: She what?
[7]   A: Went to work for Joe Garrett.
[8]   Q: Oh, whatever job Joe got after —
[9]   A: He brought her over.
[10]   Q: Okay. Where did he go to work? Do you know?
[11]   A: First NLC.
[12]   Q: What a coincidence. So the Galleria position
[13] was available. What was the process for letting
[14] somebody know that you wanted to be considered for the
[15] branch manager position?
[16]   A: Well, Razi basically came down and talked to
[17] us. Not only that, they — it seems like — what I'm
[18] saying is "they," meaning HR, tracked the individuals
[19] that were previous branch managers, and the recruiters
[20] had certain lists of — as a matter of fact, I know it
[21] was a list of branch managers that had got demoted to
[22] loan officers and got e-mails of — any branch that
[23] came open, we got the e-mail.
[24]   Q: Okay. Who did you get the e-mail from?
[25]   A: If I'm not mistaken, it was Billie Pope.

Page 101

[1] **Q:** Was there any sort of —

[2] **A:** And the regional also. The regional — and

[3] the areas sent us e-mails too.

[4] **Q:** Who was the regional manager?

[5] **A:** Stefan.

[6] **Q:** Mike Stefan, or —

[7] **A:** Correct.

[8] **Q:** — however you say it? Okay.

[9] **A:** Never met the guy.

[10] **Q:** Talked to him on the phone?

[11] **A:** Yes.

[12] **Q:** Was there a formal application that you had to

[13] fill out to be considered for the Galleria position?

[14] **A:** No, ma'am. Not that I recall.

[15] **Q:** Okay. What was the — what was the process,

[16] then, that you went through to be considered for the

[17] branch manager position?

[18] **A:** It really wasn't a process, at least not for

[19] us, because we were already branch managers. I believe

[20] the only thing we did was submit a business plan, that

[21] I can remember.

[22] **Q:** Did you have an interview?

[23] **A:** Yes.

[24] **Q:** Okay. Who did you interview with?

[25] **A:** Paul Razi and two females from HR.

Page 102

[1] **Q:** Do you remember their names?

[2] **A:** No.

[3] **Q:** Where did the interview take place?

[4] **A:** In that Galleria branch, I believe.

[5] **Q:** Was somebody named Matthew Pennies there?

[6] **A:** Mr. Pennies was there. He was the —

[7] **Q:** And who was he?

[8] **A:** He was the HR trainer. I think that was

[9] Pennies, yeah. He was a trainer.

[10] **Q:** So your interview was with four people?

[11] **A:** I believe it was four, Pennies — I don't know

[12] if Pennies was a part of the interview process, but he

[13] was there.

[14] **Q:** Okay. I understand. You don't know whether

[15] he was a decision maker, —

[16] **A:** Right.

[17] **Q:** — I guess. Who were the — who was the

[18] decision maker on whether you were — whether you

[19] obtained the Galleria branch manager job?

[20] **A:** I don't know. And the reason I don't know is

[21] because for us apparently things were a little bit

[22] different. We were supposed to get special — I would

[23] say special treatment. And the individuals who

[24] interviewed, if you didn't get that job, that's where

[25] Pennies came into play. They were supposed to tell

Page 103

[1] you, okay — this was supposed to be mandatory — if

[2] you didn't get the job, the reason you didn't get the

[3] job, what we liked, what we didn't, how we could

[4] improve. They wanted to make sure us — at least from

[5] what I knew, that we got a branch manager position.

[6] **Q:** Okay. But at this time there was just one

[7] branch manager position in your area, right, one

[8] available branch manager position?

[9] **A:** In this area, yes.

[10] **Q:** Right. Were you interested in working in

[11] another area?

[12] **A:** No.

[13] **Q:** I'm sorry?

[14] **A:** No.

[15] **Q:** So you — did you submit your business plan?

[16] **A:** Yes.

[17] **Q:** Do you have a copy of that, by any chance?

[18] **A:** No.

[19] **Q:** You didn't save it?

[20] **A:** It was — it was turned in. I mean, it was on

[21] a company computer, so —

[22] **Q:** So you prepared it on a company computer.

[23] It's not like you worked on it from your home —

[24] **A:** Right.

[25] **Q:** — computer or something.

Page 104

[1] **A:** Right.

[2] **Q:** How did the interview go?

[3] **A:** I thought it went fantastic.

[4] **Q:** To your knowledge, did Mr. Comer and Mr. Kuhn

[5] go through the same process that you did?

[6] **A:** Uh-huh.

[7] **Q:** Was there anything else involved in the

[8] application for this branch manager position?

[9] **A:** As far as I know.

[10] **Q:** Did you get the branch manager position?

[11] **A:** No.

[12] **Q:** Who got it?

[13] **A:** Ron Comer.

[14] **Q:** So Mr. Kuhn was turned down for the position

[15] as well?

[16] **A:** Yes, ma'am.

[17] **Q:** Do you know whether anybody else applied for

[18] it other than the three of you?

[19] **A:** Sure. I think we were the only three branch

[20] managers.

[21] **Q:** But do you know whether anybody else applied

[22] for that Galleria branch manager position?

[23] **A:** Yeah, I think there were some other personnel.

[24] I don't know them by name.

[25] **Q:** Okay. That's fine. I just didn't know if it

Page 109

[1] chosen because you were black?

[2] A: No, he didn't say — he has never told me

[3] that.

[4] Q: Did he tell somebody else that?

[5] A: I don't know.

[6] Q: Okay. What race is Mr. Razi?

[7] A: I don't know. I don't know what he is.

[8] Q: Okay. I mean, is he — is he

[9] African-American?

[10] A: No.

[11] Q: Is he Hispanic?

[12] A: No.

[13] Q: Is he white?

[14] A: He may be half white, half Indian. I don't

[15] know what he is.

[16] Q: I didn't know if — based on his name if maybe

[17] he was Middle Eastern, you know, Persian or something.

[18] A: Yeah.

[19] Q: Okay. I have never met him, so —

[20] A: I mean, I never — I never knew.

[21] Q: Okay. Approximately how old was he in 2006?

[22] A: Paul Razi?

[23] Q: Uh-huh.

[24] A: I never knew his age. I'm assuming late 20s.

[25] Q: You don't know for sure, but —

Page 110

[1] A: I don't know for sure.

[2] Q: — you thought he was younger than you?

[3] A: I know he was younger than me.

[4] Q: What was Mr. Haap's position at Ameriquest in

[5] January, February 2006?

[6] A: When we — I say "we," the three previous

[7] branch managers came to Plano, he was the branch

[8] manager at the time.

[9] Q: Of the Plano branch?

[10] A: Correct.

[11] Q: Did you talk to him about your not being

[12] selected for the Galleria branch manager position?

[13] A: Somewhat.

[14] Q: And did he tell you that you weren't chosen

[15] because you were black?

[16] A: No. No.

[17] Q: What did he tell you about the reason you

[18] weren't chosen?

[19] A: We didn't really talk a lot about that

[20] particular promotion. You know, I wouldn't want to

[21] just grieve on stuff like that. I was pretty much a

[22] worker. I was trying to get it done. I didn't think

[23] nothing of it at the time initially, other than, "Wait

[24] a minute" — when I say "nothing," in terms of Anthony

[25] Haap. So for that particular position, he didn't say

Page 111

[1] nothing about black or —

[2] Q: Okay. But he — I think your testimony was

[3] that he told Mark Bednar that that was the reason; is

[4] that right?

[5] A: Right.

[6] Q: Okay. He never told you —

[7] A: Well, I don't know what he said. He never

[8] told me that. I'm just telling you what Mark said.

[9] Q: Okay. Mark told you that he heard that from

[10] Anthony Haap.

[11] A: Right.

[12] Q: Who else told you that you weren't chosen for

[13] the position because you're black?

[14] A: That position, it was just Mark. You've got

[15] two.

[16] Q: The Plano position?

[17] A: You're talking Galleria.

[18] Q: I'm talking Galleria now. We'll get to Plano.

[19] A: Right.

[20] Q: I want to focus on the Galleria.

[21] A: No, that was —

[22] Q: Other than — I'm sorry, did I interrupt you?

[23] A: No. Go ahead.

[24] Q: Other than what Mr. Bednar told you, what

[25] reason do you have to believe that you were not chosen

Page 112

[1] for the Galleria branch manager position because of

[2] your race?

[3] A: Actions by Paul Razi.

[4] Q: Like what?

[5] A: I mean, the guy, he's just — I don't know.

[6] He's just — he gave — gave me reason to believe he

[7] was highly prejudiced and discriminatory of minorities.

[8] Q: Can you give me some specific examples?

[9] A: Wouldn't acknowledge you, look down to you,

[10] little things like that.

[11] Q: And when you say "to you," do you mean to you,

[12] Clinton Calhoun, or to whom?

[13] A: Oh, to me he was — he was really bad if we're

[14] talking about me. He did it to other people too, but

[15] to me it was extremely bad.

[16] Q: Why do you think he didn't like you, if that's

[17] what you're saying?

[18] A: I have no idea.

[19] Q: I mean, was there anything that ever happened

[20] between the two of you?

[21] A: I never knew the guy before then.

[22] Q: So —

[23] A: So I was kind of like that. I didn't know.

[24] Q: So is it your testimony that sort of from the

[25] first time you met him you just felt like he did not

Page 113

[1] like you?

[2] A: I mean, he did things that you would think,

[3] "Wow, something is wrong. Something is up with this

[4] guy," but I didn't know because I never knew him.

[5] Q: When you say he didn't acknowledge you, what

[6] makes you believe that that's because you're black?

[7] A: He made it seem like he didn't like

[8] minorities, black minorities.

[9] Q: And what specifically — what specifically did

[10] he do to make it seem like he did not like black

[11] minorities?

[12] A: Discriminatory in terms of the way he handled

[13] things with the rest of the staff.

[14] Q: Can you give me a specific example?

[15] A: Meetings. I mean, he did it in front of

[16] everybody, so everybody should know this. Meetings, he

[17] would point out production, the top person in

[18] production, make everybody known this is what we got,

[19] here's the numbers, here's this person. When it came

[20] to me, nothing.

[21] Q: And were you a top producer?

[22] A: Absolutely.

[23] Q: And so you felt that he should have been

[24] recognizing you in the same way?

[25] A: Yeah. And when I say "production," we have a

Page 114

[1] scale where certain applications — that's very, very

[2] important that you get a certain amount of applications

[3] per day. The more applications the more loans are

[4] going to fund. That was something that you tracked on

[5] a daily basis, okay? He would come in there, pointed

[6] out this person did this for the day or did this for

[7] the week. And I was always one of the top people, and

[8] he never even mentioned my name.

[9] Q: And what about the fact that he neglected to

[10] mention your name makes you think it was because of

[11] your race?

[12] A: I didn't know at the time.

[13] Q: What do you know now?

[14] A: Based on everything that has happened, I feel

[15] that, you know, he basically — through the age, race,

[16] and retaliation, that it was total discrimination —

[17] Q: But what specifically —

[18] A: — that generated —

[19] Q: Sorry. What specifically makes you believe

[20] that?

[21] A: Things —

[22] Q: You said "everything that happened." That's

[23] kind of vague.

[24] A: Things that were said, things that other

[25] people said he said. Like I said, I was told by

Page 115

[1] several individuals in terms of how he felt about me.

[2] The promotion, the more second promotion than the

[3] first. I mean, not the promotion, but the interview to

[4] branch manager position, how it was done, the lies that

[5] he told. It goes on and on.

[6] Q: Did he ever make any racially motivated

[7] comments to your face, to you?

[8] A: Verbally?

[9] Q: Yes.

[10] A: That I recall — that I can recall, no, not to

[11] my face.

[12] Q: What do you mean by — are you implying that

[13] there were some nonverbal comments? When I asked my

[14] question, you clarified it and said "verbally." Is

[15] there another category that you're thinking of?

[16] A: Yeah. What I'm saying is the way I felt it

[17] was discriminatory — what they call nonverbal things.

[18] Q: Like what?

[19] A: For instance, I've got — I'm talking to you

[20] two, totally ignoring me, talking to another person,

[21] things like that, acknowledgments. Just putting an

[22] individual down or would give one individual certain

[23] information and not the other. And I'm talking about

[24] myself.

[25] Q: That's what I was going to ask you. When you

Page 116

[1] say "individual," do you mean yourself?

[2] A: Yes.

[3] Q: So it sounds like you think he kind of gave

[4] you the cold shoulder?

[5] A: I think he was just racist. That's what I

[6] felt.

[7] Q: Okay. Other than what you have told me, what

[8] other examples do you have of how he was a racist?

[9] A: I mean, it's listed in the affidavit. It's

[10] just — you know, just a lot of things he's done.

[11] Q: Like what?

[12] A: I just told you.

[13] Q: Okay. Well, other than what you told me, is

[14] there anything else? I just want to make sure I have

[15] heard —

[16] A: In addition to that?

[17] Q: Yes. I want to make sure I have heard

[18] everything from you that you believe supports your

[19] claim that Mr. Razi is a racist.

[20] A: I'm sure I didn't tell you everything, but I

[21] tried to cover most of it that I can remember.

[22] Q: Okay. So there's nothing else right now that

[23] you can remember that would support your claim that he

[24] was a racist.

[25] A: Other than I was — the main thing is that I

[1] why.

[2]  **Q:** So no one ever kind of sat down with you and

[3] said, "Mr. Calhoun, I know you were a branch manager

[4] before, but here is kind of what you did in your

[5] interview that we didn't like. Here is what we didn't

[6] like about your business plan," or whatever. You never

[7] got that kind of a feedback session.

[8]  **A:** No. Again, I felt I was tossed aside by Paul

[9] Razi.

[10]  **Q:** Do you know whether Mr. Kuhn got a feedback

[11] session like that?

[12]  **A:** No.

[13]  **Q:** Do you know whether any of the other

[14] applicants for that position got a feedback session?

[15]  **A:** I don't know who the other applicants were.

[16]  **Q:** So obviously you don't know.

[17]  **A:** No.

[18]  **MS. SPROLE:** Do you want to take a lunch

[19] break?

[20]  **MS. JOHNSON:** Sure.

[21]  (Luncheon recess.)

[22]  **Q:** (BY MS. SPROLE) Mr. Calhoun, before the lunch

[23] break, we were talking about whether Mr. Razi ever got

[24] back with you to give you any kind of feedback after

[25] you interviewed for the Galleria branch manager

[1] position. Do you remember that?

[2]  **A:** Yes, ma'am.

[3]  **Q:** And I want to get into that, but it's my

[4] understanding that shortly after you found out you

[5] weren't going to be selected for the branch manager

[6] position at the Galleria a branch manager position in

[7] Plano opened up; is that right?

[8]  **A:** Correct.

[9]  **Q:** Is that your — it's right around the same

[10] time period?

[11]  **A:** Probably two and a half, three weeks later.

[12]  **Q:** Okay. Who had been the branch manager in

[13] Plano?

[14]  **A:** Anthony Haap.

[15]  **Q:** And he was — he was your branch manager after

[16] you transferred to the Plano office, right?

[17]  **A:** Yes, ma'am.

[18]  **Q:** And what happened to him?

[19]  **A:** He quit.

[20]  **Q:** Why did he quit, to the best of your

[21] knowledge?

[22]  **A:** He actually talked to me and said he didn't

[23] like how things were done and he wanted to do something

[24] better, and he left and went to work for First NLC.

[25]  **Q:** Is there anybody at Ameriquest that didn't go

[1] work for First NCL?

[2]  **A:** First NLC.

[3]  **Q:** NLC, yeah.

[4]  **A:** A lot of them did.

[5]  **Q:** Sounds like it. Did they hire a lot of people

[6] from Ameriquest?

[7]  **A:** They did. I don't know what you consider "a

[8] lot," but several people that I knew.

[9]  **Q:** Okay. And did he go over there as a branch

[10] manager?

[11]  **A:** No, as a loan officer.

[12]  **Q:** So the branch manager position became

[13] available in Plano when, approximately?

[14]  **A:** Two or three weeks later.

[15]  **Q:** Which was — but I'm looking for a —

[16]  **A:** A date?

[17]  **Q:** Uh-huh.

[18]  **A:** It may have been January.

[19]  **Q:** Okay. And I'm not trying to test you because

[20] I have an e-mail here which is marked as Deposition

[21] Exhibit No. 13.

[22]  **A:** Close. February.

[23]  **Q:** Is that about — does that seem about right to

[24] you, that it was — this e-mail from Billie Pope was

[25] February 13th, 2006?

[1]  **A:** That's correct.

[2]  **Q:** And was this the first you heard about the

[3] branch manager opportunity or —

[4]  **A:** Well, I was in the branch, so I kind of knew

[5] he was going to leave.

[6]  **Q:** Okay.

[7]  **A:** And remember previously I advised that she

[8] would send those out.

[9]  **Q:** Right. Did you get one of these for the

[10] Galleria branch as well, do you know, an e-mail like

[11] this from Billie Pope?

[12]  **A:** Yes.

[13]  **Q:** Now, it looks like attached to this e-mail

[14] there were either two or three documents. Do you see

[15] that?

[16]  **A:** Correct.

[17]  **Q:** There was something called "MS Interview

[18] Communication." I can't tell if that was a document or

[19] what that was. Then there was something called a

[20] "Transfer request doc" and a "Candidate questionnaire"

[21] and "Business plan final doc."

[22]  **A:** That's the business plan I was referring to.

[23] The rest was just general documentation.

[24]  **Q:** Okay. Are these the same documents that you

[25] would have filled out for the Galleria transfer?

Page 125

[1]   **A:** Right. I don't think the first two was filled
[2]   out. Well, the first one is. The second one is not
[3]   filled out unless you transfer to that branch; and then
[4]   the business plan, but I didn't have to do it because I
[5]   already did it for the first one.
[6]   **Q:** And that was my next question. Did you just
[7]   use the same business plan that you had submitted —
[8]   **A:** Right.
[9]   **Q:** — for your Galleria —
[10]  **A:** Correct.
[11]  **Q:** What was the candidate questionnaire?
[12]  **A:** It was just general questions. I would say
[13]  general management questions.
[14]  **Q:** Like how would you deal with X situation, or
[15]  what type of questions were they?
[16]  **A:** To be honest with you, I don't remember, but
[17]  it was just, "Do you want to come here?" "Why do you
[18]  think you would be good for the branch?" Sort of like
[19]  that. It was just general questions, but I don't
[20]  remember the exact questions.
[21]  **Q:** Okay. And you don't have a copy of that?
[22]  **A:** No.
[23]  **Q:** So did you apply for this position?
[24]  **A:** Well, here again, I was lied to again by Razi,
[25]  who — I requested — as you can see, I have HR writing

Page 126

[1]   me saying, "Hey, here's a position open." And Razi had
[2]   came into the branch and we talked about the position,
[3]   and he advised me that it's company policy — and this
[4]   was in — in the main office, the branch manager
[5]   office, just me and him — had advised me that it's
[6]   company policy that they don't promote from within the
[7]   branch.
[8]   **Q:** Mr. Razi told you this?
[9]   **A:** Correct.
[10]  **Q:** And this was after you received the e-mail
[11]  from Ms. Pope telling you about the position?
[12]  **A:** Prior to that.
[13]  **Q:** Oh, prior to that. Okay.
[14]  **A:** Like I said, I already knew the position was
[15]  coming open.
[16]  **Q:** Sure. Okay. And what did you say to that?
[17]  **A:** "Okay."
[18]  **Q:** And what happened?
[19]  **A:** Well, it's not till HR contacted me — she
[20]  sent me — I don't know in the order if this one was
[21]  the first or the second one — said, "Hey, what's going
[22]  on? The branch position is open. Why you didn't
[23]  apply?" And I e-mailed her back.
[24]  **Q:** And by "her," do you mean Ms. Pope?
[25]  **A:** Ms. Pope. I e-mailed her back. And I should

Page 127

[1]   have — that document should be in the documents.
[2]   **Q:** I have some more e-mails I'll show you, so
[3]   just go ahead and then I'll —
[4]   **A:** I e-mailed her back. I said, "Well, tell me,
[5]   I was advised that it was company policy that you can't
[6]   be promoted within the same branch." And she said,
[7]   "Hold on. I will check that out and confirm." Called
[8]   me back — I don't know if she called back or e-mailed
[9]   me back saying, "No, it's no company policy. You can
[10]  do that." And, in fact — well, that was a little bit
[11]  later, but she said, "No, we have no such policy
[12]  whatsoever."
[13]       Like I said, when I was advised by Paul
[14]  Razi, it was, "Okay, sir. I understand." I went back
[15]  to doing my job. And when I found out he was lying,
[16]  that's where I kind of thought about all the process,
[17]  "Wait a minute. What's going on with this guy? He
[18]  blatantly lied to me."
[19]       So, of course, he wasn't in the office —
[20]  he wasn't in the office when I was dealing with Billie
[21]  Pope. It's not until he returned that we had an
[22]  additional conversation.
[23]  **Q:** Okay. When did those additional conversations
[24]  take place?
[25]  **A:** Probably maybe a week later, because he was —

Page 128

[1]   he would have these conference calls. He would call
[2]   in, "I'm going to be there on this date," "I'm going to
[3]   be there on this date," and then finally showed up
[4]   maybe a week later.
[5]       And that's when I went in, and I said,
[6]   "Can I see you in your office?" And I told him,
[7]   "You — our last conversation in your office, you
[8]   advised me that this position — or that you could not
[9]   become a branch manager in the same branch." I said,
[10]  "I just talked to HR a few days ago, and they advised
[11]  me that it is not true." I said, "What's going on?
[12]  Are you being honest with me?"
[13]       He said, "Oh, I — I don't remember
[14]  saying that." I'm like, "You specifically told — that
[15]  was our conversation, me and you. What do you mean you
[16]  don't remember?" Then he tried to backtrack and said,
[17]  "Oh, what I probably meant was" — that it was Stefan's
[18]  and his policy that they don't promote.
[19]  **Q:** Did he explain to you the rationale for why
[20]  they don't like to promote to branch manager from
[21]  within the same branch?
[22]  **A:** No. We were more or less talking in
[23]  reference, "Hey, this is what you told me. Now you're
[24]  telling me something else." And he said — it ain't
[25]  till after that conversation I called HR, talked to

Page 133

[1] Q: What specifically did you tell her in February
[2] 2006 regarding discrimination?
[3] A: That I felt and I have reason to believe that
[4] Paul Razi was discriminating against me, and gave her
[5] things that were happening, the interview, how he never
[6] got back with me, the setup in reference to the
[7] briefing on the first branch manager position
[8] interview, because they had said, if you didn't have a
[9] briefing, you can even — I think — it was almost like
[10] you had to have that briefing. They — "We're going to
[11] make sure you get this," made it sound like it was
[12] extremely important.
[13]     And I keep asking and asking and asking
[14] and never got it, so she was aware of that as well.
[15] And we talked really leading up to that — what I
[16] thought was the illegal search, and then she was gone.
[17] Q: Okay. So you're absolutely certain that in
[18] February of 2006 you told her that you thought you were
[19] being discriminated against based on your race?
[20] A: Absolutely.
[21] Q: And you're absolutely certain that in February
[22] of 2006 you told her that you were being discriminated
[23] against based on your age?
[24] A: If — because it all — in terms of when I
[25] talked with her, it was during this e-mail right here.

Page 134

[1] That's where I'm putting it in the timeline, so I know
[2] it's right around that area.
[3] MS. SPROLE: Objection, nonresponsive.
[4] Q: (BY MS. SPROLE) Are you certain that in
[5] February 2006 you told Ms. Tottress that you felt that
[6] you had been discriminated against based on your age?
[7] A: I did. I'm just not 100 percent certain of
[8] the timeline.
[9] Q: You said that you — in February of 2006 you
[10] also told her that you thought you were being
[11] retaliated against. You testified to that a few
[12] minutes ago. Do you remember testifying to that?
[13] A: Right. I'm — the retaliation came when the
[14] bag situation happened.
[15] Q: Okay. You told me in February of 2006 — and
[16] maybe I just misunderstood your testimony, but I
[17] thought you testified that in February 2006 you
[18] complained to Ms. Tottress that you were being
[19] retaliated against.
[20] A: In terms of the timeline, I'm not for sure.
[21] I'm thinking this was February. In terms did I tell
[22] her of all three, the answer is yes. I'm just not for
[23] sure of the timeline because it was — one minute we're
[24] talking promotion, one minute we're talking Paul Razi
[25] lying in reference to the process of being promoted,

Page 135

[1] that you can't get interviewed, and then next came the
[2] baggage situation.
[3] Q: I'm trying to find out when you first told
[4] Ms. Tottress that you thought you were being retaliated
[5] against.
[6] A: It was after this, but I think it was in
[7] February.
[8] Q: Being retaliated against for what?
[9] A: No, this is when — in terms of the — the
[10] retaliation that I talked to her was in reference to
[11] when they did the search.
[12] Q: Okay. Which wasn't in February, was it?
[13] A: That happened later.
[14] Q: Right. So you didn't talk to Ms. Tottress in
[15] February about being retaliated against, did you?
[16] A: Not in February. That's why I said I wasn't
[17] sure of the dates absolutely.
[18] Q: Let me show you what's been marked as Exhibit
[19] No. 14. If you can flip through the pages. This is a
[20] document that you-all produced to us, and so it's an
[21] e-mail chain, different e-mails from different people
[22] to it — different people on it, rather, so you can
[23] flip through it and look at the e-mails and I'll ask
[24] you about them.
[25]     (Pause.)

Page 136

[1] Q: (BY MS. SPROLE) Is this the e-mail exchange
[2] that you were referring to earlier with respect to your
[3] e-mails to Ms. Pope asking her whether you could apply
[4] for a branch manager position in Plano?
[5] A: I believe this is part of it. Some — you may
[6] have some e-mails maybe left off.
[7] Q: And I have some more e-mails I can show you
[8] that may help tell the whole story, but this is the one
[9] where she told you that you are able to apply that you
[10] were talking about earlier?
[11] A: Correct.
[12] Q: Let me show you what's marked as Deposition
[13] Exhibit No. 15. This looks like an e-mail that you
[14] sent to Mike Stefan —
[15] A: Yes, ma'am.
[16] Q: — asking about whether you could apply for
[17] the Plano branch manager position; is that right?
[18] A: I was really questioning this policy that Paul
[19] Razi had made up.
[20] Q: Had you contacted an attorney by the time you
[21] sent this e-mail about representing you in the case
[22] against Ameriquest?
[23] A: This e-mail right here?
[24] Q: Uh-huh.
[25] A: I think I may have talked to just a friend of

Case 3:07-cv-00031-O   Document 37-5   Filed 03/19/08   Page 24 of 70   PageID 464

Page 137

[1] a friend in terms of saying, "Hey" —
[2]    MS. JOHNSON: Okay. You have to just
[3] answer whether you talked to an attorney, but you don't
[4] have to say what you talked to an attorney or what an
[5] attorney told you. I object on the basis of
[6] attorney-client privilege.
[7]    A: I'll answer yes.
[8]    Q: (BY MS. SPROLE) Okay. Was that attorney
[9] different from Ms. Johnson, though?
[10]    A: Yes.
[11]    Q: So in this e-mail you say that you were
[12] advised that "you and Paul Razi prefer not to hire
[13] someone to branch manager out of the branch from which
[14] they are in. I feel I'm qualified and truly want to
[15] apply, but I want an equal opportunity." What did you
[16] mean by "equal opportunity"?
[17]    A: As — I didn't want to be lied to and
[18] discriminated against.
[19]    Q: Why did you believe you would be discriminated
[20] against?
[21]    A: Everything that had happened up to that point,
[22] me being told he don't like me because I'm black,
[23] him — lies that he told, almost — you know, to me it
[24] was defamation of character. All the things that he
[25] had done, and now I'm talking to his boss who, you

Page 138

[1] know, he's collaborating with. You know, I'm — I'm
[2] seeking out policy, you know. I'm saying, "Hey, you
[3] claim you have this policy, and now you don't. Am I
[4] going to have an equal chance to get this position or
[5] what?"
[6]    Q: Were there other people from the Plano branch
[7] who were allowed to apply for the branch manager
[8] position? Do you know?
[9]    A: In Plano?
[10]    Q: Uh-huh.
[11]    A: I don't know.
[12]    Q: You don't know one way or the other?
[13]    A: I don't know.
[14]    Q: In this e-mail you say, "I understand and
[15] respect your decision if you want to bring someone from
[16] another branch." That's not a true statement, is it?
[17]    A: I don't know because we — we're talking
[18] policy, about this made-up policy, and, you know,
[19] writing that statement, basically what I'm saying is,
[20] "If this is your policy, that's one thing, but I found
[21] out that it ain't."
[22]    Q: Well, you — let me ask you this: Did you
[23] ever ask — did Mr. Stefan ever tell you that that was
[24] not their policy?
[25]    A: He's got a reply e-mail.

Page 139

[1]    Q: Right. And I was going to — right now I'm
[2] asking you — well, did you ever talk to him on the
[3] phone about this or anything, or were all of your
[4] communications with him via e-mail?
[5]    A: E-mail, I believe.
[6]    Q: Okay. So you sent him this e-mail on February
[7] 21st of 2006, and now turn back to Exhibit 14. On the
[8] third page of that, there is an e-mail from him to you
[9] on February 22nd of 2006.
[10]    A: Uh-huh.
[11]    Q: And I assume that this was his response to
[12] your e-mail. Is that right?
[13]    A: Correct.
[14]    Q: And he says, "You have as much opportunity as
[15] anyone. We don't promote from within the same branch,
[16] but I know Paul will talk to you about it again."
[17]    A: Right. Which I found out was a lie.
[18]    Q: What do you mean it was a lie?
[19]    A: Corporate had already confirmed that that
[20] wasn't true.
[21]    Q: Well, corporate confirmed that there was no
[22] corporatewide policy on that, right?
[23]    A: She specifically told me it wasn't true, there
[24] was no such thing, they made it up.
[25]    Q: She told you that Mr. Razi and Mr. Stefan made

Page 140

[1] up this policy?
[2]    A: She said it wasn't true.
[3]    Q: She said what wasn't true?
[4]    A: This policy, about this policy.
[5]    Q: That there was no companywide policy that you
[6] couldn't promote from within the same branch, right?
[7] Isn't that what she told you?
[8]    A: She didn't specify "companywide." She just
[9] said there was no policy.
[10]    Q: But didn't you ask her whether there was a
[11] corporate policy about promoting from within the same
[12] branch?
[13]    A: Uh-huh.
[14]    Q: And that's when she said, "No, we don't have a
[15] corporate policy"?
[16]    MS. JOHNSON: Objection, asked and
[17] answered. He keeps telling you, and you just keep
[18] asking the same question.
[19]    MS. SPROLE: And, again, you're
[20] speaking — you can make your objection, but you can't
[21] make a speaking objection.
[22]    MS. JOHNSON: Well, I know, but this is
[23] the third time you have asked the same question. It's
[24] getting harassing to the witness.
[25]    A: I'll read it to you. It's right here.

Page 149

[1]  **A:** Sure.

[2]  **Q:** — I didn't know if that was somebody at

[3]  Ameriquest or who that was.

[4]  **MS. JOHNSON:** The smoking gun witness.

[5]  **Q:** (BY MS. SPROLE) This is Exhibit No. 18. This

[6]  is just another one. It's your e-mail with Mr. Stefan.

[7]  You forwarded it on to Sekela Fobbs, but the subject

[8]  says "gg." What does that mean?

[9]  **A:** I have no idea. Possibly could have been a

[10]  typo. I don't think it means anything.

[11]  **Q:** Okay. Now, did you believe that when

[12]  Mr. Stefan said we don't promote from within the same

[13]  branch that that was some sort of race discrimination

[14]  against you?

[15]  **A:** Well, to sum it up, I'll say yes, because you

[16]  have Paul working with Stefan collaborating together,

[17]  so that made me feel now I've got — and, here again,

[18]  the area manager is white collaborating — and, yes, I

[19]  did feel it was discriminating.

[20]  **Q:** Okay. So do you believe that Mr. Stefan

[21]  discriminated against you on the basis of your race?

[22]  **A:** Yeah, he was part of the discrimination.

[23]  **Q:** Okay. And what facts do you have to show that

[24]  it was based on your race that he made the decisions

[25]  with respect to your employment at Ameriquest?

Page 150

[1]  **A:** I just linked Paul's actions with his based on

[2]  he collaborated with Paul; Paul collaborated with him.

[3]  So I'm not saying he carried out. Paul did the

[4]  carrying out. But to me it was a joint collaboration.

[5]  **Q:** And do you know that Mr. Stefan is white?

[6]  **A:** I was advised he was.

[7]  **Q:** I don't know. I'm just asking.

[8]  **A:** I don't know. I never met the guy.

[9]  **Q:** Okay. I knew —

[10]  **A:** But I was advised he was.

[11]  **Q:** I knew you hadn't met him. Do you know how

[12]  old he was —

[13]  **A:** No, ma'am.

[14]  **Q:** — at the time?

[15]  **A:** No, ma'am.

[16]  **Q:** Other than his collaboration with Mr. Razi, do

[17]  you have any facts to support your belief that

[18]  Mr. Stefan discriminated against you on the basis of

[19]  your race?

[20]  **A:** Other than the link between them?

[21]  **Q:** "Collaboration," I think, was your word.

[22]  **A:** Right. I would say no.

[23]  **Q:** Do you also believe that Mr. Stefan

[24]  discriminated against you on the basis of your age?

[25]  **A:** Yes, ma'am.

Page 151

[1]  **Q:** What makes you believe that?

[2]  **A:** Because the selection of a branch manager, and

[3]  specifically that branch manager, has to go through the

[4]  regional manager, which is Stefan.

[5]  **Q:** Which branch manager?

[6]  **A:** The one that actually took over the branch.

[7]  **Q:** Are you talking about the Plano branch

[8]  manager?

[9]  **A:** Uh-huh. That's the position we're talking

[10]  now, the Plano position.

[11]  **Q:** Was Mr. Stefan involved in the decision about

[12]  the Galleria branch manager, to your knowledge?

[13]  **A:** I'm assuming he is since he's the area.

[14]  **Q:** But do you know one way or the other?

[15]  **A:** I know he is. Area — the area manager is

[16]  part of the process.

[17]  **Q:** Okay. So when you — when the determination

[18]  was made that you would not be promoted to branch

[19]  manager in the Galleria branch —

[20]  **A:** And, again, collaboration.

[21]  **Q:** Let me finish my question, please.

[22]  **A:** Yes, ma'am.

[23]  **Q:** When the decision was made that you would not

[24]  be promoted to the branch manager position at the

[25]  Galleria branch, was it your understanding that

Page 152

[1]  Mr. Stefan was involved in that decision, in making

[2]  that decision?

[3]  **A:** Yes.

[4]  **Q:** In collaboration with Mr. Razi?

[5]  **A:** Yes.

[6]  **Q:** So what happened after you e-mailed Ms. Pope

[7]  about whether you could apply for the position, you

[8]  talked to Mr. Razi, he told you he doesn't promote from

[9]  within the branch, Mr. Stefan said they don't promote

[10]  within the branch? What happened next?

[11]  **A:** I believe I've got a phone call from Paul Razi

[12]  with a whole change of heart. And in my opinion,

[13]  excuse my language, it's full of bullshit. He said,

[14]  "Mr. Calhoun, we're going to give you an interview.

[15]  Don't worry." It's almost like he tried to brush

[16]  things off.

[17]  **Q:** He called you Mr. Calhoun?

[18]  **A:** Yes, ma'am.

[19]  **Q:** Did he typically call you Mr. Calhoun instead

[20]  of Clint or Clinton?

[21]  **A:** He did both.

[22]  **Q:** And was this telephone call to you after all

[23]  these e-mails that we have been talking about?

[24]  **A:** Yes, after Stefan's.

[25]  **Q:** Okay. What did you —

Page 153

[1]   A: In fact, Tanya Tottress, because she was
[2] notified as well, she was keeping track. And she was
[3] calling, "Did he interview you yet?" "Nope. He said
[4] he's going to do it on this day." That day came. I
[5] didn't get an interview. She would call back, "Did he
[6] interview you yet?" "Nope." "Okay. I'm going to
[7] check into it."
[8]      And as you're coming up on the e-mails,
[9] I'm sure you have got something else where I even was
[10] asking him for the interview.
[11]   Q: Do you know whether Ms. Tottress ever told
[12] Mr. Razi that you complained about discrimination in
[13] the branch?
[14]   A: I have no idea.
[15]   Q: Do you know whether she told Mr. Stefan that
[16] you complained about discrimination?
[17]   A: I have no idea.
[18]   Q: I'm showing you what's been marked as Exhibit
[19] No. 19, and it is an e-mail from February 22nd of 2006.
[20] If you look at the bottom of the second page where
[21] Ms. Pope, I believe, is asking whether you can
[22] interview for an opening in the Plano branch. Do you
[23] see that?
[24]   A: Yes, ma'am.
[25]   Q: What did you do in response to receiving this

Page 154

[1] e-mail?
[2]   A: You should have a reply e-mail.
[3]   Q: Well, if you look above it, there's a reply
[4] from you saying, "Could you schedule this Thursday or
[5] Friday, please?"
[6]   A: Right.
[7]   Q: Does Ms. Pope schedule interviews for
[8] Mr. Razi?
[9]   A: I don't — I don't know how this situation —
[10] how they handled it, because at this point I felt it
[11] was — it was a — it was a big issue.
[12]   Q: What was a big issue?
[13]   A: What had happened in terms of him
[14] discriminating against me because I was black, failing
[15] to interview me, lying to me about policies and
[16] procedures and so forth. I just felt now it was — it
[17] was a big issue, so things probably were handled — I
[18] mean, you've got HR calling the area manager. That's
[19] not normal procedure, but she's doing this because I
[20] have complained to her that I'm being discriminated
[21] against.
[22]   Q: So you complained to Billie Pope about it too.
[23]   A: No, I'm talking about Tanya Tottress.
[24]   Q: Okay. I thought this e-mail was from Billie
[25] Pope.

Page 155

[1]   A: It says Tanya Tottress. I don't know if we've
[2] got the same one. 19?
[3]   Q: Look at page 2. Yeah, look at page 2.
[4]   MS. JOHNSON: Let's refer to Bates stamp
[5] numbers. It might clear things up.
[6]   Q: (BY MS. SPROLE) And do you see at the bottom
[7] of the page it says "Billie Pope to Clinton Calhoun,
[8] 2-22-2006, 2:08 p.m."?
[9]   MS. JOHNSON: Could you tell us the Bates
[10] stamp number?
[11]   Q: (BY MS. SPROLE) Do you see where it says
[12] that?
[13]   MS. JOHNSON: It doesn't say that on my
[14] document either.
[15]   Q: (BY MS. SPROLE) Do you see where it says at
[16] the bottom of the page "AMQ 1561"?
[17]   A: Right.
[18]   Q: Okay. At the bottom of the page.
[19]   A: Okay. "Can you interview next week for the
[20] Plano branch?"
[21]   Q: Right. Whose — what's your understanding as
[22] to who wrote you that e-mail?
[23]   A: Yeah, that's — Billie Pope and Tanya was
[24] aware of this. I'm talking to both of them at this
[25] time.

Page 156

[1]   Q: Okay. My question is, who wrote you this
[2] e-mail about setting up the interview?
[3]   A: Well, this is coming from Billie Pope. I
[4] don't know why Tanya's name is on the top, though. I
[5] don't know if she's writing to Tanya or what's going
[6] on. That's why I say you've got a lot of things that
[7] was happening abnormally.
[8]   Q: Had you complained to Ms. Pope about
[9] discrimination?
[10]   A: No, ma'am. I only talked to her about the
[11] policy — what Paul Razi said, it was company policy.
[12] I didn't talk to her about discrimination because she's
[13] a recruiter. Tanya is the HR.
[14]   Q: Okay. So the recruiter was then setting up
[15] your interview for the Plano branch? Is that your
[16] understanding?
[17]   A: Looks like she was doing coordination.
[18] Remember, I told you me and Paul Razi had talked, so I
[19] guess she's following up saying, "Hey, Paul" — I don't
[20] know what she was doing.
[21]   Q: Okay.
[22]   A: I'm talking to Paul —
[23]   Q: You asked her if she could schedule it for
[24] Thursday or Friday. Do you see that in the middle of
[25] the page?

Page 157

[1] **A:** Correct. It looks like she came and said,
[2] "Hey, it's next week. What days work best for you?" I
[3] told her, "Could you schedule this Thursday or Friday?"
[4] **Q:** Who was higher up in the company hierarchy,
[5] Billie Pope or Paul Razi?
[6] **A:** They're separate entities. You got HR, which
[7] falls in a different area, and then you have regional
[8] area, branch. So who is higher, I don't know.
[9] **Q:** Now, the first page of Exhibit No. 19 looks
[10] like it's an e-mail from Razi saying that he will be in
[11] San Antonio tomorrow, "Call me if you need anything or
[12] you can reach me on my cell." Do you see that?
[13] **A:** He's sending that to the group.
[14] **Q:** Right.
[15] **A:** To the entire branch.
[16] **Q:** Did you call him that day? Do you know?
[17] **A:** Yeah, I talked — I talked to him. In terms
[18] of the interview?
[19] **Q:** I don't know. I was going to ask you what you
[20] talked to him about.
[21] **A:** The interview. During this time — remember,
[22] I told you Paul Razi called me — as a matter of fact,
[23] I know I talked to him. I was aware prior to him even
[24] sending that that he was coming because we were trying
[25] to set up this interview, you know. I mean, I was

Page 158

[1] asking him almost every day leading up to then, "When
[2] are you coming?," because he changed it. He said he
[3] would be here, didn't show, changed it. And I would
[4] call, "When are we were going to do the interview?"
[5] So, yes, there was a lot of communication.
[6] **Q:** Okay. And were you also asking him during
[7] this time about giving you feedback on why you weren't
[8] selected for the Galleria manager?
[9] **A:** Absolutely. Yes, ma'am.
[10] **Q:** And is it your testimony that he never gave
[11] you that feedback?
[12] **A:** Yes, ma'am.
[13] **Q:** Did he ever give you an interview?
[14] **A:** No, ma'am.
[15] **Q:** I'll show you what's been marked as Exhibit
[16] No. 20, and this is a document that you produced to us.
[17] And so it looks to me like you are responding to his
[18] e-mail where he says he'll be in San Antonio. Turn to
[19] the — if you turn to the second page of Exhibit
[20] No. 20, Bates pages number 20 at the bottom, and 21,
[21] the one in your right hand, says, "I will be in San
[22] Antonio tomorrow." Do you see that?
[23] **A:** Right. I'm just looking at the dates
[24] comparing it to this. This is dated the 2nd. This is
[25] dated the 27th, and then it jumped to the 3rd. So —

Page 159

[1] **Q:** Well, let's look at what's been marked as
[2] Exhibit No. 20.
[3] **A:** Okay. Well, he's not directly — on this he's
[4] not talking directly to me.
[5] **Q:** Right. But now look at — look at the first
[6] page of Exhibit No. 20. If you look at the bottom
[7] e-mail —
[8] **A:** The following day.
[9] **Q:** The following day you write and you say,
[10] "Paul, what's the status of the interview? I still
[11] haven't received any feedback from the first interview.
[12] Could you please call me when you get a chance?
[13] Thanks." Do you see that?
[14] **A:** Yes, ma'am.
[15] **Q:** So you're responding to his e-mail where he
[16] says he'll be in San Antonio, right?
[17] **A:** Well, yeah. I'm trying to find out — like I
[18] said, here you've got an abnormal process. You've got
[19] Billie Pope — it's like she's trying to coordinate and
[20] make sure I get interviewed, Paul Razi saying, "Yes,
[21] I'll do the interview," and I'm not hearing anything
[22] from Paul. He's saying, "Hey, I'll be in," et cetera.
[23] **MS. SPROLE:** Objection to everything as
[24] nonresponsive after the word "yes."
[25] **Q:** (BY MS. SPROLE) Now, Mr. Razi responded to

Page 160

[1] you when you asked him what the status of the interview
[2] was, and you said you still haven't received any
[3] feedback, right? Do you see that in the middle of the
[4] page?
[5] **A:** I didn't get the e-mail until the following
[6] day. My e-mail — let me see. Okay. Yes.
[7] **Q:** So you e-mailed him at 9:42 in the morning,
[8] and he e-mailed you back at 11:35 that same day, right?
[9] **A:** Yes, ma'am.
[10] **Q:** What did he tell you?
[11] **MS. JOHNSON:** Objection, document speaks
[12] for itself.
[13] **A:** Do you want me to read this?
[14] **Q:** (BY MS. SPROLE) Please.
[15] **A:** "Clint, last time I spoke with you I told you
[16] that I would be in your branch and that you could come
[17] to me anytime to go over your feedback," which I did.
[18] "I was in your branch for three full days and not once
[19] did you ask me for feedback or take the initiative to
[20] pursue" — this is where he started lying. He was
[21] giving excuses for not doing the interview instead of
[22] just doing it. He was there. I talked to him, "Hey, I
[23] just want to get the feedback."
[24] You've got to understand the area manager
[25] when they come in, they're doing a lot of different

Case 3:07-cv-00031-O   Document 37-5   Filed 03/19/08   Page 28 of 70   PageID 436

Page 169

[1]   **Q:** That's your e-mail to —

[2]   **A:** Let me see.

[3]   **Q:** These e-mails, I will give you, are kind of

[4] hard to follow as to who is sending them to whom.

[5]   **A:** It looks like I — I will have to look at the

[6] next e-mails to answer that.

[7]   **Q:** So do you know, just to answer my question,

[8] whether Ms. Tottress responded to your e-mail of March

[9] 3rd?

[10]   **A:** Responded to me?

[11]   **Q:** Uh-huh.

[12]   **A:** Without seeing the other e-mail, I think she

[13] did, but I can't confirm it.

[14]   **Q:** Okay. This is another e-mail chain, and it —

[15] it's a document that you produced to us. And if you

[16] turn to the second page, which is Bates-marked 23 —

[17] this is document No. 22, by the way.

[18]   **A:** So she's responding to me.

[19]   **Q:** That Tanya sent you an e-mail saying, "Hey,

[20] Clinton, did Michael Ortiz ever contact you?" Do you

[21] see that?

[22]   **A:** (Witness nods head.)

[23]   **Q:** And then you write back and you say, "No, I

[24] never heard from no one," right?

[25]   **A:** Yeah. That came out of the blue. I didn't

Page 170

[1] know who he was when I got this e-mail.

[2]   **Q:** Okay. And then Tanya wrote back to you and

[3] said, "Nothing from Paul?" on 3-14. Do you see that —

[4]   **A:** Uh-huh.

[5]   **Q:** — on the first page?

[6]   **A:** Uh-huh. Yes, ma'am.

[7]   **Q:** What was she referring to? Do you know?

[8]   **A:** Interview.

[9]   **Q:** But you didn't know who Michael Ortiz was?

[10]   **A:** No. As you can see, that's the first time he

[11] entered into — but, see, me and — here again, me and

[12] Tanya, we're talking. We're talking about this whole

[13] thing on the phone, you know. In between these

[14] e-mails, you're missing the conversation of what's

[15] going on by phone in terms of, you know, he didn't —

[16] you know, when I talked to her, she was totally

[17] surprised, "You mean to tell me he didn't interview you

[18] yet? What's going on?" I'm like, "Tanya, I don't

[19] know." So it was one of those, but —

[20]   **Q:** Which is why it's a little bit hard, then, to

[21] come in and look at the e-mails because you're missing

[22] some of the context, right?

[23]   **A:** Absolutely, ma'am.

[24]   **Q:** Okay. During all of this period that we have

[25] been talking about with these e-mails going back and

Page 171

[1] forth, did you think that you were still in the running

[2] for the Plano branch manager position or not?

[3]   **A:** During the time of these e-mails?

[4]   **Q:** Right.

[5]   **A:** Absolutely.

[6]   **Q:** Okay. Because this is where you're referring

[7] to Mr. Razi having had a change of heart and he was now

[8] going to consider you for the branch manager position?

[9]   **A:** I was waiting for my interview.

[10]   **Q:** Okay.

[11]   **A:** To answer your question, I was waiting for my

[12] interview. Even then — I mean, as you can see, she's

[13] saying, "Hey, what's going on? Did he interview you?"

[14]   **Q:** Who was chosen for the branch manager

[15] position?

[16]   **A:** I didn't know the guy. I heard he was one —

[17] a white young guy.

[18]   **Q:** His name was Ryan Perry. Does that sound

[19] familiar to you?

[20]   **A:** There you go.

[21]   **Q:** And had he been working in the Plano branch?

[22]   **A:** No, ma'am.

[23]   **Q:** Do you know who else applied for that Plano

[24] branch manager position?

[25]   **A:** No, ma'am.

Page 172

[1]   **Q:** I think I asked you that before. You don't?

[2]   **A:** No, ma'am.

[3]   **Q:** Other than you, you don't know.

[4]   **A:** No, ma'am.

[5]   **Q:** And other than, obviously, Mr. Perry.

[6]   **A:** (Witness shakes head.)

[7]   **Q:** Do you know what branch he had been in?

[8]   **A:** Well, this was what you got, ma'am, because

[9] before this gentleman was brought in —

[10]   **Q:** By "this gentleman," do you mean Mr. Perry?

[11]   **A:** — Paul had announced in a meeting all these

[12] candidates and told the entire branch, "These are the

[13] people I've got in the running."

[14]   **Q:** So he had announced who they were?

[15]   **A:** I was humiliated. He never even mentioned my

[16] name.

[17]   **Q:** Who else did he say was in the running?

[18]   **A:** I don't remember these guys' names because I

[19] didn't know none of them.

[20]   **Q:** Because none of them were in the Plano branch,

[21] were they?

[22]   **A:** As far as I can remember, no, in terms of

[23] running. I didn't say who all applied. I said I

[24] didn't know who all applied. But he said, "After

[25] interviewing, I have narrowed it down to here." And

Page 173

[1] I'm like, "Well" — he said, "I think I've got the
[2] person." He said this, and everybody in the branch was
[3] looking at me like, "Wait a minute. He ain't even
[4] mentioned your name." I hadn't even been interviewed.
[5]    Q: Was this like a branch meeting or what —
[6]    A: (Witness nods head.)
[7]    Q: Okay. Do you remember when it happened?
[8]    A: Obviously prior to bringing that gentleman in.
[9] I don't know the exact date.
[10]    Q: But probably around this March 2006 time
[11] period?
[12]    A: I would think.
[13]    Q: And did the Plano branch have the same 18 to
[14] 20 people — let me just ask how many people worked in
[15] the Plano branch?
[16]    A: At that time?
[17]    Q: Yes.
[18]    A: It was approximately — I would say 15 to 20
[19] people.
[20]    Q: So about the same as the South Dallas branch
[21] when you were the branch manager?
[22]    A: Yes, ma'am.
[23]    Q: And did Mr. Razi say who he had selected for
[24] the position?
[25]    A: He didn't give a name, but pretty much said,

Page 174

[1] "I've got the person selected," prior to him even
[2] interviewing me.
[3]    Q: And how was it — how did you know — how did
[4] the other people in the branch know that it wasn't you
[5] he had selected?
[6]    A: Because he said, "I have my three candidates
[7] already." He said, "I've pretty much got the person."
[8] He — in fact, I'm almost certain he said, "I've got a
[9] nice young guy." I mean, he said it in front of
[10] everybody. You don't have to quote me. "I've got a
[11] nice young guy." And everybody was looking at me like,
[12] "Wait a minute. What in the world is going on?"
[13]    So, now, once that announcement — do you
[14] think I'm still in the running after he said that?
[15]    Q: And you specifically remember him saying,
[16] "I've got a nice young guy"?
[17]    A: Yeah.
[18]    Q: You're certain he said that?
[19]    A: I'm — he said "young." I don't know exact
[20] words, but I'm certain of that.
[21]    Q: And so if I talk to other people from the
[22] branch, they would —
[23]    A: They should.
[24]    Q: — remember that too?
[25]    A: They should.

Page 175

[1]    Q: Did Mr. Perry start working as the branch
[2] manager of the Plano branch while you were still
[3] employed there?
[4]    A: No, ma'am.
[5]    Q: Other than what you have already told me, what
[6] makes you believe that Mr. Razi did not choose you for
[7] the branch manager position in Plano based on your
[8] race? And you have already — you don't have to repeat
[9] what you have already told me. Is there anything else?
[10]    A: Other than what I have already said?
[11]    Q: Right.
[12]    A: Just the — after the individual was chosen,
[13] several conversations with other people. I can't —
[14] you know, people came and told me, "I'm sorry. I know
[15] you were done wrong. He didn't like you. We had heard
[16] he wasn't going to hire no black person."
[17]    Q: Who told you that?
[18]    A: Karl.
[19]    Q: Karl Kuhn?
[20]    A: Karl Kuhn. He shook — he came and shook my
[21] hand. I'm trying to think. I don't know where we was
[22] at. It may have been — I don't know. But we talked,
[23] he shook my hand, he apologized.
[24]    Q: And was Mr. Kuhn still working in the Plano
[25] branch —

Page 176

[1]    A: He had quit.
[2]    Q: — when this conversation —
[3]    A: He had quit.
[4]    Q: Let me just finish my question. Did he end up
[5] quitting?
[6]    A: Yeah, he left.
[7]    Q: Okay. Before the layoffs?
[8]    MS. JOHNSON: Objection —
[9]    A: No.
[10]    Q: (BY MS. SPROLE) But he quit as opposed to
[11] getting laid off, Mr. Kuhn?
[12]    A: He quit right after — prior to that position.
[13]    Q: Prior to what position?
[14]    A: The branch manager position in Plano. It was
[15] right in that area.
[16]    Q: And he went to NLC as well?
[17]    A: That's correct.
[18]    Q: So was he still — I guess I'm just not
[19] completely following the chronology here. Was he still
[20] working in the Plano branch when he came up and said,
[21] "Sorry you didn't get the position"?
[22]    A: No.
[23]    Q: Okay. That's where I got confused. But when
[24] he — well, how was it that you ended up talking to
[25] him, then, if he wasn't working there anymore?

Page 177

[1] **A:** He came back to get his stuff. That's why I
[2] was trying to remember where — he came back to the
[3] Plano branch to pick up his stuff, shook my hand, "I'm
[4] sorry. Heard what happened to you, man." He said,
[5] "You know you deserved it. You know how Paul Razi is."
[6] Just one of those.

[7] **Q:** Did anyone else say anything to you about
[8] Mr. Razi not wanting to hire a black person?

[9] **A:** Yeah. I'm trying to think of her name. She
[10] said he was a racist bastard. She told me that because
[11] she said he didn't like women. Her name, I believe,
[12] was Sue.

[13] **Q:** Was she in the Plano branch?

[14] **A:** She — she said she got out of there because
[15] he didn't like women.

[16] **Q:** Had she been working in the Plano branch?

[17] **A:** Yes, ma'am.

[18] **Q:** And so this was her opinion about Mr. Razi?

[19] **A:** Yes, ma'am.

[20] **Q:** Do you know Rachel Eldridge?

[21] **A:** Yes, ma'am.

[22] **Q:** Did you ever ask her whether she walked around
[23] her house naked?

[24] **A:** Absolutely not.

[25] **Q:** Did you ever make any sort of sexual related

Page 178

[1] remarks to her?

[2] **A:** No, ma'am.

[3] **Q:** Have you now told me all of the reasons that
[4] you think that Mr. Razi discriminated against you on
[5] the basis of your race in connection with not hiring
[6] you for the Plano branch manager position?

[7] **A:** Without viewing any additional notes, yes.

[8] **Q:** And it is my understanding that you also
[9] believe that he discriminated against you on the basis
[10] of your age in not hiring you for the Plano branch
[11] manager position; is that correct?

[12] **A:** Yes, ma'am.

[13] **Q:** Other than what you have already told me about
[14] comments that Mr. Razi made to you, what facts do you
[15] have to support your claim that Mr. Razi discriminated
[16] against you based on your age?

[17] **A:** That was his mouth — word of mouth. He's the
[18] one that said, "I've got this young guy — I've got
[19] this young guy in," things like that.

[20] **Q:** So the fact that he said — the fact that when
[21] he announced that he had chosen his branch manager that
[22] he referred to him as a young guy led you to believe
[23] that you had been discriminated against based on your
[24] age?

[25] **A:** And other things in terms of what people have

Page 179

[1] said, yes.

[2] **Q:** Like what?

[3] **A:** He wanted a young white guy.

[4] **Q:** Who told you that?

[5] **A:** I mean — and this was told by Anthony, Mark
[6] Bednar, Karl.

[7] **Q:** These were their opinions about what Mr. Razi
[8] wanted?

[9] **MS. JOHNSON:** Objection, form of the
[10] question.

[11] **A:** I don't know their opinions. I mean, I'm
[12] just — this is what was told to me.

[13] **Q:** (BY MS. SPROLE) Well, did they — how did
[14] they form their belief that that's what Mr. Razi
[15] wanted?

[16] **A:** I don't know if they heard it from him or
[17] someone told them.

[18] **Q:** You just don't know.

[19] **A:** I don't know.

[20] **Q:** Were you aware of anybody within Mr. Stefan's
[21] region who was promoted to branch manager from within
[22] the same branch?

[23] **A:** I am aware of someone in his region, and, by
[24] golly, I can't think of the name. And to be honest
[25] with you, I did some calling around just to find out.

Page 180

[1] **Q:** Okay.

[2] **A:** And I found out that, yes, there was someone.
[3] I can't think of his name. I may be wrong, but I think
[4] the name is Ortega. Ortega. He was a loan officer,
[5] got promoted in his branch.

[6] **Q:** Do you know what branch that was?

[7] **A:** No. I don't know the specifics behind it.
[8] But I was trying to do some research myself.

[9] **Q:** And that was within Mike Stefan's region?

[10] **A:** I believe so.

[11] **Q:** It wasn't somebody who — who was in your
[12] branch in South Dallas or anything? No, there's no
[13] Ortegas.

[14] **A:** No, ma'am. He wasn't in none of these Dallas
[15] branches. He's — you got a region, and now you got
[16] other areas that combine the region.

[17] **Q:** Right.

[18] **A:** So he was in another area, but I believe still
[19] under Mike Stefan's area.

[20] **Q:** Do you know what year this was?

[21] **A:** That he got promoted?

[22] **Q:** Uh-huh.

[23] **A:** It was either 2005 or 2006.

[24] **Q:** Do you know whether any white people applied
[25] for the Plano branch manager job other than Mr. Perry?

Page 181

[1] **A:** I don't know who applied.

[2] **Q:** Well, I know you don't know who applied, but I

[3] don't know whether you had heard that — of anybody who

[4] was white, anybody who was Hispanic, any other races.

[5] **A:** I don't know.

[6] **Q:** Again, you just don't know one way or the

[7] other.

[8] **A:** No, ma'am.

[9] **Q:** Did you have any conversations with Mr. Razi

[10] about what happened in connection with the Plano branch

[11] manager position after he made the decision to hire

[12] Perry?

[13] **A:** I wasn't ever there, no. I was already gone.

[14] I was gone before Perry got there.

[15] **Q:** I know you were, but you testified that

[16] Mr. Razi had this meeting in the Plano branch where he

[17] said he had his guy or whatever.

[18] **A:** Yes, ma'am.

[19] **Q:** Did you talk to him after that —

[20] **A:** No, ma'am.

[21] **Q:** — about the branch manager position?

[22] **A:** Not that I know of.

[23] **Q:** Did you call Tanya Tottress —

[24] **A:** Yes.

[25] **Q:** — about this after you — after this meeting

Page 182

[1] happened in the Plano branch?

[2] **A:** I talked to Tanya, yes, ma'am.

[3] **Q:** Did you talk to her on the phone, or did you

[4] talk to her via e-mail?

[5] **A:** I called her on the phone.

[6] **Q:** And what did you tell her?

[7] **A:** "What's going on? He had said he already got

[8] his guy. He's already been selected." I don't know

[9] what her response was at that point. It was — as you

[10] can see, things are just moving along now. So, now,

[11] you know, I'm really worried about my status in terms

[12] of retaliation at that point and stressing out over

[13] what are they going to do to me, what's going on, they

[14] promised me an interview I never got. "You always said

[15] you're going to give it to me. You make an

[16] announcement that you got the guy," so that tells you

[17] everything was, in my eyes, corrupt in this thing, I'll

[18] call it.

[19] **Q:** Now, do you know whether Ms. Tottress at this

[20] point in time told Mr. Razi that you had complained

[21] about discrimination?

[22] **A:** I have no idea what she told him.

[23] **Q:** Okay. Because you just said that you were

[24] worried about retaliation. I'm trying to find out what

[25] the basis of your worry about retaliation was.

Page 183

[1] **A:** Well, just basically now it's clear that they

[2] wasn't going to interview me or select me, for the

[3] simple fact that he made the statement that he got his

[4] candidates.

[5] **Q:** And that was in retaliation — do you believe

[6] that was retaliatory?

[7] **A:** I didn't say that was retaliatory.

[8] **Q:** Okay.

[9] **A:** I said I was worried about, okay, here I am

[10] complaining to HR on my regional — on my area, on my

[11] regional. What's going to happen now? They lied. I

[12] didn't — they wouldn't interview me and I didn't get

[13] selected and I didn't even get feedback, so at that

[14] point I'm wondering, okay, what's going to happen now.

[15] Obviously in those cases, I mean, something normally

[16] happens.

[17] **Q:** What do you mean?

[18] **A:** Something normally happens to that individual.

[19] Usually — they usually get rid of that person.

[20] **Q:** Who gets rid of that person?

[21] **A:** The company.

[22] **Q:** Had you complained specifically to Tanya

[23] Tottress about Mr. Stefan as well?

[24] **A:** I wouldn't say "complained." I would say told

[25] her in reference — about the policy that Razi said

Page 184

[1] that Stefan and him had.

[2] **Q:** Had you told Ms. Tottress that you thought

[3] that Mr. Stefan was discriminating against you on the

[4] basis of your race or your age?

[5] **A:** None of those specific words. I told her I

[6] thought it was discrimination. I don't think I went

[7] into detail with her about him, but just — but now to

[8] me it was one. It wasn't just Paul. It was Stefan and

[9] Paul. It was — it was one whole entity versus two

[10] people, because Paul was — in my opinion, Paul was

[11] doing what Stefan told him to at this point.

[12] **Q:** Paul was doing what Stefan told him to?

[13] **A:** I said in my opinion. Now — because

[14] everything had been taken to Stefan. He's — he's the

[15] regional. He knows everything that's going on, so

[16] obviously he's telling Paul, "This is what you need to

[17] do. You need to do this. You need to do that." You

[18] know how it works.

[19] **Q:** Were you there for any of those conversations?

[20] **A:** No.

[21] **Q:** You don't have any personal knowledge that

[22] Stefan was telling Paul what to do, do you?

[23] **A:** No. Just prior experience how regionals and

[24] area managers coordinate.

[25] **Q:** Well, a few minutes ago you said you were

Page 185

[1] afraid of retaliation, so tell me what the basis of
[2] that fear was.
[3]   A: I have already did it. The announcement that
[4] he already had the guy, and I opened up this whole
[5] complaint. And they have lied instead of taking action
[6] and saying, "Hey" — it would have been different,
[7] "Hey, let's" — I wasn't interviewed. I wasn't even
[8] given feedback. Why?
[9]   Q: Let me ask —
[10]   A: So — go ahead, ma'am.
[11]   Q: No, you go ahead. You can finish. I thought
[12] you were done.
[13]   A: I'm just saying from — from the point of
[14] having someone hired, and that's what pretty much Paul
[15] Razi told us, to the point where everything that was
[16] supposed to happen never happened. So, here again,
[17] normally something happens to that individual.
[18] Normally they get rid of them. I have seen it.
[19] Something happens and —
[20]   Q: Did you believe that you were retaliated
[21] against for having complained to Tanya Tottress when
[22] you were not selected for the Plano branch manager
[23] position?
[24]   A: Absolutely. When I — when I said
[25] discrimination, race, age, I felt they were trying

Page 186

[1] to — now they were going to try to do something.
[2]   Q: So did you feel that Tanya Tottress had turned
[3] on you or was betraying you, she wasn't trying to help
[4] you anymore? How did you feel then about Tanya?
[5]   A: Later I did. Because she was talking to me,
[6] and the next thing I know she was gone. I didn't hear
[7] anything. She was supposed to have been getting back
[8] with me, giving me information, helping me, and then
[9] the next thing I know she was gone.
[10]   Q: Do you know whether Tanya Tottress was
[11] involved in the decision as to whether to hire you as
[12] the Plano branch manager?
[13]   A: I have no idea, ma'am.
[14]   Q: Do you remember approximately the date that
[15] this Plano branch manager — Plano branch meeting
[16] occurred where Mr. Razi said he had decided on a branch
[17] manager?
[18]   A: I don't know the exact date, no, ma'am.
[19]   Q: If you can turn back to Exhibit No. 22,
[20] there's the e-mail from Tanya that says, "Nothing from
[21] Paul?," dated March 14th of 2006. Do you see that?
[22]   MS. JOHNSON: Do you want to indicate the
[23] Bates stamp, please?
[24]   Q: (BY MS. SPROLE) It's Exhibit No. 22, the
[25] first page.

Page 187

[1]   MS. JOHNSON: And what's the Bates stamp?
[2]   MS. SPROLE: The Bates stamp is 22.
[3]   MS. JOHNSON: Thank you.
[4]   Q: (BY MS. SPROLE) Do you see where it says
[5] that, Mr. Calhoun?
[6]   A: It's got, "Nothing from Paul?"
[7]   Q: Right. And that one looks like it's dated
[8] March 14th of 2006.
[9]   A: This is Tanya telling me, "Nothing from Paul?"
[10]   Q: Right.
[11]   A: Correct. Okay.
[12]   Q: I'm just trying to find out when this branch
[13] manager meeting — the Plano branch meeting occurred
[14] where Paul Razi said he had decided on a branch
[15] manager.
[16]   A: You're asking me?
[17]   Q: Yes.
[18]   A: Oh. It was —
[19]   Q: Was it before or after you got this e-mail?
[20] Do you remember? And maybe you just don't remember.
[21]   A: I believe it was after this e-mail.
[22]   Q: Did you like Paul Razi?
[23]   A: I didn't know him long enough to like him or
[24] dislike him. I didn't — I didn't know him.
[25]   Q: So you didn't have an opinion one way or the

Page 188

[1] other?
[2]   A: No, ma'am. His actions spoke, but I didn't
[3] know him.
[4]   Q: I'm showing you what's been marked as Exhibit
[5] 23. These are documents, Mr. Calhoun, I'll represent
[6] to you that I received from Ameriquest that they
[7] generate apparently when you start working there. They
[8] show you various policies, and you electronically on a
[9] computer click off and say that you had reviewed them.
[10] Do you remember doing that when you started at
[11] Ameriquest?
[12]   MS. JOHNSON: Objection, form.
[13]   A: Honestly I don't.
[14]   Q: (BY MS. SPROLE) Okay.
[15]   A: I wouldn't say I didn't do it, but I really
[16] don't remember doing it.
[17]   Q: When you started, did they show you like the
[18] employee —
[19]   A: On a computer?
[20]   Q: — handbook? And there was an arbitration
[21] agreement that said you had to arbitrate claims. Do
[22] you remember looking at any of that and then having to
[23] basically say, "Yeah, I've reviewed that"?
[24]   A: I don't remember, but when you get hired they
[25] give you 50, 60 pages and say sign.

Page 189

[1] **Q:** Right.

[2] **A:** I'm assuming that may have been part of that.

[3] I just don't remember a specific arbitration agreement

[4] like that. Every company does it.

[5] **Q:** Did you ever have those first couple of days

[6] where you're just filling out —

[7] **A:** Exactly.

[8] **Q:** — paperwork all day?

[9] **A:** Yes, ma'am.

[10] **Q:** Did you receive a copy of the company's

[11] employee handbook at any time?

[12] **A:** I don't think I did. I think it was —

[13] however this was presented, I don't think it was

[14] physically given to me.

[15] **Q:** Did you have like a company intranet or

[16] something where you could access company documents

[17] through their computer system?

[18] **A:** Yes. And I know it was there. I think you

[19] were able to do that.

[20] **Q:** Let me ask you this: When you were the branch

[21] manager, obviously you had to handle personnel type

[22] issues. Did you have like a manager policy book or

[23] anything that you were able to refer to?

[24] **A:** I had an office manager — not necessarily

[25] company — or they call it in processing "checklist."

Page 190

[1] Is that what you're referring to?

[2] **Q:** Well, no, I don't — I don't know. I mean,

[3] most managers — or most companies have, you know, this

[4] is the number of sick days you get, this is the number

[5] of vacation days you get, that sort of thing, and as a

[6] manager —

[7] **A:** That's in the handbook.

[8] **Q:** Okay. That's in the handbook. And then

[9] usually there's like a manager's policy book that tells

[10] you how to discipline your employees and all that kind

[11] of stuff.

[12] **A:** And Ameriquest did it different because their

[13] hiring was different. Me being a manager at the other

[14] companies, I did have access to that, but not with

[15] Ameriquest.

[16] **Q:** So you don't remember having access to any

[17] sort of manager's handbook or anything?

[18] **A:** No, ma'am.

[19] **Q:** But you did have access to the employee

[20] handbook?

[21] **A:** Yeah. I think you were able to access it

[22] through the Internet, I think.

[23] **Q:** This document has been marked as Exhibit 24,

[24] which is the employee handbook from 2003. If you look

[25] at the bottom, it has in parentheses "11/03." Do you

Page 191

[1] see where it says that?

[2] **A:** Yes, ma'am.

[3] **Q:** Were you — we talked about this a little bit

[4] earlier. Were you aware that loan applications were to

[5] be treated as confidential documents?

[6] **A:** Yes, ma'am.

[7] **Q:** And were you aware that removing confidential

[8] documents from Ameriquest's premises could lead to your

[9] termination?

[10] **A:** I was aware — because it's a fine line, and

[11] the reason why I say it's a fine line is because

[12] documents by employees, branch managers are removed all

[13] the time. Your mortgage companies protect their

[14] documents for the purpose of brokering. But to say

[15] someone would leave with a document and we're going to

[16] terminate you, no, you — in order — especially the

[17] top performers. To conduct your business, you have to

[18] have documentation of the customers to refer to. And

[19] everyone does that.

[20] If we take the top person, I guarantee

[21] you he's got documents that he's taken, reviewed prior

[22] to the customer's closing. You have to review this

[23] with them. The top people, you've got something

[24] that's — there will always be closings. And I was one

[25] of them.

Page 192

[1] I had customers' documents, reviewed

[2] loans, reviewed rates, did calculations. I did this in

[3] the evening time, early in the morning, on weekends.

[4] But it's not uncommon. And I can give you names, if

[5] you like, of people that have took documents. That's

[6] normal.

[7] What's unnormal [sic] is to take a

[8] document for the purpose of giving it to another

[9] company and providing some type of compensation back.

[10] That's considered brokering.

[11] **MS. SPROLE:** Objection, nonresponsive.

[12] **Q:** (BY MS. SPROLE) Were you aware that the

[13] company had a written policy that the removal of

[14] customer loan information from the premises could

[15] result in termination?

[16] **A:** I have never read that. My interpretation was

[17] you're not allowed to broker, so you can take

[18] documents. Take my branch. People took documents,

[19] especially — it was — a lot of times they came and

[20] told me, "Hey, I'm working on this customer." "Okay."

[21] The insight was what are you doing with the documents.

[22] That's what the company was concerned — not to take a

[23] document out. Obviously you've got protection. They

[24] don't want you losing this document, leaving it outside

[25] and someone finding it, the confidentiality. The key

Page 193

[1] is what are you utilizing the document for.

[2] **MS. SPROLE:** Objection, nonresponsive.

[3] **Q:** (BY MS. SPROLE) And, again, loan applications

[4] have —

[5] **MS. JOHNSON:** Excuse me. He did ask —

[6] answer your question.

[7] **Q:** (BY MS. SPROLE) Loan documents have Social

[8] Security numbers on them, right?

[9] **A:** Yes, ma'am.

[10] **Q:** And financial information regarding the

[11] customers, right?

[12] **A:** Yes, ma'am.

[13] **Q:** Would you just explain for the jury, please,

[14] what brokering means?

[15] **A:** I just did.

[16] **MS. JOHNSON:** Well, you have the

[17] opportunity to explain it once more to her.

[18] **A:** From my interpretation, which probably is

[19] many, to take a company document or customer document

[20] that was retrieved by the company — and I'll go back

[21] to say when the company provides you with leads, okay?

[22] If I got a lead from outside, that didn't originate

[23] from the company. But a company document originated

[24] from the company that I take outside to another company

[25] or personnel to retrieve some type of compensation is

Page 194

[1] considered brokering.

[2] **Q:** Where you would have gotten the lead at

[3] Ameriquest, but then you would give that customer lead

[4] to somebody at NCL —

[5] **A:** For payment.

[6] **Q:** — and then they would —

[7] **A:** For payment.

[8] **Q:** Let me just finish.

[9]     — and then they would give you a

[10] kickback or a payment or whatever for having referred

[11] that customer to them. Is that essentially what you're

[12] saying?

[13] **A:** Yes, ma'am. In those terms, that would be

[14] considered brokering.

[15] **Q:** And why is it that you would be able to make

[16] more money doing that — and I don't mean you,

[17] Mr. Calhoun, but anybody would be able to make more

[18] doing that as opposed to getting their commission from

[19] keeping the loan at Ameriquest?

[20] **A:** They necessarily — that's necessarily not

[21] true.

[22] **Q:** Why would — why would anybody do it, then, if

[23] they weren't going to make more?

[24] **A:** Really you don't find it done unless somebody

[25] is leaving. People have left — usually people who

Page 195

[1] left take leads and go broker them out. Someone that's

[2] within the company that's not leaving may be brokering

[3] if an individual who's trying to get a loan done can't

[4] get it done. We can't get it done. When I say "we,"

[5] Ameriquest Mortgage couldn't do it. Tried everything

[6] we can, but couldn't do it. They found somebody that

[7] could do it. That would be an instance of brokering.

[8] **Q:** Did you ever broker any loans when you were at

[9] Ameriquest?

[10] **A:** No, ma'am.

[11] **Q:** Do you know anybody who did?

[12] **A:** That's hard to say. In terms of Ameriquest,

[13] or with any company?

[14] **Q:** In terms of Ameriquest.

[15] **A:** It's hard to say. I have heard of it being

[16] done.

[17] **Q:** Well, when you were the branch manager, did

[18] you ever discipline anybody, fire anybody, counsel

[19] anybody for having brokered a loan?

[20] **A:** Not at Ameriquest.

[21] **Q:** This is Exhibit No. 25, which is the 2004

[22] employee handbook, and it's just excerpts from it. We

[23] have produced to you the entire handbook, but I didn't

[24] think we wanted to go over that today. Do you remember

[25] seeing this handbook before?

Page 196

[1] **A:** Not until I reviewed it in these documents.

[2] **Q:** Okay. You understood, obviously, Mr. Calhoun,

[3] that you were employed "at will" at Ameriquest, meaning

[4] that Ameriquest could terminate you for any reason or

[5] no reason at all. Do you understand that term?

[6] **A:** Well, you still have legal reasons.

[7] **Q:** Absolutely true.

[8] **A:** Are you referring to legal reasons?

[9] **Q:** No. But did you understand that you didn't

[10] have, you know, a contract with Ameriquest that you

[11] were going to be employed for ten years or something?

[12] Right?

[13] **A:** Yes, ma'am.

[14] **Q:** Would you turn to the second page of Exhibit

[15] No. 25, which is AMQ 1208.

[16] **A:** Okay.

[17] **Q:** Do you see that? Do you see about the middle

[18] of the page it says "employment at will"?

[19] **A:** Yes, ma'am.

[20] **Q:** Do you remember reviewing that term of your

[21] employment at any time while you were employed by

[22] Ameriquest or having that be explained to you?

[23] **A:** No, ma'am.

[24] **Q:** You do remember that the employee handbook —

[25] you could access the employee handbook while you were

Page 197

[1] employed there?

[2] **A:** Yeah. I'm not saying I didn't see this. I

[3] never read this.

[4] **Q:** Most employees don't.

[5] **A:** Exactly.

[6] **Q:** It's not real exciting reading.

[7] **A:** Yeah. But I do understand what they're

[8] referring to.

[9] **Q:** Okay. Would you turn to the next page, which

[10] is AMQ 1211? And there's a section there that says

[11] "Business Ethics and Professional Conduct." Do you see

[12] that?

[13] **A:** Yes, ma'am.

[14] **Q:** And Ameriquest, again, had a policy that

[15] unauthorized removal from the premises of property that

[16] belongs to a customer could lead to disciplinary

[17] action, up to and including termination. Do you see

[18] where it says that?

[19] **A:** It actually says "may be cause for

[20] disciplinary action."

[21] **Q:** Right.

[22] **A:** So, here again, you take a document out, you

[23] talk to a customer, you work that loan, it isn't a

[24] termination just because you took it out. It happens

[25] all the time.

Page 198

[1] **Q:** You took home a loan application, didn't you,

[2] Mr. Razi — I'm sorry, Mr. Calhoun?

[3] **A:** Don't you call me that.

[4] **Q:** That's an insult, I know. I'm sorry.

[5] **A:** It was — I don't know if it was actually an

[6] application. I know it was customer information.

[7] **Q:** Okay. Confidential customer information?

[8] **A:** When I say "confidential," I always say was it

[9] Social Security documentation? I think it was. I

[10] think it was, because it printed out his loan proposal.

[11] **Q:** And did that also include financial

[12] information related to the customer, their income and

[13] all that kind of stuff?

[14] **A:** I don't know if it was on that document. It

[15] could have, depending on what part of the documents

[16] printed out. I don't even remember.

[17] **Q:** Do you remember the customer's name?

[18] **A:** No, ma'am. I know it was a gentleman, but I

[19] don't know his name.

[20] **Q:** How often did you take home confidential

[21] customer information?

[22] **A:** As often as needed. When I was working with a

[23] customer and that customer requested, "Call me back

[24] after business hours," or if it was a weekend, "Can you

[25] call me in the morning and review this with me?"

Page 199

[1] Closings, "Can you call me?" Things like that. Here

[2] again, common practice.

[3] **Q:** There was an incident in March, my

[4] understanding is, where Mr. Razi asked whether he could

[5] look in your duffle bag, or your gym bag, right?

[6] **A:** You mean Mr. Razi and probably other personnel

[7] searched my bag, and then as I returned from being

[8] pushed out of my office and I felt the bag was

[9] searched, then I was asked.

[10] **Q:** Okay. Well, why don't you just tell me what

[11] happened.

[12] **A:** Well, where do you want me to start? At what

[13] point? The time where Paul Razi came and asked me or

[14] prior to that?

[15] **MS. JOHNSON:** That day. Probably that

[16] day.

[17] **A:** That day?

[18] **Q:** (BY MS. SPROLE) Sure.

[19] **A:** Walked in the office with my gym bag.

[20] **Q:** And before you go too far, do you remember the

[21] date?

[22] **A:** No.

[23] **Q:** It was in March, though, right?

[24] **A:** It was in March around the 15th, in that area,

[25] I think.

Page 200

[1] **Q:** Okay.

[2] **A:** I walked in as normal, went to work as normal.

[3] The next thing I know I started getting these taps on

[4] the back, "Are you going to lunch?"

[5] **Q:** What do you mean "taps on the back"?

[6] Physical —

[7] **A:** Paul Razi came and physically tapped me on the

[8] back.

[9] **Q:** Okay.

[10] **A:** Whispered in my ear, "Hey, are you going to go

[11] to lunch?" I didn't think nothing. I'm working.

[12] "Yeah, I'm going to go to lunch." 15 minutes, "Are you

[13] going to go to lunch?" I really didn't think nothing

[14] of it. I said, "I don't know. I may." I'm pricing up

[15] loans and working customers' proposals.

[16] And he came to me maybe about four times,

[17] and the last time he came to me, he said, "Hey, why

[18] don't you go ahead to lunch." You know, I kind of

[19] thought in the back of my mind, but still, I went to

[20] lunch. "All right." I got kind of — you know, I

[21] didn't want him to continue harassing me, so I went to

[22] lunch.

[23] I came back. As soon as I came back and

[24] sat down, here come Paul Razi, tapped me on the back,

[25] "Hey, can you come in my office? And by the way, can

Page 201

[1] you bring your bag?" As soon as he said that — I
[2] basically said, "Okay." I basically felt, "I know what
[3] you did. Setup."
[4]    In terms of when I came in, I said, "I
[5] ain't got nothing to hide." He asked me could he look
[6] into my bag. I said, "Of course, sir."
[7]    Q: Did Mr. Razi have an actual physical office in
[8] the Plano branch?
[9]    A: He didn't. There was a branch manager office,
[10] and that's what he utilized.
[11]    Q: So you were in what, I guess, by now was the
[12] empty branch manager office?
[13]    A: Correct.
[14]    Q: Because Anthony Haap had already left?
[15]    A: And the new guy wasn't there yet.
[16]    Q: Right. So this was when there was really no
[17] true branch manager.
[18]    A: Yes, ma'am.
[19]    Q: Was Mr. Razi at this point sort of acting as
[20] the branch manager as well as the area manager?
[21]    A: If you want to say that, but normally when the
[22] area manager has a branch — I would say no, because
[23] normally he assigns someone, but no one was assigned.
[24] So he would just come there and utilize that office.
[25]    Q: Like if you had something that needed branch

Page 202

[1] manager approval during this time when there was no
[2] branch manager, would you just get that approval from
[3] Mr. Razi?
[4]    A: If you can reach him. I mean, not normally.
[5] This is not a guy that says, "Here is my" — remember,
[6] we didn't know where he was at. He was over all the
[7] other places. I never had his cell phone.
[8]    Q: Did you have reason to need approval from a
[9] branch manager to make particular decisions?
[10]    A: Me? No.
[11]    Q: Okay. Okay. So he, Mr. Razi, asked you to
[12] come into this empty branch manager office?
[13]    A: Yes.
[14]    Q: And you did that?
[15]    A: Yes.
[16]    Q: Was anybody else there?
[17]    A: No.
[18]    Q: And you had your duffle bag with you?
[19]    A: Yes.
[20]    Q: Do you want to call it a duffle bag or a gym
[21] bag?
[22]    A: It was a gym bag.
[23]    Q: Gym bag. Okay. Did you work out at lunch or
[24] something, or why did you have a gym bag?
[25]    A: I worked out after work.

Page 203

[1]    Q: Was there anybody on the phone?
[2]    A: Yes.
[3]    Q: Who was on the phone?
[4]    A: Mike Stefan.
[5]    Q: Anybody else?
[6]    A: Not that I'm aware of.
[7]    Q: Do you remember a Mike Ortiz being on the
[8] phone? Well, do you remember anybody from HR being on
[9] the phone?
[10]    A: I don't remember. Could have possibly been.
[11] I don't remember.
[12]    Q: Okay.
[13]    A: I think he said, "I've got Mike Stefan on the
[14] phone as well," and that's all I remember.
[15]    Q: Okay. What happened next?
[16]    A: He asked me could he look in my bag. I said,
[17] "Sure," and before we even opened the bag, I said,
[18] "Sir," and I don't remember the exact words, "I have an
[19] application. I know what y'all are doing." And I
[20] think I used the word "application," or I may have said
[21] I had a customer doc. I don't know the exact words,
[22] but I advised him I had a customer and this was a
[23] customer I was working last night.
[24]    Q: Why did you tell him that?
[25]    A: Because I knew that's what they were going

Page 204

[1] after. Read between the lines. I mean, I knew exactly
[2] what they were doing.
[3]    Q: So if this was something that people did all
[4] the time, then why would — why would you think there
[5] was a problem with it?
[6]    A: When people do that all the time, they don't
[7] get their bag searched and asked to come into the
[8] office in front of the regional manager. That was
[9] abnormal. So I let him know right from the beginning.
[10] This is what's — well, you know, here again, remember,
[11] I'm thinking retaliation regardless, anyway. And now
[12] I'm — you know, to my behold, here it is.
[13]    Q: Well, how did you know he wasn't thinking that
[14] you were stealing office supplies?
[15]    A: Because I wasn't. Why would he think that if
[16] I wasn't? The only thing he would ask for my bag for,
[17] I had a customer — whatever customer information.
[18] Other than that what was in there was gym clothes.
[19]    Q: And where — okay. So I'll let you tell me
[20] what happened next.
[21]    A: He asked me and I told him.
[22]    Q: What did he say?
[23]    A: He said, "Could you open your bag?" I went in
[24] and I said, "Here it is."
[25]    Q: So you pulled the application out of your gym

Page 205

[1] bag for him?

[2]   **A:** Yeah.

[3]   **Q:** He didn't —

[4]   **A:** No.

[5]   **Q:** — pull it out?

[6]   **A:** No.

[7]   **Q:** Were there like dirty clothes in there, or

[8] what else was in your gym bag?

[9]   **A:** It was my gym clothes.

[10]   **Q:** And was the application — where was the

[11] application in the gym bag?

[12]   **A:** Right on the side, you know. I put it in and

[13] it was right there on the side. You know, you had your

[14] clothes, and on the side of the bag it was right there.

[15]   **Q:** Was it underneath things, or was it just on

[16] the side?

[17]   **A:** I mean, it had clothes against it.

[18]   **Q:** Were there any other papers in your bag?

[19]   **A:** No, not that I recall. Might have been

[20] personal information, but in terms of company

[21] information, no.

[22]   **Q:** So you pulled out the application and you gave

[23] it to Mr. Razi?

[24]   **A:** Yeah. And I don't — and I'm saying

[25] "application." I don't know if it was an application.

Page 206

[1] It may have been what we call a printout. When you do

[2] a loan proposal, you print the proposal. I think it

[3] was actually a proposal. I'm not for sure. It could

[4] have been an application, but — could have been both.

[5] But I pulled it out, and I think him and Stefan said,

[6] "Why are you with that bag?"

[7]   **Q:** Why did you what?

[8]   **A:** I mean, "Why — why is that in your bag?"

[9]   **Q:** And what did you say?

[10]   **A:** I may have not said nothing because I didn't

[11] want to say anything to the fact of — I knew what they

[12] were trying to do. I felt it was a setup. They set me

[13] up. They searched my bag. They were finding ways to

[14] get me out. And here I expressed earlier something

[15] happens, and I felt this was it.

[16]   And I think — he may have — I may — he

[17] may have told me, "Why do you have it?" And I told

[18] him — I know I told him, "Hey, man, listen, I'm not

[19] stealing. I'm not" — I said, "I worked — this is a

[20] customer that I worked" — and as a matter of fact, the

[21] reason why it actually got in the bag, I was the last

[22] one in the office. Pulled up, got the loan

[23] information, hadn't priced it, and I printed it from my

[24] computer, and as I shut the lights off, I grabbed it

[25] from the computer.

Page 207

[1]   And I told them, "This is the loan I was

[2] working last night," and I didn't say nothing else. I

[3] was just kind of in shock.

[4]   **Q:** Well, you say they were setting you up. How

[5] did they set you up?

[6]   **A:** They searched my bag.

[7]   **Q:** How do you know they searched your bag?

[8]   **A:** Just by the way the events happened.

[9]   **Q:** Did you see them search your bag?

[10]   **A:** No. I was gone. He knew — he knew it was in

[11] there. Remember, this was not in my bag until 7:30,

[12] 8:00 o'clock. I was the last one in the office. Ain't

[13] nobody see me put it in there, unless somebody was

[14] hiding behind a chair. But I was in the office. I'm

[15] the one that closed the office. So nobody ain't see me

[16] put it in there. That means in order for them to even

[17] pop up and say, "Hey," they had to search my bag.

[18]   **Q:** Did anybody tell you that they saw them

[19] searching your bag?

[20]   **A:** No, ma'am, I don't believe so.

[21]   **Q:** Did you work on the loan that night before?

[22]   **A:** Didn't even call the customer. Didn't even

[23] have a chance to call them. I got the loan, never

[24] talked to them. Because I actually ended up getting

[25] out of there fairly late and didn't even — and I was

Page 208

[1] going to look at the proposal, call the customer, "This

[2] is what I can do." I didn't even call them. I ended

[3] up doing something and never even got — made an

[4] attempt to even call the customer.

[5]   **Q:** What would you have — what discussion would

[6] you have had with the customer if you had called them?

[7]   **A:** Well, you — you got your calculator, you

[8] calculate the loan. The customer is trying to get a

[9] certain percentage, and that's the reason why I was

[10] doing it. I don't know the exact percent he was trying

[11] to get in terms of interest rate. If you scale back

[12] .5, what is that going to make your loan amount. So I

[13] would calculate it and see what we could do.

[14]   Normally, you would have a little bit of

[15] room. If the customer is trying to — maybe trying to

[16] get a 5.9, for example, and we had him at 6.1, I can

[17] calculate it, and, "Sir, I can get you this 5.9," and

[18] still maintain what we're trying to do in terms of loan

[19] amount, is there enough room, can I keep the same fees

[20] on this particular loan, so things like that.

[21]   **Q:** And to give him — you're basically crunching

[22] some numbers there for him and trying —

[23]   **A:** True. Yes, ma'am.

[24]   **Q:** And so you need to use the company software to

[25] be able to do that, right? Isn't that what you talked

Page 209

[1] about earlier?

[2] **A:** You have a little mortgage calculator.

[3] **Q:** I thought you said earlier that there was a

[4] company software that you used to be able to calculate

[5] the rates and everything.

[6] **A:** At work. At work. I'm saying when you

[7] initially put this information in the system, it

[8] calculates it for you, and then you go in and work the

[9] numbers.

[10] **Q:** What do you mean "work the numbers"?

[11] **A:** Like if you're trying to get a lower rate,

[12] lower payment, lower fees, you go in and work the loan.

[13] If a customer is saying, "I need to be here," and we

[14] had them here, so I can go in and look at it and see

[15] how much I need to cut back and say, "Yep, I can do

[16] this" or, "No, not whatsoever."

[17] **Q:** And what tools would you use to calculate

[18] those amounts?

[19] **A:** Mortgage calculator.

[20] **Q:** What's a mortgage calculator?

[21] **A:** It's a calculator — a handheld calculator

[22] that gives you mortgage information, such as interest

[23] rates, payment, term. If you're doing different types

[24] of loans, such as interest only loans, it gives you

[25] information for that. Just mortgage information.

Page 210

[1] **Q:** And is this a calculator that you took home as

[2] well?

[3] **A:** I had one at home. Most loan officers keep

[4] their mortgage calculators. I was a loan officer

[5] that — in terms of high producer, I gave my cell

[6] number out to all my customers, so they would call me

[7] all through the day, all through the night.

[8] **Q:** And so are you now certain it was a loan

[9] proposal and not an application that you took home, or

[10] you still aren't sure?

[11] **A:** It was a document printed from the computer.

[12] I don't know — like I say, when you print this

[13] document, depending on what parts you print — and I

[14] don't remember. I think it was just a proposal. The

[15] proposal — I don't know if it showed just loan

[16] proposal, or you can print it where it shows all

[17] information that it contains the customer information

[18] as well. I'm not for sure. Because all I did is grab

[19] it, put it in the bag, and that's it. Never contacted

[20] the customer. I came back, they asked to see the bag,

[21] and I gave it to them.

[22] **Q:** Does the name Kyle Pierce ring a bell, or Ken

[23] Pierce?

[24] **A:** I remember a Ms. Pierce.

[25] **Q:** Is that who —

Page 211

[1] **A:** No.

[2] **Q:** Is that who — that wasn't whose —

[3] **A:** No.

[4] **Q:** — application it was?

[5] **A:** No. Absolutely not.

[6] **Q:** Why do you remember Ms. Pierce?

[7] **A:** I was advised — they were saying I was — I

[8] got — I think Mark Bednar told me. And then

[9] information from my attorney of a Pearson [sic], and I

[10] recall that because it was a loan that we could never

[11] get done. But it wasn't that person. That's a loan we

[12] had been working with for two months.

[13] **MS. JOHNSON:** Which one are you saying

[14] was the loan?

[15] **THE WITNESS:** Pearson was the loan that I

[16] had been working with for quite a while. It was

[17] somebody else's loan in the office. I came in, found a

[18] way to get it done. I initially ended up taking over

[19] the loan. She was very frustrated because she had been

[20] working trying to get the loan done for quite a while,

[21] but we ended up — we couldn't do it.

[22] **Q:** (BY MS. SPROLE) But you don't remember the

[23] name of the customer at issue with the documents in

[24] your duffle bag?

[25] **A:** No. I know it wasn't Pearson.

Page 212

[1] **Q:** Okay.

[2] **A:** This was — remember, this was a customer I

[3] talked to 6:30, 7:00 o'clock at night, and that was it.

[4] **Q:** Did you ever talk to that customer again?

[5] **A:** No, never talked to them — I mean, as soon as

[6] I walked in, that's what happened, so I didn't have the

[7] opportunity to talk to the customer whatsoever.

[8] **Q:** And did anything else happen in this

[9] conversation with Razi and Mr. Stefan?

[10] **A:** I didn't say anything. Yeah, I think Stefan

[11] told — "Hey, that's all I got for you." It's like

[12] they had made up their mind. You know, I can read

[13] between the lines, at least that's the feeling I got.

[14] And they said — Paul Razi said, "Okay, Clint. Go back

[15] to your seat." He got on the phone, and that was that.

[16] And I went back to my seat, and I called Tanya right

[17] after that.

[18] **Q:** You told her that they had looked — asked to

[19] look in your duffle bag?

[20] **A:** I told her I felt that they had — did an

[21] illegal search on my bag prior to me going to lunch and

[22] I was sort of pushed out to go to lunch by Paul Razi.

[23] I felt they had went in — I explained to her what

[24] happened, "Hey, I pulled the information off the

[25] printer, put it in my bag, was going to call the

Page 213

[1] customer, never did, and that was it."

[2] **Q:** What did Tanya Tottress say?

[3] **A:** She said, "Okay. I'm going to check it out,
[4] and I'll call you back."

[5] **Q:** Did she?

[6] **A:** And I think that's the last time I heard from
[7] her.

[8] **Q:** Okay. So she never called you back, you don't
[9] think.

[10] **A:** No. I think that was the last time I heard
[11] from her.

[12] **MS. SPROLE:** Would you like to take a
[13] short break?

[14] **THE WITNESS:** Yeah.

[15] **MS. JOHNSON:** Sure.

[16]    (Recess taken.)

[17] **Q:** (BY MS. SPROLE) What happened next in terms
[18] of your career at Ameriquest? You left Mr. Razi's
[19] office, you called Tanya Tottress, you spoke to her,
[20] you never heard from her again. What was the next you
[21] heard with respect to what was happening?

[22] **A:** I believe it was the next day. The area
[23] processor — and her name — what is her name?

[24] **Q:** I know a name Michelle Buford. I don't know
[25] if that's — what that is.

Page 214

[1] **A:** That's not it. But she's the area processor.

[2] **Q:** Which means what?

[3] **A:** Basically, she's in control of the processing
[4] for the entire area.

[5] **Q:** Okay.

[6] **A:** As a matter of fact, she may have even got
[7] promoted to regional. You got loan officers, you got
[8] processors. She's over all the processors and the
[9] processing division on how things flow to corporate.
[10] So she's in coordination with corporate.

[11] **Q:** Okay.

[12] **A:** She came in the office and asked me to come
[13] in. She said, "Clint, I'm sorry, we're going to have
[14] to suspend you." She apologized. She said, "I've got
[15] to walk you out." I gathered my things and left.

[16] **Q:** Who did she report to?

[17] **A:** I think she fell under Stefan, him being the
[18] regional. I'm not sure. I'm not sure exactly. I
[19] think it's Mike Stefan.

[20] **Q:** So you left?

[21] **A:** Uh-huh.

[22] **Q:** And what happened next?

[23] **A:** That was pretty much it in terms of me being
[24] physically in the office. After that, I don't know if
[25] Mr. Ortiz called me or I called him. In fact, I may

Page 215

[1] have still been calling Tanya. Like I said, I couldn't
[2] talk to her. She vanished. And then they said — not
[3] Tanya, but someone in that office said, "Hey, you have
[4] to call Ortiz. Tanya is not working your case." I
[5] said, "Okay." I called Ortiz. He was on the East
[6] Coast.

[7] **Q:** Did you call him from home?

[8] **A:** Cell. Cell phone, I believe. And I'm going
[9] to be honest, I don't know if he called me back because
[10] I called and I couldn't get him or if I called him
[11] again. I'm not for sure. But once we did communicate,
[12] because he was actually calling, he had indicated,
[13] "Clint, we're going to put you on suspension, and
[14] you'll be paid for the days that you're on suspension.
[15] And then I'll give you a call after the investigation."

[16] **Q:** Investigation into what?

[17] **A:** That's exactly what I asked him.
[18] "Investigation into what?" I said, "This investigation
[19] already started."

[20] **Q:** I'm sorry, whose investigation had already
[21] started?

[22] **A:** The investigation had been started. And —

[23] **Q:** By Tanya?

[24] **A:** By Tanya. And it was like, "What
[25] investigation?" It almost seemed like he was — he

Page 216

[1] gave me the impression he didn't even know about
[2] everything else that was going on, because he was like,
[3] "What investigation?" I'm saying, "Discrimination
[4] investigation." He may have came out and said, "I
[5] don't know about that." I think he may have said that.
[6] And then he said, "Okay. I'll check into it."

[7]    But his — talking with him, his main
[8] point was the duffle bag, or in this case gym bag
[9] situation. But once I told him, he said, "Okay. I'll
[10] check into it, and I'll call you back after we get an
[11] answer to everything."

[12] **Q:** It was your understanding he would check into
[13] what?

[14] **A:** The discrimination.

[15] **Q:** Okay. Did you tell him that you believed you
[16] had been discriminated against?

[17] **A:** Yes. Well, I told him Tanya — I said, "Tanya
[18] got all the information. She — I'm talking with
[19] her off and on for about a month. You don't know
[20] anything about it?" Because apparently he's supposed
[21] to be over Tanya. That's why I found it odd that he
[22] didn't know nothing that was going on. So that drew a
[23] red flag, but I said okay. He said he'll call me back.

[24]  · **Q:** What specifically did you tell him about your
[25] belief that you had been discriminated against?

Page 217

[1] **A:** It really wasn't detailed. I just kind of
[2] took him through in terms of what had happened and the
[3] conversations me and Tanya had. It was very short.
[4] **Q:** Did he say he would investigate your claims or
[5] he would just investigate to find out what Tanya had
[6] been doing?
[7] **A:** Like I said, I don't — I think he used the
[8] word "investigate," "I'll investigate this," and he may
[9] have said, "I don't know about all that." And he said
[10] he would get back with me.
[11] **Q:** Did you give him specific examples of how you
[12] felt you had been discriminated against?
[13] **A:** Not him. Because, again, he was — I was
[14] explaining to him about the gym bag, but I told him,
[15] "What's going on with the discrimination case?" "I
[16] don't know about that." So —
[17] **Q:** Okay. Maybe I wasn't clear. Did you tell him
[18] that you believed you had been discriminated against?
[19] **A:** Well, I told him — because he was saying
[20] about the gym bag. I said, "What about the
[21] discrimination against me?" He's like, "What? I
[22] didn't know about that. I thought this was about the
[23] duffle bag." I said, "No, an investigation has been
[24] going on. I have been talking with Tanya for quite a
[25] while." And he said, "Let me find out what's going on

Page 218

[1] and I'll get back with you."
[2] **Q:** Did he get back with you?
[3] **A:** It was approximately about a week later he
[4] called me, and he said — it was very short again. He
[5] said he did an investigation and he didn't find no
[6] grounds for discrimination and that based on the gym
[7] bag, that "There's a trust issue and we have to
[8] terminate you." And all I said was, "Okay."
[9] **Q:** So Mr. Ortiz, then, was the one who told you
[10] you were being terminated?
[11] **A:** Yes, ma'am.
[12] **Q:** Did you talk to Razi again?
[13] **A:** No.
[14] **Q:** Do you know whose decision it was to terminate
[15] you?
[16] **A:** No, ma'am.
[17] **Q:** Do you believe your termination was based on
[18] your race?
[19] **A:** Sure. Yes. Absolutely. Race, age, and
[20] retaliation. I feel — and I told you I was feeling
[21] retaliation was coming, and I felt it was a result of
[22] the whole thing that, "Okay. Here is this gentleman,
[23] he has filed a discrimination complaint, then we've got
[24] to get rid of him." I felt that everything was the
[25] cause of me being terminated.

Page 219

[1] **Q:** So do you think that Tanya Tottress was the
[2] one who wanted you to be terminated? Or who was
[3] retaliating against you? I'll ask it that way.
[4] **MS. JOHNSON:** Objection, form of the
[5] question.
[6] **Q:** (BY MS. SPROLE) Who do you believe was
[7] retaliating against you?
[8] **A:** I always said Ameriquest. You're saying
[9] specific individuals?
[10] **Q:** Yes, sir.
[11] **A:** Initiated with Paul Razi and Stefan. I don't
[12] know who gave the go. Normally, if you're an area
[13] manager or regional manager and say I want to get rid
[14] of that person, he's gone. My area manager when I
[15] worked there came and terminated the number one branch
[16] manager for no reason. He filed a lawsuit — well, he
[17] didn't file a lawsuit. He settled, and I was told he
[18] was paid quite a bit of money.
[19] **Q:** By Ameriquest?
[20] **A:** By Ameriquest.
[21] **Q:** And that's what you're after in this case,
[22] aren't you?
[23] **A:** Yes. I feel that everything that's happened
[24] to me shouldn't happen to no minority or American. It
[25] should never happen. I feel the company should pay.

Page 220

[1] **Q:** Do you believe that anybody other than
[2] Mr. Razi and Mr. Stefan retaliated against you?
[3] **A:** I would say yes based on — here again, when
[4] individuals are terminated, it is communicated through
[5] HR up the chain, so everyone — when I say "everyone,"
[6] upper management could say, "I want this person gone,"
[7] but they have to coordinate it with HR. So HR is
[8] involved with it as well.
[9] **Q:** Do you — well, who in HR do you think
[10] retaliated against you? Let me ask it that way.
[11] **A:** I just don't know who — I don't know
[12] everybody in HR. I don't know.
[13] **Q:** Was anything — in connection with your
[14] termination or with the search of your duffle bag, was
[15] anything said to you about your race or your age? Were
[16] there any comments that were made to you about your
[17] race or your age?
[18] **A:** About my duffle bag?
[19] **Q:** In connection with either your termination —
[20] well, let's just do one.
[21] When you had the duffle bag in the branch
[22] manager's office —
[23] **A:** Yes.
[24] **Q:** — and Mr. Razi had you pull out the —
[25] whatever documentation was in it, did he make any

Page 221

[1] comments about your race or your age at that time?

[2]   A: No, ma'am.

[3]   Q: Did Mr. Stefan?

[4]   A: No, ma'am.

[5]   Q: When Mr. Ortiz called to tell you that you

[6] were being terminated, did he make any comments about

[7] your race or your age?

[8]   A: Yes, ma'am.

[9]   Q: What did he say?

[10]   A: He talked about the investigation and that he

[11] didn't find there was any age, race, or retaliation in

[12] his investigation.

[13]   Q: Anything else?

[14]   A: No, ma'am.

[15]   Q: Were mortgage specialists allowed to work at

[16] home?

[17]   A: What do you mean "work at home"?

[18]   Q: I'm sorry?

[19]   A: When you say "work at home," what are you

[20] asking me?

[21]   Q: Did they work for Ameriquest — were they

[22] allowed to perform work for Ameriquest from their

[23] homes?

[24]   A: See what I'm saying? What is your category of

[25] "working at home"? Are you saying bring a computer

Page 222

[1] home or at home calculating loan proposals?

[2]   Q: Doing any kind of work for Ameriquest from

[3] home.

[4]   A: Yeah, it happened — it's done all the time.

[5]   Q: Well, you mentioned earlier that you were

[6] aware of other mortgage specialists who took home loan

[7] applications or loan proposals, I think you said; is

[8] that right?

[9]   A: Yes, ma'am.

[10]   Q: Are you aware of any instances where Mr. Razi

[11] learned that mortgage specialists were taking home

[12] those documents?

[13]   A: Here again, no, ma'am, but based on — I mean,

[14] I only knew him a short period of time.

[15]   Q: Are you aware of any instances where

[16] Mr. Stefan was aware that a mortgage specialist was

[17] taking home customer-related information?

[18]   A: I was unaware. But I assume they do. This is

[19] so common it's — I'm just surprised they asked me

[20] because it's a common practice.

[21]   Q: Were you aware that Rachel Eldridge and Kevin

[22] Olsta had reported that they thought you were brokering

[23] loans?

[24]   A: Not until today.

[25]   Q: "Today," meaning right now or —

Page 223

[1]   A: Earlier.

[2]   Q: When you were going through documents?

[3]   A: Yes.

[4]   Q: Because I don't think we have discussed that.

[5] You and I haven't discussed that, have we?

[6]   A: No.

[7]   Q: Okay. I'm just checking. Does that surprise

[8] you?

[9]   A: Very much. It's totally false. I mean, I

[10] just felt that — it never happened, so the exact

[11] accusations are totally false.

[12]   Q: Why would they have told Mr. Razi that, do you

[13] think?

[14]   MS. JOHNSON: Objection, assumes facts

[15] not in evidence.

[16]   A: I have no idea, ma'am. I really don't.

[17]   Q: (BY MS. SPROLE) In your opinion, what made

[18] Mr. Razi look in — as you tell it, you think that he

[19] did look in your gym bag while you were at lunch. What

[20] made him do that? How did he know to do that, in other

[21] words?

[22]   A: Here again, if — I feel that he was looking

[23] to do anything to get rid of me, and the easiest way to

[24] get rid of a loan officer, find a document, it could be

[25] anything of a customer's, even if it was legitimate in

Page 224

[1] terms of, "Yep, he's working with this document" — I

[2] have known people who have told branch managers, "I

[3] have a document I'm taking home."

[4]   I mean, in the mortgage business so many

[5] things happen and you deal with so much confidential

[6] documentation, it's easy to say, "I'm going to fire you

[7] for this."

[8]   Q: What do you think made Mr. Razi ask to look in

[9] your gym bag to begin with?

[10]   A: The complaint.

[11]   Q: What complaint?

[12]   A: Here you have got a discrimination complaint

[13] on this area manager. He's trying to get rid of me.

[14]   Q: Okay. I'm not being clear, I don't think, in

[15] my question. What made him think, "I wonder what's in

[16] Mr. Calhoun's gym bag"?

[17]   A: You have to ask him.

[18]   Q: Why did he go after the gym bag?

[19]   A: You have to ask him.

[20]   Q: You don't know?

[21]   A: I don't know. I have no idea.

[22]   Q: So was —

[23]   A: I have never had a document in that bag until

[24] the night before, so I have no idea.

[25]   Q: So the first time you ever had a customer

Page 225

[1] document in your bag happens to be the same day that
[2] Mr. Razi asked to look in your bag?
[3] **A:** No, the night before. Remember, I took it
[4] home the night before.
[5] **Q:** It was still in your bag, though, the next
[6] day.
[7] **A:** Right.
[8] **Q:** So that's —
[9] **A:** That was the only time.
[10] **Q:** That's the first time ever?
[11] **A:** That was the first time ever. Absolutely.
[12] First time ever.
[13] **Q:** Bad luck?
[14] **A:** You call it what you want. I call it
[15] retaliation.
[16] **Q:** But if Mr. Razi had asked you, let's say, the
[17] day before to look in your gym bag, there wouldn't have
[18] been anything —
[19] **A:** There wouldn't have been nothing in there.
[20] Absolutely, ma'am.
[21] **Q:** Mr. Calhoun, I'm showing you what's been
[22] marked as Exhibit No. 26, and these are notes made by
[23] Tanya Tottress regarding the duffle bag search. Have
[24] you seen this document before?
[25] **A:** No, ma'am.

Page 226

[1] **Q:** I'll represent to you it's a document that we
[2] produced in this litigation. Your lawyer has a copy of
[3] it.
[4] (Pause.)
[5] **Q:** (BY MS. SPROLE) Have you had a chance to read
[6] it now?
[7] **A:** Yes, ma'am.
[8] **Q:** Is there anything in this — these notes
[9] prepared by Tanya Tottress that's incorrect?
[10] **A:** I mean, obviously this is not exact. It's
[11] through another person, but —
[12] **Q:** What do you mean it was through another
[13] person?
[14] **A:** I mean, this is a conversation that me and
[15] Paul Razi had, so she's translating what I told her.
[16] **Q:** Right. This is — when I read this, it sounds
[17] to me like you —
[18] **A:** Called her.
[19] **Q:** This is the call you told me you made to her
[20] at the duffle bag incident?
[21] **A:** Right.
[22] **Q:** And these are the notes that she made, right?
[23] **A:** Right. I just see a couple of little things.
[24] If you want an example, "He also admitted that he had
[25] no reason to put the information in his bag and it was

Page 227

[1] a stupid mistake." I never said that.
[2] "Clint claims he usually — that he never
[3] usually takes any applications home with him." I never
[4] said that. I was very precise of why I took it home.
[5] **Q:** Was that a true statement, though?
[6] **A:** No, I said it's not true.
[7] **Q:** No, but is it true that you didn't usually
[8] take applications home with you?
[9] **A:** If I was working on a customer document and
[10] needed to. So randomly, yes.
[11] **Q:** How did you usually get that document home?
[12] **A:** Just take it home.
[13] **Q:** But not in your duffle bag?
[14] **A:** I mean, have I ever took something home in my
[15] bag? I mean, yeah. Normally I would just grab a
[16] document and take it home. If I have whatever bag on
[17] me, yeah, I would just put it in the bag. Absolutely.
[18] But those two statements are wrong.
[19] **Q:** Did you ask Paul Razi if he had anything
[20] personal against you?
[21] **A:** Yeah, I sure did. At the time when that
[22] happened, I said, "What's going on? You got anything
[23] against me?" I said — you know, I may have said other
[24] things, but, yes, I did.
[25] **Q:** Did you ask him whether it was based on your

Page 228

[1] race?
[2] **A:** I don't recall asking him that at the time.
[3] **Q:** Did you ask him whether it was based on your
[4] age?
[5] **A:** No.
[6] **Q:** It says in here that you needed to ask
[7] Mr. Razi the question about whether he had anything
[8] against you due to several rumors told to you that Razi
[9] does not like you and wants you to leave the company.
[10] **A:** No. What was said was I asked him do he have
[11] anything against me, and then he asked me a question,
[12] "Why would you say that?" I told him, "I have heard
[13] that you have. Several people have told me." And then
[14] he wanted names, and I said, "I'm not disclosing any
[15] names."
[16] **Q:** And what would those names have been?
[17] **A:** People who have told me? I have already given
[18] them to you.
[19] **Q:** The ones we talked about earlier?
[20] **A:** Yes, ma'am.
[21] **Q:** Mark Bednar?
[22] **A:** Mark, Karl Kuhn, Anthony Munoz — I mean, not
[23] Munoz, but Anthony Haap, Lidell Stevenson. I mean, it
[24] was there. But, yes, the names I have already given
[25] you.

Page 229

[1]   **Q:** Is there anything else that's incorrect in
[2] these notes?
[3]   **A:** Those are the two I seen. Other than that,
[4] it's pretty much accurate.
[5]   **Q:** It says that she told you to touch base with
[6] her when you returned from your vacation?
[7]   **A:** That's — my daughter was getting married. I
[8] had a preplanned vacation, and so I was leaving during
[9] this time that I was suspended. So — and I had told
[10] her. She said, "Okay. I'll touch base with you when
[11] you get back."
[12]   **Q:** And did you try to call her when you got back?
[13]   **A:** Tanya? Yes.
[14]   **Q:** And that's when you couldn't find her again?
[15]   **A:** After that call, I couldn't find her. I think
[16] that's the last time I talked to her.
[17]   **Q:** Do you know a Michelle Buford?
[18]   **A:** I don't recall that individual.
[19]   **Q:** Do you know whether you were replaced at
[20] Ameriquest? Did they hire another mortgage specialist
[21] to replace you? Do you know?
[22]   **A:** I have no idea.
[23]   **Q:** And your official termination date was April
[24] 7th, 2006.
[25]   **A:** Yes, ma'am.

Page 230

[1]   **Q:** Does that sound right to you?
[2]   **A:** That sounds correct.
[3]   **Q:** Okay. And we talked about this a little bit
[4] earlier but are you aware that within a month all of
[5] the retail operations in Ameriquest had been shut down?
[6]   **A:** Yes, ma'am.
[7]   **Q:** And do you understand that you would have also
[8] been terminated at that time?
[9]   **A:** Possibly. I don't know exactly what happened,
[10] how y'all handled positions or how — you're saying all
[11] employees were terminated? Is that what you're saying?
[12]   **Q:** All of the retail — all of the employees in
[13] the branch were terminated.
[14]   **A:** Okay.
[15]   **Q:** The retail branch. I don't want to make any
[16] misrepresentations to you, but —
[17]   **A:** I would assume that I probably would have
[18] been, along with them.
[19]   **Q:** Mr. Razi was terminated, for example.
[20]   **A:** Yes, ma'am.
[21]   **Q:** Were you aware of that?
[22]   **A:** That Mr. Razi was terminated?
[23]   **Q:** Yes.
[24]   **A:** No.
[25]   **Q:** I assume you haven't talked to him since you

Page 231

[1] left Ameriquest.
[2]   **A:** No, ma'am.
[3]   **Q:** You haven't tried to contact him?
[4]   **A:** No, ma'am.
[5]   **Q:** Other than what you have already told me, what
[6] makes you believe that you were terminated because of
[7] your race?
[8]   **A:** I think I have — the information I told you,
[9] that's pretty much it.
[10]   **Q:** And the same question with respect to your
[11] age. Other than what you have already told me, what
[12] makes you think that you were terminated because of
[13] your age?
[14]   **A:** Other than what I told you?
[15]   **Q:** Right.
[16]   **A:** It's just — I guess like I told you
[17] everything. It's just based on everything that
[18] happened, but I have already told you that.
[19]   **Q:** I don't want to go over all that again.
[20]   **A:** Yes.
[21]   **Q:** But you don't know who made — I think you
[22] just testified that you don't know who made the
[23] decision to terminate you; is that right?
[24]   **A:** Right.
[25]   **Q:** You assumed it was Mr. Razi and Mr. Stefan, or

Page 232

[1] do you not have an assumption about that one way or the
[2] other?
[3]   **A:** I'm assuming it was initiated from them.
[4] Normally your termination starts with the individual
[5] you come in direct contact with. Corporate had no idea
[6] what was going on because I was dealing with Paul Razi,
[7] so I'm assuming he initiated it.
[8]   **Q:** What about Mr. Stefan?
[9]   **A:** Of course.
[10]   **Q:** Do you think that Mr. Ortiz made the decision
[11] to terminate you?
[12]   **MS. JOHNSON:** Objection, calls for
[13] speculation.
[14]   **A:** I don't know, ma'am.
[15]   **Q:** (BY MS. SPROLE) Obviously he's the one who
[16] delivered the news to you, but do you believe that he
[17] was a decision maker?
[18]   **MS. JOHNSON:** Objection, calls for
[19] speculation.
[20]   **A:** You're asking me to speculate?
[21]   **Q:** (BY MS. SPROLE) I'm just asking you what you
[22] believe.
[23]   **MS. JOHNSON:** Objection, calls for
[24] speculation.
[25]   **A:** I don't know, ma'am.

Page 245

[1] of the investigation documents. Just for example, and
[2] this is just one, I reviewed a questionnaire that he
[3] gave in the investigation to individuals. It talks
[4] nothing about discrimination. Individuals that really,
[5] in my opinion, knew what Paul Razi was doing was never
[6] even investigated, never talked to.
[7]   Q: Like who?
[8]   A: Mark Bednar. Never talked to him. Lyle — I
[9] mean, Lidell Stevenson. Never talked to him. I was
[10] advised they may have talked to Anthony Haap. But it
[11] was several key individuals that was never even in the
[12] investigation. He talked to a lot of individuals that
[13] didn't know anything.
[14]   So things that were done were really done
[15] between me and Ortiz, other than things that he said
[16] around people. But I just felt — I mean, you can ask
[17] somebody that don't know anything, "Do you know
[18] anything?" "No." And I think it was just a slipshod
[19] investigation. It wasn't a true investigation.
[20]   Q: They talked to a number of the people in your
[21] branch, right?
[22]   A: Uh-huh. Yes, ma'am.
[23]   Q: Do you have any documents that you submitted
[24] to Tanya Tottress in which you made complaints of
[25] discrimination, e-mails, or any other type of

Page 246

[1] documents?
[2]   A: I don't think it was on e-mail. It was done
[3] on the phone. It was — I remember there was something
[4] that I always thought, "Why didn't I document that?"
[5] Most of our conversation in reference to what he did
[6] was done on the phone. As a matter of fact, I think
[7] all of them. Because her e-mails was keying on, "Let's
[8] get this guy interviewed," and "He should be
[9] interviewed." That was most of her e-mails.
[10]   Q: Exhibit 30 is a copy of your resume which was
[11] produced in this case.
[12]   A: Okay.
[13]   Q: Did you prepare this document?
[14]   A: Yes, ma'am.
[15]   Q: Did you prepare it while you were still
[16] working at Ameriquest?
[17]   A: I would say so because it says "present."
[18] There's no date on here. I think so, ma'am.
[19]   Q: Would you have submitted this resume to
[20] Countrywide when you applied for a position there?
[21]   A: Yes. I don't know if it had "present." It
[22] may have had the date, but this is — at that time this
[23] was my latest updated resume.
[24]   Q: And is everything that you state on this
[25] resume true?

Page 247

[1]   A: To the best of my knowledge. Dates and things
[2] like that may not be to the T.
[3]   Q: Your description of your employment at
[4] Ameriquest, are all of those statements true?
[5]   A: There's no one in Texas that's generated more
[6] revenue, yes, in my category. "Finished in top ten
[7] every month in sales" —
[8]   THE REPORTER: Sir, could you speak up a
[9] little bit? I'm having trouble hearing you.
[10]   THE WITNESS: Sure. I'm sorry.
[11]   Q: (BY MS. SPROLE) Or you can just read it to
[12] yourself —
[13]   A: Yeah, I was reading it.
[14]   Q: — and then she doesn't have to type it.
[15]   A: I'm just going down the line. On number two,
[16] "Finished number one in Texas for most generated
[17] revenue and volume." That was true in my category.
[18]   Q: What do you mean in your category?
[19]   A: Remember, I was — it goes back to I said the
[20] Plano branch was in a different category than all the
[21] other branches, which is much higher, so I
[22] automatically beat everybody out. But that was true.
[23] I was the number one selected. I was the top person in
[24] Texas.
[25]   Q: Sorry, I didn't understand what you said about

Page 248

[1] the next one higher or something.
[2]   A: In terms of the category, remember I said
[3] because we produce at a higher volume, we were
[4] categorized so that they had certain levels. They had
[5] what we consider smaller volume branches in one
[6] category and higher and so forth. For instance, a
[7] branch that was in California at the time was in the
[8] highest category because the volumes were bigger, if
[9] you understand what I'm saying.
[10]   So I finished in the top ten every month
[11] in sales, revenue and volume in the region. There may
[12] have been one or two months that I didn't, but for the
[13] most part, yeah, at least eight to nine or ten, I know
[14] for sure. "Finished number one in Texas for most
[15] generated revenue to win Hawaii" — there it is.
[16]   Q: Is that your trip to Hawaii that you talked
[17] about earlier?
[18]   A: Yes. "Promoted to branch manager in South
[19] Dallas." As you know, that's true. "Responsible for
[20] taking South Dallas from last to first in revenue and
[21] volume in" — actually, it might have been two months
[22] that I got more revenue. May have been two months.
[23]   Q: Is that when you first took over the branch?
[24]   A: Yeah. In two months we went from last to
[25] first.

**Min-U-Script®**   **United American**   **A044**



Page 281

[1]        CORRECTIONS AND SIGNATURE
[2] PAGE LINE     CORRECTION     REASON FOR CHANGE
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15] I, CLINTON CALHOUN III, have read the foregoing
[16] deposition and hereby affix my signature that same is
[17] true and correct, except as noted herein.
[18]
[19]              CLINTON CALHOUN III
[20]    SUBSCRIBED AND SWORN to before me this the
[21]    day of          , 2007.
[22]
[23]          NOTARY PUBLIC IN AND FOR THE
[24]          STATE OF TEXAS
[25] My commission expires:

Page 282

[1]              COUNTY OF DALLAS )
[2]              STATE OF TEXAS )
[3]     I, Vicki L. Peterson, RPR, certified
[4] shorthand reporter in and for the State of Texas, do
[5] hereby certify that the facts as stated by me in the
[6] caption hereto are true; that there came before me the
[7] aforementioned named person, who was by me duly sworn
[8] to testify the truth concerning the matters in
[9] controversy in this cause; and that the examination was
[10] reduced to writing by computer transcription under my
[11] supervision; that the deposition is a true record of
[12] the testimony given by the witness.
[13]    I further certify that I am neither
[14] attorney or counsel for, nor related to or employed by,
[15] any of the parties to the action in which this
[16] deposition is taken, and further that I am not a
[17] relative or employee of any attorney or counsel
[18] employed by the parties hereto, or financially
[19] interested in the action.
[20]    Given under my hand and seal of office on
[21] this, the 19th day of November, A.D., 2007.
[22]
[23]
[24]    Vicki L. Peterson, RPR, CSR
        Certification No. 5789
[25] Expiration Date 12-31-07

Page 283

Page 284

[1]              INDEX
[2] 1. Appearances ........................... 2
[3] 2. The Witness:  CLINTON CALHOUN III
[4]    Examination by Ms. Sproie ............. 3
[5]    Examination by Ms. Johnson ............ 276
[6] 3. Signature Page ........................ 281
[7] 4. Reporter's Certificate ............... 282
[8]
[9]
[10]              EXHIBITS
[11]
[12]              PAGE NO. FIRST
[13] EXHIBIT NO.:          REFERRED TO:
[14] 1.....                  ..... 11
     (Employment Application)
[15]
     2.....                  ..... 21
[16] (5/24/2004 E-mail exchange between Kathryn Foster
     and Travis Paules)
[17]
     3.....                  ..... 19
[18] (5/25/04 Letter to Clinton Calhoun from Ginger
     Crawford)
[19]
     4.....                  ..... 30
[20] (Benefits Enrollment Form)
[21] 5.....                  ..... 31
     (Job Description)
[22]
     6.....                  ..... 32
[23] (2/1/05 Personnel Action Notice)
[24] 7.....                  ..... 36
     (5/27/05-6/13/05 E-mail exchange between
[25] Tanya Tottress and Joe Garrett)

Apr-28-06    04:11pm    From-AMERIQUEST -                    7145585380              T-033   P.050/085   F-709
NOV-28-05    12:44pm    FROM-AMERIQUEST



## PERSONNEL ACTION NOTICE
### Initiated Change

Use the [TAB] key to move the cursor from field to field.
Using the [ENTER] key will add additional cells.

Effective Date / Associate ID
21 NOV 05  CC052888

## I. PERSONAL INFORMATION

First Name: Clinton III   Middle Name:   Last Name: CALHOUN   Former Last Name (Optional):

Employee: / Hire Date:   Home Address (Street, City, State, Zip):   County:

## II. TRANSACTION(S) REQUESTED

Check All That Apply

☐ Promotion   ☐ Leave of Absence   ☐ Salary Adjustment   ☒ Job Title Change   ☐ Personal Information Change
☐ Demotion   ☐ Return from Leave   ☐ Location Change   ☒ Transfer

## III. DEPARTMENT / LOCATION / MANAGER INFORMATION

| | Cost Center | Department Name | Loc Code | Location Name | Reports To | |
|---|---|---|---|---|---|---|
| Current: | 5766 | | | SOUTH DALLAS | | |
| New: | 4354 | PLANO, TX | | PLANO | | |

## IV. JOB INFORMATION

| | Effective Date | Job Title | Shift | Hours | FLSA Status | Direct Reports | Salary Grade | Job Code |
|---|---|---|---|---|---|---|---|---|
| Current: | 21 NOV 05 | BANK MANAGER | | | | | | |
| New: | 21 NOV 05 | MORTGAGE SPECIALIST | RT | | | | | |

Associate will have HR cost center management responsibilities? Yes ☐ No ☒   ☐ Cost Center Form Complete (HR Only)

## V. PAY DATA

| | Effective Date | Salary | % Incr | Incr Amount | Misc Earnings | Special Instructions |
|---|---|---|---|---|---|---|
| Previous 3 (Current): | | | | | | |
| Previous 2 (Current): | | | | | | |
| New: | 12/1/05 | 24,000 | | | | |

## VI. LEAVE OF ABSENCE

| Last Day Worked | Date of Leave | Date of Return | LOB | LOA Description |
|---|---|---|---|---|

## VII. ADDITIONAL REMARKS

ACCEPTED TO TRANSFER TO PLANO AS MORTGAGE SPECIALIST
DURING REALIGNMENT ( BRANCH CLOSURE OF SOUTH DALLAS )
BM DEMOTION TO MS

## VIII. APPROVALS

| | Signature | Print Name | Date |
|---|---|---|---|
| Associate: | Clinton Calhoun | Clinton Calhoun III | 21 NOV 05 |
| Manager: | | | |
| Second Level: | | | |
| Third Level: | | | |

## IX. PROCESSING

| HR Dept. Date Rec'd: | | Date Processed: | Processed By: |
|---|---|---|---|
| Payroll Dept. Date Rec'd: | | Date Processed: | |

Please contact Payroll to request changes to this form.

DEPOSITION
EXHIBIT
12

AMQ 1367

A046

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CLINTON CALHOUN, III, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:07-CV-0031-O |
| | § | |
| AMERIQUEST MORTGAGE COMPANY, | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF AMIR PAUL RAZI IN SUPPORT OF DEFENDANT AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT

BEFORE ME, the undersigned authority, on this day personally appeared Amir Paul Razi, who, being by me duly sworn, stated as follows:

1.      My name is Amir Paul Razi. I am over 21 years old, have never been convicted of any crime, and I am fully competent to make this Affidavit. I have personal knowledge of the facts that are set forth in this Affidavit and they are true and correct.

2.      I am currently self-employed. I was previously employed by Ameriquest Mortgage Company. I worked for Ameriquest from December 2002 until May 2006, when I was laid off. The last position I held was as the Area Manager for branches including branches in Dallas.

3.      I am familiar with the allegations made by Clinton Calhoun in the above lawsuit. I was the Area Manager over the Plano branch when Mr. Calhoun worked there.

4.      I was not involved in the decision to close the South Dallas branch. I do know, however, that the South Dallas branch (branch number 5766) was closed. I also know that the East Dallas branch remained open and that Daniel Munoz was the branch manager of the East

Dallas branch (branch 7319). Mr. Munoz did not become the branch manager of the South Dallas branch and he did not replace Mr. Calhoun. He was the branch manager of the East Dallas branch until my layoff in May 2006. The Ameriquest employees from the East Dallas branch moved into the physical space formerly occupied by employees in the South Dallas branch. They continued to be employees of the East Dallas branch (branch 7319), however. No one moved into the space formerly occupied by the East Dallas branch.

5.      I interviewed Mr. Calhoun for the position of branch manager of the branch located at the Galleria in Dallas. I did not interview Mr. Calhoun alone. I was part of a 3 member panel that interviewed Mr. Calhoun simultaneously. The other members of the panel included a Human Resources representative (who was present via telephone) and someone from the Organizational Development (who was with me in the same room when we interviewed Mr. Calhoun and the other candidates).

6.      Mr. Calhoun did not do well in his branch manager interview and we therefore chose Ron Comer as the branch manager for that branch. Mr. Calhoun was the only candidate who was late to the interview. Also, Mr. Calhoun was not specific in his answers to the questions that were asked of him and some of his answers indicated that he was lacking fundamental management skills and training that would be essential as a branch manager. Overall, Mr. Calhoun did not demonstrate the level of competency and ability that Ron Comer did. All three panel members were in full agreement that Mr. Comer was the best candidate. In fact, Mr. Comer had previously been a branch manager and we chose him because he demonstrated superior experience, expertise, and performed the best in his interview.

7.      I did not make this decision based on Mr. Calhoun's age or race. In fact, I did not know that Mr. Calhoun was over 40 years old when I made the decision.

AFFIDAVIT OF AMIR PAUL RAZI IN SUPPORT OF DEFENDANT
AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT                                    Page 2
126464-1

A048

8.    I also interviewed a white, under 40 year old man named Karl Kuhn for the Dallas/Galleria branch manager position. I did not choose him for the position, either.

9.    Mr. Calhoun did not follow up with me in-person to receive feedback on the reason I did not choose him to be the branch manager.

10.    Later, a branch manager position became available in Plano. Mr. Calhoun was a mortgage specialist in the Plano branch. When he expressed an interest in applying for the position, I informed him that the Regional Manager, Mike Stefan, and I had a practice of not promoting from within the same branch. In other words, Mr. Stefan and I did not promote mortgage specialists to branch manager from the same branch. We instead chose individuals for branch manager from a branch other than the one with the available position to avoid former peers supervising each other.

11.    In accordance with this practice, Mr. Calhoun was not eligible for the Plano branch manager position. Mr. Calhoun's ineligibility had nothing to do with his race or his age.

12.    I chose Ryan Perry, a white male under 40, for the Plano branch manager position. Mr. Perry had previously been a mortgage specialist in The Woodlands branch in Houston. He had not been working in the Plano branch.

13.    Shortly thereafter, in March 2006, two mortgage specialists reported to me that they believed that Mr. Calhoun was "brokering" loans. "Brokering" loans involves referring a potential loan to a different mortgage lender (and then obtaining a payment from that mortgage lender for the referral). It was strictly prohibited by Ameriquest policy. Removing confidential customer loan information is a sign of brokering.

14.    These mortgage specialists advised me that Mr. Calhoun had put a loan application or other customer information in his duffle bag. I therefore asked to look in Mr.

AFFIDAVIT OF AMIR PAUL RAZI IN SUPPORT OF DEFENDANT
AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT                Page 3
126464-1

A049

Calhoun's duffle bag. A human resources representative named Michael Ortiz was on the phone with me, as was Mr. Stefan when I asked to look in Mr. Calhoun's duffle bag. Mr. Calhoun opened his bag and in it was a customer's credit report and loan application.

15.    Customer loan applications and credit reports usually contain social security numbers and salary information, as do loan proposals.

16.    On April 7, 2006, Ameriquest terminated Mr. Calhoun's employment for violation of company policy, based on his removal of customer information from Ameriquest premises. No one replaced Calhoun after the termination of his employment in April 2007.

17.    I was involved in the decision to terminate Mr. Calhoun's employment based on his violation of company policy, as were Michael Ortiz and Mike Stefan. I did not base my decision on Mr. Calhoun's race or his age. Again, I did not know that he was over 40 years old when I made this decision.

18.    Tanya Tottress was not involved in the termination decision, nor was she involved in the decision regarding Mr. Calhoun's desire to become a branch manager. I never spoke with Tanya Tottress about Mr. Calhoun.

19.    I have learned since Mr. Calhoun filed his lawsuit that he claims that he complained of discrimination to Tanya Tottress. I was not aware that Mr. Calhoun had made any complaints of discrimination to Tanya Tottress or to any other Ameriquest employee at the time that I made the decisions regarding the branch manager promotions and the termination decision.

AFFIDAVIT OF AMIR PAUL RAZI IN SUPPORT OF DEFENDANT
AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT                                          Page 4
126464-1

A050

Amir Paul Razi

STATE OF TEXAS              §
                           §
COUNTY OF Harris           §
                           §

Before me a notary public on this day personally appeared Amir Paul Razi, who is personally known to me and is the person whose name is shown on the foregoing Affidavit and further acknowledged to me that he had signed the Affidavit and that all of the statements in the Affidavit are true and correct.

Given under my hand and seal of office this \_19\_ day of December, 2007.



MARIA I. PALOMO
MY COMMISSION EXPIRES
February 5, 2011

Notary Public

(SEAL)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CLINTON CALHOUN, III, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:07-CV-0031-O |
| | § | |
| AMERIQUEST MORTGAGE COMPANY, | § | |
| | § | |
| Defendant. | § | |

### AFFIDAVIT OF MICHAEL ORTIZ IN SUPPORT OF DEFENDANT
### AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT

BEFORE ME, the undersigned authority, on this day personally appeared Michael Ortiz, who, being by me duly sworn, stated as follows:

1.      My name is Michael Ortiz. I am more than 21 years old, have never been convicted of any crime, and I am fully competent to make this Affidavit. I have personal knowledge of the facts that are set forth in this Affidavit and they are true and correct.

2.      I am currently employed by The Marketing Store as a Senior Manager, Human Resources. I was employed by Ameriquest Mortgage Company from 2005 until March 2007 as the Senior Human Resources Business Partner. I was laid off from Ameriquest in March 2007.

3.      While employed at Ameriquest, my duties included providing human resources support for Ameriquest retail offices, including those offices managed by Mike Stefan, the Regional Manager for the branch in which Clinton Calhoun worked.

4.      My first involvement with Mr. Calhoun occurred when his area manager, Amir Paul Razi, had been told that Mr. Calhoun had taken home a customer loan application or other customer document. Mr. Razi consulted with me, and I advised him that he should ask Mr.

Calhoun to allow him to look in his duffle bag.  With me on the telephone, Mr. Razi requested

Mr. Calhoun to come into his office and to allow him to look in his duffle bag.  I was listening

on the telephone when Mr. Razi brought Mr. Calhoun into his office.  Mr. Calhoun opened his

duffle bag.  Underneath some gym clothes was a customer loan document.  Mr. Calhoun

admitted that he had taken this document home.

     5.     It was strictly prohibited by Ameriquest policy for an employee to take home

customer information.  Mr. Calhoun admitted that he had done this.  I am aware that Ameriquest

terminated others for this reason.

     6.     I made the decision to suspend Calhoun after the duffle bag search.

     7.     Within a few minutes of the meeting in Mr. Razi's office, Mr. Calhoun called me.

He told me that Mr. Razi did not like him.  He did not complain to me of discrimination.

     8.     Because of the situation involving the customer information in the gym bag, I

decided that I should investigate Mr. Calhoun's claims of Mr. Razi not liking him before making

a final decision regarding whether Mr. Calhoun should be terminated.  We therefore suspended

Mr. Calhoun while I conducted my investigation.

     9.     I interviewed approximately six employees in the Plano branch and asked them

questions regarding whether Mr. Razi treated Mr. Calhoun fairly.  I did not ask the employees

whether Mr. Razi discriminated against Mr. Calhoun because Mr. Calhoun had not complained

of discrimination.  I determined that Mr. Razi had treated Mr. Calhoun fairly.

     10.     On April 7, 2006, Ameriquest terminated Calhoun's employment for violation of

company policy, based on his removal from Ameriquest premises of customer information.  No

one replaced Calhoun after the termination of his employment in April 2007.  Paul Razi, Mike

Stefan, and I were the people who determined that Mr. Calhoun's employment should be

terminated. Tanya Tottress was not involved in this decision. I was not aware that Mr. Calhoun was over the age of 40 when I made the decision to terminate his employment.

11.     At the time I made the decision to terminate Mr. Calhoun's employment, I was not aware that Mr. Calhoun had allegedly complained to Ms. Tottress about discrimination. Mr. Calhoun told me that he had complained to Ms. Tottress, but did not tell me that he had complained about discrimination. I did not discuss any discrimination complaints by Mr. Calhoun with Mr. Razi or Mr. Stefan because I was not aware that they had allegedly occurred.

12.     As a human resources manager, I was involved in the nationwide reduction in force that occurred at Ameriquest in November 2005. In connection with this nationwide reduction, the South Dallas branch (branch number 5766) was closed. The East Dallas branch (branch number 7319) remained open, although the Ameriquest employees who had been working in the East Dallas branch physically moved into the leased space in the former South Dallas branch. These employees were still assigned to the East Dallas branch (number 7319). The South Dallas branch 5766 did not continue in operation after November 17, 2005. This branch was within my area of responsibility and I therefore have personal knowledge that the branch did not continue operating. Branch 7319, however, did continue originating loans.

13.     Branch manager Daniel Munoz was the branch manager for the East Dallas branch 7319. He did not replace Calhoun as branch manager of the South Dallas branch. Instead, Munoz continued working for Ameriquest as the branch manager of branch 7319 until his termination in May 2006.

14.     I am familiar with the practice of not promoting from within the same branch. I was aware that Mr. Stefan and Mr. Razi had a practice of not promoting a mortgage specialist to branch manager from within the same branch.

_____
Michael Ortiz

STATE OF _____        §
                          §
COUNTY OF _____       §

Before me a notary public on this day personally appeared Michael Ortiz, who is personally known to me and is the person whose name is shown on the foregoing Affidavit and further acknowledged to me that he had signed the Affidavit and that all of the statements in the Affidavit are true and correct.

Given under my hand and seal of office this _____ day of December, 2007.

_____
Notary Public

(SEAL)

AFFIDAVIT OF MICHAEL ORTIZ IN SUPPORT OF DEFENDANT
AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT          Page 4
126465-1

A055

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CLINTON CALHOUN, III, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:07-CV-0031-O |
| | § | |
| AMERIQUEST MORTGAGE COMPANY, | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF LORI GRIGG IN SUPPORT OF DEFENDANT
## AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT

BEFORE ME, the undersigned authority, on this day personally appeared Lori Grigg, who, being by me duly sworn, stated as follows:

1.  My name is Lori Grigg. I am over 21 years old, have never been convicted of any crime, and I am fully competent to make this Affidavit. I have personal knowledge of the facts that are set forth in this Affidavit and they are true and correct.

2.  I am employed as Senior Vice President of Human Resources for ACC Capital Holdings Corporation. My job duties and responsibilities generally include, among other things, overseeing the Human Resources Department, personnel matters, compensation, and managing employment related claims against Ameriquest Mortgage Company ("Ameriquest"). Except where stated on information and belief, the following facts are true of my own personal knowledge and, if called upon to testify to the truth thereof, I could and would competently do so under oath.

3.      In my capacity as a Senior Vice President of Human Resources, I have custody, supervision and/or control of Ameriquest's employment records, including personnel files. I have reviewed Ameriquest's files concerning this matter and I am familiar with their content. Based thereon, I make the following Affidavit.

4.      The records and documents referred to in this Affidavit constitute writings taken or made in the regular or ordinary course of business of Ameriquest at or near the time of the act, condition or event to which same relate. I further state from my own knowledge that any such record or document was prepared in the ordinary course of business of Ameriquest by a person employed by Ameriquest who has personal knowledge of the event being recorded and who has a business duty to so record such event accurately.

5.      Ameriquest Mortgage Company is a sub-prime mortgage lender, which is currently winding down its business operations and no longer has any employees. It is not originating any loans.

6.      I have reviewed the personnel records for Clinton Calhoun, a former Ameriquest employee. Mr. Calhoun worked for Ameriquest as a Mortgage Specialist and Branch Manager from June 2004 to April 7, 2006 (less than two years), at which time he was terminated for admittedly taking home confidential customer information.

7.      In November 2005, Ameriquest conducted a nationwide reduction in force in which it closed 37 branches and laid off 1178 employees, including Branch Managers and Mortgage Specialists. I was part of the decision-making process as to which branches were selected for closure. Each decision was based on a variety of business reasons, including, but not limited to, the financial performance of a branch, its location relative to other branches, the lease terms for the branch, and/or the physical properties of the branch (e.g., the size of the branch

and/or whether it had recently been remodeled [Ameriquest was in the process of remodeling its branches at the time of the reduction in force]). Ultimately, Mary Jo Shelton, Executive Vice President of Sales, (who is over 40 years old) decided which branches to close in reliance upon my and other employees' recommendations based on these criteria. No decision was made based on the race or age of a Branch Manager. Non-African-American employees under the age of 40 were affected by the reduction in force.

8.      Ameriquest's branches were organized into "Areas" and "Regions" and assigned a specific branch number. At the time of the November 2005 reduction in force, seven branches existed in Region 6, Area 26 (which is the Area within which Mr. Calhoun was employed): South Dallas (5766), East Dallas (7319), Dallas (5565), Arlington (7318), Bedford (5661), Richardson (7393), and Plano (7354). Based on the criteria discussed above, Ameriquest decided to close the Arlington, Bedford, and Richardson branches (which were all managed by non-African-American employees under the age of 40). Because of its location relative to the Dallas and East Dallas branches and because it had recently been remodeled (whereas the other branches in the Area had not), Ameriquest further decided to close the South Dallas branch and lay off its employees and move its top performing branch in the Area, the East Dallas branch into the South Dallas location.

9.      As part of Ameriquest's decision to close the South Dallas branch, Ameriquest laid off the employees in the South Dallas branch. At or around this time, the employees of branch number 7319 in East Dallas were physically moved into the South Dallas branch. No employees continued physically working in the former East Dallas branch after this date.

10.     Although the East Dallas branch employees physically moved into the leased space in the former South Dallas branch, they continued to operate as Branch 7319. By contrast,

AFFIDAVIT OF LORI GRIGG IN SUPPORT OF DEFENDANT
AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT                    Page 3
126462-1

A058

branch 5766 did not continue in operation after November 17, 2005, as evidenced by the fact that it did not originate loans. I have reviewed the records of Ameriquest, and no loans were originated in 2006 by branch 5766. Additionally, the only loan originated in December 2005 was loan number 137785804 and it was funded out of Branch 7319. Branch 7319, however, did continue originating loans until the branch closed in May 2006.

11.    Daniel Munoz was the Branch Manager of Branch 7319 and remained so after November 17, 2005 until his termination in May 2006. He did not replace Mr. Calhoun as Branch Manager of the South Dallas branch (Branch 5766). While Munoz physically moved into the leased space in the former South Dallas branch, he continued to manage Branch 7319's employees, not Branch 5766.

12.    Rather than lay Mr. Calhoun off in connection with the South Dallas branch closure, Ameriquest gave him the option of returning to the position of Mortgage Specialist at his former branch in Plano. Based on my review of documents maintained by Ameriquest, Mr. Calhoun accepted this position change and took a position as a Mortgage Specialist in the Plano branch, effective immediately. On the personnel action notice effectuating the change, Mr. Calhoun acknowledged that his position elimination was the result of a reduction in force.

13.    It is my understanding that Mike Stefan, the Regional Manager for the branch in which Mr. Calhoun worked, had a practice of not promoting mortgage specialists to branch manager from within the same branch because he had concerns regarding employee morale and/or whether an employee could effectively supervise a former colleague. Although this practice is not included in Ameriquest's written policies or procedures, it is consistent with the company's policies.

14.   It is my understanding that Mr. Calhoun claims that someone named "Ortega" was promoted from within the same branch within Mr. Stefan's region in 2005 or 2006. According to Ameriquest records, no employee who worked in Region 6 under Mr. Stefan was promoted to Branch Manager within the same branch, let alone an individual named Ortega.

15.   As a mortgage lender, Ameriquest relied on confidential and proprietary borrower information that it received, including "leads," or contact information for prospective borrowers, to maintain its competitive edge.  This information was highly sensitive and was so valuable to Ameriquest and its viability that Ameriquest maintained strict policies prohibiting its employees from "brokering," or giving loans or other borrower information to a mortgage broker or other third party (for which employees often received kickbacks or other forms of compensation).  In its Associate Handbook (Exhibit A), Ameriquest specifically stated that the unauthorized removal from Ameriquest premises of property that belongs to customers, fellow workers, or Ameriquest may be cause for immediate termination.  This policy is reinforced in Ameriquest's Employee Proprietary Information and Inventions Agreement, which every employee was required to sign as a condition of employment.  As such, removing confidential customer information from Ameriquest property was prohibited by Ameriquest's written policy and grounds for termination.  A true and correct copy of Ameriquest's written policies are attached hereto as Exhibit A.

16.   On March 14, 2006, Ameriquest suspended Mr. Calhoun pending approval for his termination for admittedly removing confidential customer information from Ameriquest's premises.

17.   After he was suspended, on March 14, 2006, Mr. Calhoun contacted Human Resources Representative Tanya Tottress and reported that he had heard rumors that Area

Manager Paul Razi did not like him and wanted him to leave the company. Mr. Calhoun also reported that Mr. Razi avoided him and failed to provide him feedback after he interviewed for a Branch Manager position. Mr. Calhoun, however, refused to identify the source of the alleged rumors or provide any other information to support his claims against Mr. Razi. A true and correct copy of the notes prepared by Ms. Tottress regarding this conversation are attached hereto as Exhibit B.

18.     Ms. Tottress's March 14, 2006 notes do not mention any complaints by Mr. Calhoun of any discrimination. Similarly, they do not mention any prior complaints made by Mr. Calhoun to Ms. Tottress.

19.     Ameriquest investigated Mr. Calhoun's claims against Mr. Razi and was unable to substantiate his claims. Upon the conclusion of the investigation, on April 7, 2006, Ameriquest terminated Mr. Calhoun's employment for violation of company policy, based on his admitted removal of confidential customer information from Ameriquest's premises. Ameriquest did not hire anyone to replace Mr. Calhoun.

20.     Approximately three weeks after Mr. Calhoun's termination, on May 4, 2006, Ameriquest shut down all of its retail operations nationwide, closed all of its retail branch offices, including the Plano branch, and laid off all retail employees. If Mr. Calhoun had still been employed by Ameriquest at this time, he would have been laid off as well.

_____

Lori Grigg


STATE OF CALIFORNIA          §
                             §
COUNTY OF Orange             §


    Before me a notary public on this day personally appeared Lori Grigg, who is personally known to me and is the person whose name is shown on the foregoing Affidavit and further acknowledged to me that he had signed the Affidavit and that all of the statements in the Affidavit are true and correct.

    Given under my hand and seal of office this _2nd_ day of January 2008.


JAY BURTON
COMM. #1553953
NOTARY PUBLIC • CALIFORNIA
ORANGE COUNTY
Comm. Exp. FEB. 19, 2009

_____
Notary Public


(SEAL)


AFFIDAVIT OF LORI GRIGG IN SUPPORT OF DEFENDANT
AMERIQUEST MORTGAGE COMPANY'S MOTION FOR SUMMARY JUDGMENT          Page 7
126462-1


A062

# Ameriquest Mortgage Company
# Associate Handbook

Ameriquest Mortgage Company Proprietary and Confidential



AMQ 1201

**We Thrive on Achievement**

Thriving on achievement means:

- Establishing and achieving bold, challenging and ambitious goals. "If" is not part of our vocabulary.

- Making extraordinary efforts required to accomplish our goals.

- Producing stellar financial results.

# Equal Employment Opportunity

We are committed to providing an environment that is free of discrimination and harassment on the basis of an associate's race, color, religion, gender, age, marital status, national origin, national ancestry, sexual orientation, veteran status, disability or any other legally protected classification. Reasonable accommodation will be considered for qualified disabled individuals. This policy applies to all departments, branches and facilities of Ameriquest Mortgage Company.

Ameriquest holds every associate responsible for ensuring that this policy is followed. If you suspect an associate or other person with whom Ameriquest conducts business of violating the Equal Employment Opportunity Policy, you must report the violation to a manager and/or Human Resources immediately.

Any associate found to be in violation of this non-discriminatory policy is subject to disciplinary action including, but not limited to, termination.

# Employment-at-Will

Employment with Ameriquest Mortgage Company is at the mutual consent of both you and Ameriquest. This means that either you or Ameriquest may terminate the employment relationship at any time for any reason not expressly prohibited by law. This is called "employment-at-will."

The employment-at-will policy applies to all associates of Ameriquest and its parent, affiliated and successor companies, unless it is specifically modified by an express written contract between an associate and the Chief Executive Officer.

AMQ 1208

**A064**

**Real Estate Settlement Procedures Act**

The Real Estate Settlement Procedures Act (RESPA), implemented through Regulation X, serves two functions:

- Providing additional disclosures to applicants for the purposes of comparison shopping for rates
- Prohibiting settlement service providers from paying or receiving kickbacks or unearned fees in return for the referral of business

**Home Mortgage Disclosure Act/Loan Application Register**

The federal Home Mortgage Disclosure Act requires lenders to maintain statistics of loans made. These statistics are published and aid in the prevention of unintentional redlining or disparate treatment of protected classes.

**Gramm-Leach-Bliley Act**

The Gramm-Leach-Bliley Act requires financial institutions to disclose their information-sharing practices to consumers and customers, and to protect their nonpublic personal information.

Ameriquest's Privacy Policy is available on My Ameriquest.

1. Go to **My Ameriquest** and click **Forms > Company Forms.**
2. On the Company Forms page, go to the **Regulatory Documents** section.
3. Click **Ameriquest Privacy Policy** to download the document.
- ❶ **FYI:** Refer to the Confidentiality and Computer and Electronic Systems Standards of Conduct sections of this document for information about your responsibility to protect customer information.

## Business Ethics and Professional Conduct

As an Ameriquest Mortgage Company associate, it is important that you conduct business with your fellow workers, customers and suppliers with honesty and integrity. You are also required to comply with all applicable laws and regulations.

The following examples of inappropriate conduct are provided as a guideline, and such conduct may be cause for disciplinary action up to and including termination. Please understand that conduct that is not specifically stated below, but that adversely affects or is detrimental to the interests of Ameriquest, other associates or customers, may result in disciplinary action, up to and including termination.

Inappropriate conduct includes, but is not limited to:

- Insubordination to a supervisor or use of offensive language or conduct.
- Theft or unauthorized removal from Ameriquest premises of property that belongs to customers, fellow workers or Ameriquest.
- Altering, falsifying or making material omissions to any Ameriquest record, including time sheets, employment applications, expense reports or other business-related documents (such as loan applications and appraisals).
- Misusing, damaging or destroying property belonging to Ameriquest, other associates or customers.
- Possessing dangerous or unauthorized materials, such as acidic substances, explosives or firearms.
- Violation of Ameriquest policies and standards.

AMQ 1211

A065

- Participation in, or conviction of, a crime that poses a threat to the safety of other associates, customers or Ameriquest property, and/or indicates an inability to perform effectively on the job.

- Failure to cooperate in a regulatory, criminal or company-sponsored investigation that affects Ameriquest.

- Making false or misleading statements about Ameriquest and/or other associates.

- Brokering loans without express management approval. Brokering is defined as providing loan files or other information about a borrower to any mortgage broker, company or other third party.

- Disclosing confidential information about Ameriquest and/or its customers.

## Responding to Inquiries from the Media

Ameriquest Mortgage Company associates may be contacted for interviews or comments by the news media. To ensure accuracy of statements made about company events or policy, all media requests are handled by Ameriquest's public relations firm, Gladstone International.

**To respond to inquiries from the media:**

1. Inform the media representative that Gladstone International handles all media inquiries for Ameriquest.

2. Ask the representative for his/her name and contact information.

3. Provide the representative with the following contact information for Gladstone International:

   - **24/7 Hotline (949) 791-5008**

4. Immediately call Gladstone International at the above number to notify them of the contact and the representative's name and contact information.

5. Contact Julie Heth, at x12202 in the corporate office, regarding your contact with the news media.

**Press Releases**

Only Ameriquest's President and executive management responsible for media and public relations policy are authorized to make contact with the news media for the purpose of releasing company information.

## Gifts and Payments

In order to avoid any conflicts of interest, Ameriquest Mortgage Company has a policy regarding the receipt of gifts and payments.

It is important that you not become involved with any act that could be interpreted as seeking, receiving or dispensing a bribe, kickback or questionable payment.

Of course, there are certain periods during the year (such as holidays, birthdays and retirements) when you may accept minor gifts. However, you must receive management approval prior to accepting any gift. An item having an estimated value in excess of $100 must be reported to Human Resources.

## Reporting Illegal, Unethical or Improper Activities

Ameriquest Mortgage Company associates must be sensitive to situations that could result in illegal, unethical or improper actions.

- The standard procedure for reporting potential or actual violations is to contact your immediate supervisor, the department head or Human Resources.

- A special procedure is provided for complaints concerning accounting, compliance, loan fraud and internal control matters. Filing a report for this special category of complaints (collectively

referred to as "covered matters") is described in the **Administrative Guide > Administrative Services and Resources > Complaint Process**. The complete Employee Policy for Complaints of Accounting, Compliance, Loan Fraud and Internal Control Matters is also available on **My Ameriquest > Forms > Enterprise Risk Management** along with the Complaint Report form. These types of complaints are submitted to the Chief Risk Officer or the General Counsel and may be reported anonymously. Complaints that do not qualify as "covered matters" are submitted to the appropriate manager or Human Resources representative.

When reports or complaints are received, they are handled as expeditiously and confidentially as possible.

> ❶ **Important:** Any associate may submit a good faith complaint about a violation or potential violation without fear of dismissal, discrimination or other retaliation. However, filing false reports is not tolerated, and anyone filing such reports will be subject to appropriate disciplinary action up to and including termination of employment. For complete details about the protections provided, refer to the Employee Policy for Complaints of Accounting, Compliance, Loan Fraud and Internal Control Matters.

## Associate Proprietary Information and Inventions Agreement

At the time of hire as an Ameriquest Mortgage Company employee, you are required to read and sign the Associate Proprietary Information and Inventions Agreement as a condition of employment.

By signing, you agree that you have been entrusted with protection of Ameriquest's proprietary information and will refrain from its unauthorized disclosure.

If you would like a copy of this document, please contact Human Resources.

## Smoking in the Workplace

Ameriquest Mortgage Company is committed to providing a safe and healthy working environment for all associates. Therefore, smoking is not permitted in offices or work areas at any time.

Associates who wish to smoke during work hours may do so outside the work premises during approved break and meal periods.

## Confidentiality

As an associate of Ameriquest Mortgage Company, you are exposed to confidential information about Ameriquest, our customers and other associates on a daily basis.

Disclosure of such information to any outside party in a business or social context can seriously impact you or Ameriquest, and may jeopardize the relationship of trust we enjoy with our customers.

Associates should follow these guidelines to help protect confidential information:

- Shred all documents that contain customer information, such as screen prints, handwritten notes and copies of loan documents not needed in the loan file.

  > ❶ **FYI:** Remember to follow appropriate record retention policies.

- Keep confidential information in your immediate work area secure, and notify management if confidential information in the office appears to be unsecured.

- Be aware of unknown persons in your work area—remove confidential information from the view of non-Ameriquest associates and Ameriquest associates who have no business need to view the information.

- Secure confidential information in a locked drawer or cabinet at the end of the day.

AMQ 1213        A067

- Associate records, the resumes of potential associates, and customer information must be retained in locked files and never left on desks.
- Electronic files of vital information, including phone lists, must be password-protected and never physically posted.
- Never share customer information with anyone who is not an Ameriquest associate.
- Refer to the Standards of Conduct topic in the Computer and Electronic Systems section of this guide for additional guidelines.

If your employment with Ameriquest ends for any reason, you may not disclose any confidential information. Doing so may subject you to civil and/or criminal liability. When your employment with Ameriquest is over, you must return all property belonging to Ameriquest.

For additional information, please refer to the Associate Proprietary Information and Inventions Agreement.

## Company Assets

All Ameriquest Mortgage Company associates are responsible for respecting and safeguarding Ameriquest assets used for daily business operations. These assets include, but are not limited to, furniture, operating equipment, supplies, computer hardware, software and data (including customer information).

If you become aware of the misuse of any asset, please report it immediately to a manager.

Any associate found to be in violation of this policy will receive disciplinary action, up to and including termination.

## Telephone Use

### Company Phones

Ameriquest Mortgage Company telephones are to be used for business purposes.

- Personal calls may be made on a limited basis within reason.
- Long distance and toll charges may not be charged to Ameriquest unless they are incurred while conducting Ameriquest business.

Your department or branch has telephone standards of etiquette appropriate for your business needs. Talk to your manager about your branch or department's expectations.

Ameriquest's standard telephone greeting is, "Thank you for calling Ameriquest Mortgage, this is [your name]." If your branch or department does not have a defined telephone greeting, use the Ameriquest standard greeting when answering the phone.

### Personal Cellular Phones

While at work, associates are expected to exercise the same discretion in using personal cellular phones as they do for company phones. Excessive personal calls during the workday interfere with associate productivity and are distracting to others. Associates should make every effort to limit personal calls to their break times, when possible, and to ensure that friends and family members are aware of the Company's policy.

- **Important:** The Company is not liable for the loss of personal cellular phones brought into the workplace.

**AMQ 1214**

3/14/06
3:31 pm

Clinton Calhoun #052888 (Plano Branch)

Re: Duffle Bag Search

-According to Clinton, he walked into the branch, Paul Razi - AM called him in the office and requested to see inside of his duffle bag.

-When Clinton walked into the office Paul was present and Mike Stefan – RM for Region 4 was the speakerphone conference in. Paul mentions that the instruction to look through Clinton's bag was given to him by HR corporate.

-Before Paul looked into Clinton has admitted that he had a loan application that he printed on his way out of the office the previous evening of 3/13/06. He also admitted that he had no reason to put the information in his bag and it was a stupid mistake. Clinton claims that he never usually takes any applications home with him. He also mentions that he never looked at the form after he left the branch and we could contact the customer to verify this information.

-Clinton told me that he asked Paul if he had anything personal against him. According to Clinton Paul did not respond. Clinton felt he needed to ask the question due to several rumors told to him that Paul does not like him and he wants him to leave the company. When I asked Clinton who told him the rumors he stated, "I don't want to get anyone in trouble, so I rather not say. Also, I was trying to refuse that it was true since I do not know Paul."

-Clinton went on to discuss how he has been waiting for weeks to have feedback from Paul on his potential to become a BM again. He feels that Paul constantly avoids having discussion with him. For example, Clinton claims that every time Paul comes for branch visits he avoids him.

-Clinton started vacation on Wednesday, 3/15/06 – Monday, 3/20/06.

-I told him to touch base with me when he returns.

Notes by: Tanya Tottress – HR Rep



DEPOSITION EXHIBIT 26
PENGAD 800-631-6989

AMQ 1581

A069

EEOC Form 161 (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  RECEIVED  OCT 1 1 2006

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| Clinton Calhoun<br>5159 Finnhorse Drive<br>Grand Prairie, TX 75052 | From:  Dallas District Office - 450<br>207 S. Houston St.<br>3rd Floor<br>Dallas, TX 75202 |

| | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* | | |
|---|---|---|---|
| EEOC Charge No. | EEOC Representative | | Telephone No. |
| 450-2006-02854 | Olga Sepulveda,<br>Investigator | | (214) 253-2773 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [ ] | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| [ ] | While reasonable efforts were made to locate you, we were not able to do so. |
| [ ] | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| [X] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (*briefly state*) |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_____               10/10/06
Michael C. Fetzer,                            *(Date Mailed)*
Director

Enclosures(s)

cc:   Nicole Arvizu, Employee Relations
      Human Resources Representative
      AMERIQUEST MORTGAGE CO.
      1100 Town and Country Road
      Orange, California 92868

DEPOSITION
EXHIBIT
32
PENGAD 800-631-6989

0036

A070